Eugene Wallace PERRY, Petitioner,

v.

Larry NORRIS, Director, Arkansas Department of Correction, Respondent.

No. PB–C–83–275.

United States District Court, E.D. Arkansas, Pine Bluff Division.

March 3, 1995.

**1504**

Eugene Wallace Perry, Tucker, AR, pro se.

John Wesley Hall, Jr., Walter Craig Lambert, Little Rock, AR, Charles Daniels, Albuquerque, NM, Sam T. Heuer, Little Rock, AR, for Eugene Wallace Perry.

Jack Ward Gillean, Office of Governor, State of Ark., Little Rock, AR, for A.L. Lockhart.

Thomas Jeffrey Vining, Pamela Rumpz, Atty. General's Office, Jack Ward Gillean, Office of Governor, State of Ark., Little Rock, AR, for Roger Endell.

Rosalie B. Shields, New York City, Thomas M. Lahiff, Jr., New York City, Peter Drake Mann, Little Rock, AR, for Marion Albert Pruett.

### MEMORANDUM OPINION

EISELE, District Judge.

On January 17, 1990, Mr. Eugene Wallace Perry filed a "Supplemental Petition for Writ of Habeas Corpus" on the ground that he was "awaiting execution, pursuant to a conviction obtained in violation of the 14th Amendment to the U.S. Constitution." He raises two claims for relief:

A. Newly discovered evidence that Marion Pruett, and not petitioner, committed the crime, entitles petitioner to a new trial as a matter of due process.

B. The trial court's refusal to permit the issuance of subpoenas to compel the attendance of four out-of-state alibi witnesses violated Perry's 6th Amendment right to compulsory process.

The latter issue was one of many that was dealt with by the Court as a result of petitioner's first habeas corpus petition which was denied by the Court in 1986.

The original state court trial occurred in July of 1981. This Court on July 11, 1986, reviewed from the bench the evidence ad-

duced during the state trial. It will be repeated here as background for a discussion of the issues raised in the 1990 Supplemental Petition. That review commences at page 159 of Volume II of the transcript of the habeas proceeding (which transcript was filed October 17, 1986) and concludes at page 170, as follows:

Sometime in the late afternoon of September 10, 1980, someone robbed the Staton Jewelry Store in Van Buren, Arkansas, of an estimated $100,000 worth of rings, watches and other jewelry, and shot to death the owner of the store, Kenneth Staton, and his daughter, Suzanne Ware, who also worked in the store. A clerk at a neighboring store in the same Cloverleaf shopping Center in Van Buren discovered two bound and gagged bodies in the rear part of the store at around 6:00 p.m. Autopsies revealed that both Ware and her father had been shot twice in the head from close range.

Key witnesses for the state placed the petitioner, Eugene Wallace Perry, in and around the Staton Jewelry Store on several occasions preceding the robbery and murders. At least seven persons identified the petitioner as a man that they had seen in the Van Buren area during a period surrounding the 10th of September, 1980. In addition, various pieces of physical evidence connect the petitioner to the jewelry store and the September 10, 1980, crime. The Court believes it is important to set forth all of this evidence in some detail.

Ruth Staton, the wife and mother of the victims, testified that she saw the petitioner in the Staton Jewelry Store on September 3, 1980, one week before the robbery. She stated the man she believed to be the petitioner remained in the store looking at the display cases for over 30 minutes, affording her an opportunity to observe him. Mrs. Staton testified that the man was there with a woman and that this man conspicuously kept his hands tucked under his arms or in his pockets.

Two other local merchants testified that the petitioner had been in their places of business on September 9, 1980, one day before the crime. Arthur Parr said that the petitioner resembled one of the two men who entered his jewelry store in Fort Smith, Arkansas on September 9, 1980. According to Parr, both men carried motorcycle helmets and they looked at the store's merchandise for about 15 minutes. Another witness, Walter Carson, told of a similar episode involving two men, traveling on a motorcycle, who came into Paul's Pawn Shop on September 9, 1980. Carson stated that the two men told him that they were gold buyers. He identified the petitioner as one of these men. He believed that this man's name was "Anderson" because he had produced a Kansas driver's license bearing that name. State's Exhibit 22 represents a pawn ticket issued by Carson to Anderson on September 10, 1980, when the latter pawned a ring for $45.00.

Crucial testimony was offered by Chantina Ginn. She testified that sometime after the first of September 1980, she and a man named Rick Anderson traveled from Kansas to Arkansas on a blue Harley–Davidson motorcycle, which she identified as the one photographed in State's Exhibits 13, 14, and 15. Ginn stated that they went to the Horseshoe Bend camping area on Beaver Lake near Rogers, Arkansas. There, according to Ginn, she and Anderson met a man named Damon Peterson and his apparent wife, Lorili Peterson, who were camped at an adjacent campsite. Ginn testified that the Petersons had a white camper trailer, which they were pulling behind a light blue Cadillac, and that they invited Rick Anderson and her to stay with them in the camper. She further noted that this camper had a cardboard license plate with the words "Lost Tag" handwritten on it. Ginn identified State's Exhibits 27 and 28 as photographs of the Petersons' camper and State's Exhibits 44–46 as photographs of the Cadillac that pulled the camper.

Ginn stated that on or about the third day after the two couples had met, which would have been either the 8th or 9th of September, Rick and Damon left on the motorcycle, taking with them a briefcase with a gun inside it, a change of clothes, some rope, and a woman's brown wig. She

testified that when the two men returned several nights later, they had two orange duffle bags of jewelry which they spread out on the floor of the camper and proceeded to divide among the four individuals. Ginn further stated that after the jewelry had been divided, Damon acted like he was talking to someone and said "Get down on the floor, dog." [That's from transcript 2588.]

The following day September 11, Anderson and Peterson traded the blue Cadillac for another car, according to Ginn's testimony. She said that the four later burned their trash at the campsite, including some jewelry tags and watch boxes that had been left on the floor of the camper the night before. The four then left the Horseshoe Bend camping area and went to a storage facility in Fayetteville, Arkansas. Ginn stated that they placed the motorcycle and the camper in a self-storage room before leaving the state enroute to Atlanta. Finally, Ginn identified the petitioner as the man whom she had known as Damon Peterson and with whom she and Rick had camped at Beaver Lake.

Pat Etier also testified that an individual known to her as Damon Peterson was one and the same person as the petitioner, Eugene Perry. Etier stated that she saw Peterson and another man, who was introduced to her as "Rick," on the afternoon of September 9, 1980 at the Wal–Mart parking lot in Van Buren. She said the two men were riding a Harley–Davidson motorcycle when she saw them. She identified State's Exhibits 13 and 14 as photographs of that motorcycle, the same photographs which Ginn had identified as being the motorcycle that Anderson and Peterson were riding when they left Beaver Lake.

Etier said that she and the two men left the parking lot to get a drink together. She testified that when the man named Peterson climbed into her truck and took off his motorcycle helmet, she noticed that a wig he was wearing came off inside the helmet. She said that this wig was a light brown woman's wig.

After the three had drunk some beer at Peterson's and Anderson's room in the Terry Motel in Fort Smith, Arkansas, Etier left. But, according to her testimony, she later returned to pick up Peterson and took him to her house where they spent the night of September 9, 1980, together. The following morning, September 10, Etier drove Peterson back to the motel. This occurred around 8:00 a.m. The cities of Fort Smith and Van Buren are immediately adjacent to each other, simply across the river, one from the other.

Linda Godwin, another important witness, told the jury that she had seen two men walking briskly across the Cloverleaf Shopping Center parking lot in Van Buren shortly before 6:00 p.m. on September 10, 1980. Godwin testified that as she was leaving her office she met two men who appeared to be in a hurry. She identified the petitioner as one of these two men.

A Mr. Billy Miller testified he saw two men driving a Jeep a few minutes after the robbery. The Jeep apparently belonged to one of the victims.

Grant Cummins supported Chantina Ginn's testimony which placed the petitioner at the Horseshoe Bend campground. Cummins said that he was camping on Beaver Lake in early September and that he had talked for several hours with two couples. He identified one of the group as the petitioner.

Michael Jeffcoat told the jury that he had sold a used car to a man on September 11, 1980 in Rogers, Arkansas. Jeffcoat identified the petitioner as the man who had traded a blue Cadillac for the car Jeffcoat sold him. Jeffcoat testified that he soon sold the Cadillac to a salvage yard. Police located a blue Cadillac at an auto salvage yard, the same car that was pictured in one of the exhibits that Chantina Ginn identified as the vehicle Peterson drove to Beaver Lake.

The search of the car led to the discovery of a single page of the Van Buren telephone book with Kenneth Staton's phone number on it, along with a copy of the September 11, 1980 edition of the *Northwest Arkansas Morning Times*

headlining the Staton robbery and murders.

The owner of a Fayetteville self-storage facility, Gifford Heckathorn, provided a lease agreement which he said he entered into on September 11, 1980 with a man who signed "Damon Peterson" on the contract. Peterson was with another man according to Heckathorn when he rented space No. 109 for a month. Heckathorn testified that he could not say which man signed the agreement. Authorities later opened this storageroom and discovered a blue Harley–Davidson motorcycle and white camper trailer. The camper had a cardboard license with "Lost Tag" written on it. Ginn identified this motorcycle and camper as the ones that they had stored on the day that Rick Anderson, Damon Peterson, Lorili Peterson and she had left the state.

Items found inside the camper underscore the link between the camper and the robbery. From the camper the police obtained the following pieces of physical evidence which were introduced at the trial: a gold coin like those taken from the Staton jewelry store; a buffalo nickel with an identifiable nick on its face and one that Ruth Staton testified she had kept in the store, State's Exhibit 21; a jewelry price tag containing the handwriting of Karen Staton, State's Exhibit 35; a brown plastic ring plug like those used at Staton's to fill up the space in a display case after a ring is sold, State's Exhibit 33; an orange blossom ring filler, State's Exhibit 37; a book of matches from the restaurant at the Terry Motel in Fort Smith, State's Exhibit 30; a book of matches from the Horseshoe Bend Marina in Rogers, Arkansas, State's Exhibit 31.

Larry Gray of the Corps of Engineers was the Park Technician at Beaver Lake in 1980. He testified that a user permit was issued by the Corps to a Damon Peterson on September 6, 1980 and again on September 8, 1980. These permits, State's Exhibits 49 and 50, indicate that Damon Peterson was assigned campsite 2–10 on each occasion. An investigation of the area around this particular campsite turned up several additional pieces of physical evidence, further linking the campers to the robbery. Police recovered at campsite 2–9, the one adjacent to the one assigned to Peterson, a jewelry box, a ring box, a watch band display holder, and some rope. A crime lab analyst testified that burned remains of a rope found at the campsite possessed characteristics similar to those of the rope which was removed from the hands and legs of the victims.

Thus, to review, the evidence includes numerous pieces of tangible evidence connecting the jewelry store robbery-murder to the camper, the blue Cadillac, and to the man named Damon Peterson, who had possessed both the camper and the Cadillac in northwest Arkansas in early September 1980. The testimony of Chantina Ginn and Michael Jeffcoat, plus the lease agreement from the Fayetteville self-storage facility, also show that someone named Damon Peterson was in charge of those vehicles at the times in question. Ginn and Etier, both of whom spent a considerable number of hours in very proximate, even intimate, circumstances with the man they called Damon Peterson, identified the petitioner, Eugene Wallace Perry, as being one and the same as Damon Peterson.

The final significant evidence in this case consists of two rings which the petitioner had in his possession when he was arrested in Florida. I believe that was on September 23, 1980. Those two rings, introduced as State's Exhibits 17 and 18, were identified by Ruth Staton and Karen Staton. Ruth Staton, the wife of Kenneth, testified that State's Exhibit 17 is identical to her husband's wedding band. Ruth Staton's daughter, Karen, also stated that this ring "looks like my father's wedding band." Karen Staton further testified that she remembered State's Exhibit 18, a man's yellow cluster diamond ring, from her having worked with the inventory at the family store. Thus, the two rings found in petitioner's possession emphatically implicate him in this crime. State's Exhibits 17 and 18, more than other items in evidence, underscore and tend to corroborate Etier's and Ginn's testimony that Damon Peterson

is the same individual as Eugene Wallace Perry.

The defendant relied upon an alibi defense. Seven of his witnesses testified in person at the trial. They were: David Redding, Frank King, Richard Hays, Tonya Perry, Dawn Perry, Wallace Perry and Eulene Perry. The four remaining defense witnesses testified by deposition—I think one on the basis of written interrogatories—and they were: Greg Bagley, Alicia Brown, Linda Ashworth, and Glenda Perry.

A brief synopsis of their testimony will be useful. David Redding placed Perry in Alabama on August 30, 1980. Frank King saw Perry on September 1, 1980, and believes that Perry traded his pop-up camper on that day. Richard Hays stated that Perry was in Alabama on September 1, 1980. Hays rented a camper to a man whose picture is reflected in State's Exhibit 25.

Tonya Perry, defendant's younger daughter, stated that her father was in Alabama on Labor Day, September 1, 1980, and that he returned one week later, September 8th and stayed with them two days before leaving on the 10th. Dawn Perry essentially gave the same testimony as Tonya. She also testified that her father took her shopping on September 9 for some clothes. Wallace Perry—that is, the father of the defendant—said petitioner arrived at his house on the night of September 10 at about 10:00 p.m. He said that Perry spent the night of the 10th and stayed most of the 11th with his parents. Eulene Perry, the mother of the defendant, essentially corroborated Wallace Perry's testimony. The witnesses that testified by deposition testified as follows:

· Greg Bagley stated that he worked for the Red Hanger Shop in Oxford at a mall. This is Oxford, Alabama. He said that someone made payment on a lay-away account in Perry's name on September 11, 1980. He did not see anyone make it and said that it could have been received by mail. Alicia Brown, a teen-aged clerk at a clothing store in Oxford testified that Perry and his daughter, Dawn, came in shopping. She could only pinpoint that it was between the last week of August and the first two weeks of September. Linda Ashworth testified by written interrogatories that she managed the store where Brown worked. She also saw a man she identified as the defendant but would only say that he was in the store sometime during the "back to school" sale. We will discuss the testimony of Glenda Perry, the ex-wife of the defendant, later. I think it can be fairly said from an examination of the record that the evidence of the defendant's guilt was clear and strong and, if fully credited by the jury, as it obviously was, could be considered overwhelming. The case demonstrates the oft-stated proposition that circumstantial evidence can often be more damning and convincing than some eyewitness testimony. On the other hand, a careful and meticulous review of the alibi evidence introduced on behalf of the defendant reveals that most of it is weak, uncertain, lacking in specificity, and not inconsistent with the State's case. Only the immediate family members—that is, the defendant's daughters, his mother and his ex-wife—provided any factual testimony that might be said to be completely inconsistent with the possibility of the petitioner's guilt. The Court will discuss this later in connection with the confrontation issue that has been raised by the defendant. So, that's a brief review of the evidence that was adduced during the course of the trial.

As further background for an understanding of the issues raised by the 1990 supplemental petition it is important to note how the Court dealt with the second issue currently being raised (Issue B *Supra*) since that issue was also raised in the first habeas proceeding. The Court resolved that issue from the bench. The discussion thereof found at pages 181–198 of the transcript reads as follows:

THE COURT: We will take up the compulsory process issue and then have a short break for lunch and then proceed with the other issues.

One of the most troubling issues raised by the petitioner concerns the state trial court's refusal to grant the petitioner com-

pulsory process for a number of out-of-state witnesses whom petitioner sought to have testify at the trial. Prior to the trial, petitioner filed a motion for production of witnesses from outside the state. Therein petitioner's defense counsel requested that the Court order the prosecutor, pursuant to his power under Arkansas Statute 43–2006, to subpoena certain witnesses to appear on petitioner's behalf at the trial. Critically, counsel indicated to the trial court that only the prosecuting attorney held the power to bring in out-of-state witnesses pursuant to the Arkansas statute. Petitioner's list of requested witnesses contained 17 names. Seven of these prospective witnesses were in the nature of alibi witnesses and six were character witnesses.

The defense counsel for petitioner generally argued that it was a constitutional right to have these witnesses appear at the trial in person rather than by means of depositions. As a fallback position, counsel requested that the Court require the State to pay the cost of deposing these individuals on videotape.

The trial judge, after hearing oral argument on the motion, ruled that the Court would not require the prosecutor to subpoena any of the defendant's witnesses. The Court further held that the State was not going to pay any expenses, either for attendance or depositions, for petitioner's character witnesses. But the Court did propose a choice to the defendant: the State would pay to have the remaining 11 witnesses deposed in Alabama, or the State would offer to reimburse four defense witnesses for travel expenses to the trial if these individuals were willing to come. But under no circumstances was the State going to have to subpoena anyone to appear on the petitioner's behalf.

As stated in the transcript, the Court stated: "As far as the character witnesses are concerned, the Court is not going to authorize any type of expenditures for character witnesses. If he wants character witnesses and can get them here, then fine. If he can't, I'm sorry. He can't. I'm not going to require the State to use its subpoena power to require the attend-ance of any of the witnesses. I think I am going a long way in an effort to try to be as fair as I can in a situation that's presented. And I'm just saying to you that you can take depositions of these 11 witnesses, or I will see that the county pays the expenses of any four witnesses that will attend. That's as far as I am prepared to go because I think I'm going further than I'm required to go by the law anyway."

Now, although it is quite understandable, given that the defense attorney had incorrectly stated the Arkansas law at the hearing, it is nevertheless clear that the trial judge labored under the mistaken belief that the prosecutor alone could attempt to secure out-of-state witnesses under the Arkansas law. The Court indicated its belief that the subpoena power belonged to the State only, and that if the prosecutor declined to produce the defense witnesses, the Court could not order the prosecutor to do so.

As the Court stated:

"Well, I'm hesitant about using the State's subpoena power to bring in defense witnesses. The best I can tell you on that is that unfortunately it's the responsibility the defendant has to get his witnesses here and the subpoena power, is not available except through the State."

It should also be noted that the prosecutor did nothing to disabuse the Court of this erroneous view of the law.

The trial court obviously did not realize that the Court, not the prosecutor, could order the production of the out-of-state witnesses. Under Arkansas law it is clear that the defendant, as well as the prosecutor, may petition the Court to secure the attendance of material witnesses. *Mackey v. State*, 279 Ark. 307, [651 S.W.2d 82], 1983. See also *Hall*, 33 Ark Law Review 122, pages 138 and 139.

Arkansas adopted the Uniform Act to Secure Attendance of Witnesses from Without the State in Criminal Cases back in 1935. Section 43–2001 is that statute. Similar acts have been adopted by virtually every state in the union in order to facili-

tate the interstate compulsory process. *Barber v. Page,* [390 U.S. 719] 88 Supreme Court 1318 [20 L.Ed.2d 255], a 1968 case, note 4. The Court notes that Alabama, the state where the witnesses at issue here were residing at the time of the petitioner's trial, was among the states that had adopted the reciprocal statutes whereby that state agrees to produce witnesses for a court in another state which has likewise adopted the uniform act and would, therefore, produce witnesses for criminal trials in Alabama courts.

The Act allows the prosecutor or the defendant to seek an order from the Court requiring the officials in a cooperating state which has adopted the uniform act to command the appearance of the particular witnesses at trial in Arkansas, 43–2006. That reads as follows:

"If a person in any state, which by its laws has made a provision for commanding persons within its borders to attend and testify in criminal prosecutions or proceedings or grand jury or prosecuting attorney's investigations commenced or about to commence, in this state, is a material witness in a prosecution or proceeding pending in a court of record in this state, or in a grand jury or in a prosecuting attorney's investigation which has commenced or is about to commence, a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. Said certificate may include a recommendation that the witnesses be taken into immediate custody and delivered to the officer—to an officer of this state to assure its attendance in this state. This certificate shall be presented to a judge in the court of record in the county in which the witness is found.

"If the witness summoned to attend and testify in this state"—I'll start that again. "If the witness is summoned to attend and testify in this state, he shall be tendered the sum of 12 cents a mile for each mile by the ordinary traveled route or the actual expense of travel, lodging and meals to and from the court where the prosecution or proceeding is pending or the grand jury or prosecuting attorney's investigation is be-

ing conducted and $25.00 for each day he is required to travel and attend as a witness. A witness who has appeared in accordance with the provisions of the summons shall not be required to remain within this state a longer period of time than the period mentioned in the certificate unless otherwise ordered by the Court. If such a witness, after coming to the state, fails without good cause to attend and testify as directed in the summons, he shall be punished in the manner provided for the punishment of any witness who disobeys a summons issued from a court of record in this state." The Arkansas Supreme Court has recognized that the defendant in a capital case is entitled to use this statute to secure the attendance of as many witnesses as the trial court deems material. See *Mackey* at page 314 [651 S.W.2d 82]. Thus, there is no question that Arkansas law provided a mechanism for the petitioner to request the Court to order the attendance of the defendant's witnesses. It is equally clear that this authority did not rest exclusively with the prosecutor. To the extent that the trial judge believed that this was solely the province of the prosecutor, the Court erred or was misled by counsel.

However, it is important to note that the power of the Court to issue a certificate requiring an out-of-state witness to attend the Arkansas trial is discretionary. *Mackey* at page 314 [651 S.W.2d 82]. And, of course, Section 43–2006 does not state the Court shall issue the certificate; it says the Court may.

The Arkansas Supreme Court has so held in *Mackey* at page 314 [651 S.W.2d 82] where it states:

"It is true that Arkansas Stats. Annotated 43–2001 provides for unlimited out-of-state witnesses in capital felony cases. However, this statute must be read in conjunction with 43–2006 which provides that such witnesses must be material. We have interpreted these statutes by declaring such right not to be absolute but, rather, resting within the sound discretion of the trial judge. Citing *Wright v. State* [267 Ark. 264, 590 S.W.2d 15 (1979)]. We have

also held that the right to have out-of-state witnesses in capital felony cases means material witnesses. *Henry v. State* [278 Ark. 478, 647 S.W.2d 419 (1983) ]. Under the circumstances contained in this case, we do not find this error to be prejudicial."

So, although the Court was unaware it had any authority to act under Section 43–2006, the result was the same as if the trial court had knowingly exercised its discretion by deciding that it would not, under the facts and circumstances of the case, issue a certificate demanding the Alabama authorities require the attendance of defendant's witnesses. But it must be acknowledged that the Court did not knowingly exercise its discretion, believing that it had no discretion in the matter.

Is it possible to tell from the record what decision the trial court would have made had it been aware of its discretionary authority? I think not. During the hearing here last month the Court expressed certain views concerning the inferences that might be drawn from the circuit judge's remarks. The Court was speculating on whether there was some clear indication of how the judge would have ruled, had he known that he had the power to order the subpoena of out-of-state witnesses. The Court has re-read in its entirety the relevant portions of the transcript and is now convinced that one cannot with any certainty conclude which way the Court would have ruled. The best guess is he probably would have ruled essentially as he did since he was contemplating or attempting to balance the defendant's needs against the cost to the county.

However, even if we treat the trial judge's decision as a sound exercise of his discretion to deny the compulsory process, we are still left with the question whether this decision may have violated petitioner's constitutional rights. The Sixth Amendment expressly guarantees the right of a criminal defendant to "compulsory process for obtaining witnesses in his favor." That's the United States Constitution, Amendment Six. The Supreme Court has held in *Washington v. Texas,* [388 U.S. 14,] 87 Supreme Court 1920 [18 .L.Ed.2d 1019], a 1967 case, that the Sixth Amendment's

right to compulsory process extends through the Fourteenth Amendment to the accused in a state criminal proceeding. The right of the defendant "to have compulsory process for obtaining witnesses in his favor" is so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment. [388 U.S. at page 16,] 87 Supreme Court at page 1922.

Drawing on previous Sixth Amendment cases, the Court held that the right to present one's own witnesses lay at the core of the right to a defense and is as important as the right to confront those witnesses who are adverse to the defendant. As stated [388 U.S. at p. 18, 87 S.Ct.] at page 1923:

"The right to offer testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for purposes of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."

The Court further noted that this specific right of compulsory process has been included in the Bill of Rights because the drafters of the Constitution were bothered by the common law rule that could prevent those accused of treason or felonies from introducing any witnesses on their own behalf. [388 U.S: at page 18, 87 S.Ct.] At page 1923. The Court stated its belief that truth is more attainable when the jury hears from all the witnesses with knowledge of the issues in the case. [388 U.S. at page 20, 87 S.Ct.] At page 1924. Thus, the Court held the petitioner had been deprived of his right to compulsory process for obtaining witnesses in his favor. "The State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been rel-

evant and material to the defense." [388 U.S. at page 22, 87 S.Ct. at] Page 1925.

The Supreme Court of the United States has recently reaffirmed its holding of *Washington v. Texas* in the case of *California v. Trombetta*, [467 U.S. 479,] 104 Supreme Court 2528 [81 L.Ed.2d 413], a 1984 case. In its recent decision the Court reiterated the criminal defendant's constitutional right to "a meaningful opportunity to present a complete defense." [467 U.S. at page 486, 104 S.Ct. at] Page 2533. Likewise, the Eighth Circuit has cited the *Washington* case for the right of the accused to compulsory process. See *Thomas v. Wyrick*, 687 F.2d 235 at page 239, a 1982 case, as has the Eleventh Circuit, *United States v. Garmany*, 762 F.2d 929, 933, a 1985 case. Clearly, then, the Sixth Amendment affords one the right to call his own witness to trial, and that right cannot be doubted.

These cases would suggest that when the trial court in this case denied Mr. Perry the chance to subpoena certain witnesses in his defense, it denied him his constitutional rights under the Sixth Amendment. Recent Supreme Court cases, however, indicate that something "more than mere absence of testimony was necessary to establish a violation of the right." *United States v. Valenzuela–Bernal*, [458 U.S. 858,] 102 Supreme Court 3440, [73 L.Ed.2d 1193], a 1982 case. The petitioner must not only show that he was deprived of certain witnesses' live testimony, but that such testimony was material and that its absence "fatally infected the trial." And I quote from the Valenzuela case:

"The only recent decision of this Court dealing with the right to compulsory process guaranteed by the Sixth Amendment suggests that more than the mere absence of testimony is necessary to establish a violation of the right. See *Washington v. Texas*. Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him compulsory process for obtaining witnesses in his favor. U.S. Constitution, Amendment Six. In *Washington*, this Court found a violation of this Clause of the Sixth Amendment when the defendant was arbitrarily deprived of testimony that would have been relevant and material, and vital to his defense. This language suggests that respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of the passengers deprived him of their testimony. He must at least find some plausible showing of how their testimony would have been both material and favorable to his defense.

"Having borrowed much of our reasoning with respect to the Compulsory Process Clause of the Sixth Amendment from cases involving the Due Process Clause of the Fifth Amendment, we have little difficulty holding that at least the same materiality requirement obtains with respect to a due process claim. Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' Citing *Lisenba v. California*. In another setting, we recognized that Jencks Act violations, wherein the Government withholds evidence required by statute to be disclosed, rise to the level of due process violations only when they so infect the fairness of the trial as to make it 'more a spectacle or trial by ordeal than a disciplined contest.' Citing *United States v. Augenblick*. Such an absence of fairness is not made out by the Government's deportation of the witnesses in this case unless there is some explanation of how their testimony would have been favorable and material."

The Supreme Court has equated the right to compulsory process and the right to effective assistance of counsel in that both are constitutionally protected means to the end of a fair trial. As such, they are not "recognized for their own sake" but because of their effect upon the trial. See *United States v. Cronic*, [466 U.S. 648 at page 657,] 104 Supreme Court 2039 at

page 2046, [80 L.Ed.2d 657], a 1984 case. In short, therefore, unless the deprivation of compulsory process in the instant case actually affected the quality of the trial, it will not constitute a violation of the petitioner's Sixth Amendment rights. To quote from Cronic:

"Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." [466 U.S. at page 657, 104 S.Ct. at] Page 2046.

In thus requiring that some material deprivation be the basis for a finding that the compulsory process clause of the constitution is violated, the Court has in effect applied a prejudice standard to the issue which is like that of the *Strickland* standard used in the context of the Sixth Amendment right to counsel. See *McNeil v. Cuyler*, 782 F.2d 443, Third Circuit, 1986. The result is that this Court must review the deprivation of the compulsory process against the backdrop of all the evidence and circumstances of the case. After having completed such a review of the voluminous record in this case, the Court concludes that the absence of live testimony from the four witnesses whose testimony is offered by deposition—namely, Greg Bagley, Alicia Brown, Linda Ashcraft, and Glenda Perry—was not prejudicial to the petitioner in the face of the substantial, indeed overwhelming, evidence of his guilt. The deposition testimony of three of these individuals was, indeed, not inconsistent with the prosecution's theory of the petitioner's guilt. These three individuals placed the petitioner in the Oxford, Alabama area sometime in late August or early September. Because these persons did not specifically fix the petitioner's presence at the time of the crime, it is impossible to infer that the jury disregarded their depositions entirely. Their credibility was not put in question in a significant degree. The jury could have easily found that the witnesses were truthful, that the petitioner was in Alabama in late August, but that he had come to Arkansas by September 3, 1980, the first date that any government witness placed the petitioner in the Staton Jewelry Store.

It is true that the testimony of the fourth alibi witness who did not appear live, if credited, cannot be reconciled with the jury's finding of guilt. Glenda Perry testified that her ex-husband, the petitioner, visited her and her two daughters—also the daughters of Perry—on September 1, 1980, and that he returned "about a week later" and stayed for a couple or three days. Accepting this testimony, Perry would have been in Alabama from September 8 through September 10, which is at odds with the testimony of numerous government witnesses who said they saw the petitioner frequently in Northwest Arkansas during this time. However, the Court notes that Glenda Perry's testimony was not as strong as that given by Perry's own two daughters who essentially corroborated the alibi defense and who did testify in person at the trial. In addition, the defense called petitioner's parents who also testified at the trial that Perry was in Alabama through the morning of September 11, 1980. Had the jury been inclined to give credence to this version of the petitioner's whereabouts at the time of the crime, there was ample live testimony before them which supported that version. The jury obviously unanimously rejected this alibi testimony.

The Court does not find it even remotely likely that the physical presence of the one deposition witness whose account was inconsistent with the verdict—namely, that of Glenda Perry—would have lent any more credibility to the alibi defense. This is particularly so in light of the fact that the four witnesses who did appear in person testified with more certainty about their recollections than did Glenda Perry. Thus, the trial court's refusal to allow the petitioner to avail himself of the process set forth in Section 43–2006 of the Arkansas Statutes did not, under the peculiar facts and circumstances of this case, violate petitioner's Sixth Amendment right to compulsory process. He presented the testimony of the witnesses. And for the reasons stated, the fact that certain of the witnesses testified by deposition did not prejudice him. He did in fact present the

favorable and material evidence available to him from these witnesses. In effect, he has been denied no material evidence and there is nothing to suggest the result would have been different if the deposed witnesses had testified in the courtroom in person.

The Court might add that although the Supreme Court's cases mandate that there can be no constitutional violation unless the denial of compulsory process concerned material evidence, even if the Court were today finding a constitutional violation, the law of this Circuit requires the Court to further determine if the violation was harmless error. *Thomas v. Wyrick,* 687 F.2d [235,] 241, a 1982 case. In *Thomas,* the Eighth Circuit refused to pass on the constitutionality of certain Missouri criminal discovery rules which had been used to prohibit the defendant from calling character witnesses to testify at trial because these witnesses had not been previously disclosed to the prosecutor. [*Id.* at] Page 236. But the Eighth Circuit held that it made no difference whether the Missouri law had worked to violate the defendant's constitutional right to compulsory process. It stated:

"Nevertheless, even if the trial court's exclusion of character witnesses were deemed to be constitutional error, it would not affect the result in this case. If there were constitutional error, it would be harmless beyond a reasonable doubt." [*Id.* at] Page 241.

Other circuits have adopted the automatic reversal or per se rule where constitutional violations of this nature are involved. The Eighth Circuit, however, has refused to follow those courts. *Peeler v. Wyrick,* 734 F.2d, 378, a 1984 case. Peeler involved a habeas petitioner's claim that the government had intimidated one of his witnesses and thereby prevented him from testifying. The Eighth Circuit relied upon the Supreme Court's opinion in *United States v. Hasting,* [459 U.S. 1032,] 103 Supreme Court 440 [, 74 L.Ed.2d 598] a 1983 case, which addressed the applicability of harmless error doctrine in cases of constitutional violations, to conclude that "any error which may have occurred was

harmless error due to the overwhelming evidence of guilt." The court noted that in *Hasting* the Supreme Court stated:

"That it is the duty of reviewing courts to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations. The Court acknowledged that certain errors may involve rights so basic to a fair trial that their infraction can never be deemed harmless; however, the Court's examples only included the right to counsel, an impartial judge, and coerced confession. Thus, it seems clear that the Court in *Hasting* directs this court to apply the harmless error rule in cases such as this." [*Id.* at] Page 381.

The Court here concludes that the evidence from the four deposition witnesses was not sufficiently material to implicate the compulsory process clause of the Sixth Amendment, and, alternatively, that even assuming that the denial of compulsory process was unconstitutional, the evidence of petitioner's guilt is such that any possible violation would be harmless error.

As I said, that's strictly under the peculiar facts and circumstances of this case as we have detailed them. Ordinarily, the refusal to permit a defendant in a case of this type to subpoena witnesses from out of state would be error that would require the granting of the petition. It is only the unusual circumstances here that precludes that possibility.

### NEWLY DISCOVERED EVIDENCE CLAIM

On May 8, 1989, Marion Pruett wrote a letter to Mr. Brian Willett, an attorney in Albuquerque, New Mexico. In that letter, (See petitioner's Exhibit 11) he made the following statements:

Look Bro, about the Van Buren deal, "I didn't want anyone else to know about it *but you* "!! I was just thinking out loud to *you,* because my conscious has been troubling me a little, but that doesn't mean I'm going to confess and let this guy here go free. that may sound mean, but hell Bro, if I confess then I know the D.A. in Van

Buren will end up giving me two more Death Sentences, plus I'll even face another one in New Mexico. See Bro, Michelle was also involved in that Van buren deal. She, me, Sundance, Pat, (Sundance's ole Lady), and Sportster Rick. Me and Sportster Rick are the two who went in the jewelry store, (Staton's), on September 10th, 1980, and did the robbery, and it was I who shot the old man and his daughter, (around 23 years old). Michelle, Pat and Sundance stayed back at a Motel (Terry's), in Fort Smith, then me and Michelle drove back to Alberqe (sic) with half of the jewelry, (over $75,000 dollars worth).

Around September 25th Sportster Rick, the guy here on death row, and Sundance were down in Jacksonville, Fla, (Rick and Sundance has went there to sale (sic) their share of the jewelry to a guy named "Gen Perry", (who is the guy now here on death row). While there, the police busted in on them, but Sundance got away, and called me, so I sent him the bucks to come to Albuqe." (sic) Now Rick and the guy here, (Gen Perry), got busted in the Motel room in Fla., so the police in Van Buren said Rick and Gen Perry was the two who did the robbery and murders.

Sundances Ole Lady Pat, got mad because Sundance left her in Ft. Smith after the robbery, and he took off with another woman, so she, (Pat), went to the police and said Sundance was involved in the crime. I made Sundance go with me to Van Buren looking for her but we couldn't find her, but Sundance knew one of the police officer's on the Van Buren Force and he told Sundance everything the police knew about the crime. sundance paid the Policeman to tell Rick (Rick was in the Van Buren Jail), that if he didn't say it was him and Gen Perry who did the crime, "then I, (me), would go kill his girl-friend and sister in Kansas. Rick was really scared of me, so he did just like Sundance told him too. About three months later (after I seen Rick was going to do just like he was told), I went ahead and killed Sundance (I made Michelle help me), and I did away with his body there in Albuqe!! (sic) Now Sundance and Gen Perry even look alot alike, but it wasn't Gen Perry who did the crime, (he was just going to buy the hot jewelry).

Now, what I'm going to do is just wait and see if this Gen Perry guy does get a new trial from the U.S. Supreme Court, (it'll take about another year), and if he does then I may, (or may not), be a witness for him, and just confess in front of the jury. Hell I can even prove it all, but if he doesn't get a new trial, then I'll handle that when the time comes, but for now I'm not going to open my mouth, and I don't want you to mention this to anyone. When I feel the time is right, then I'll have you get in touch with this Gen Perry guys attorney, but not instill (sic) I feel the time is right, okay??

Apparently this letter was a follow-up to one written by Mr. Pruett to Willett on April 17, 1989—the first time Pruett mentioned the matter to Willett. Petitioner's Exhibit 10 is a copy of the April 17, letter. The pertinent part reads as follows:

Oh, I also need to run something "Big" by you that no one knows about but me, and when I tell the Newspapers about it, "all shit will hit the fan, and my name will be back in every Newspaper across America again." I did a Jewelry Store Robbery in Van Buren, Arkansas back in 1980, (around the end of the easy) with another guy. Anyway, some shit came down and I killed the Store Owner, (a man), and his daughter, (around 25), during the robbery. A few months later the fool who helped me during the robbery got busted down in Fla. on some dumb shit, and he had part of the Jewelry still on him. To make a Long Story Short, "he got a Life Sentence out of the robbery, and the poor ass-hole who was in Fla. and with him at the time he got busted, "ended-up getting charged on the Robbery and Murders too, and he got the Death Sentence.

Now Bro, that guy got the Death Sentence for a *crime I truely did*, and during the last year that I've been here it really troubles me to see his face everytime I go on the yard with him. The Federal 8th Circuit Court of Appeals just refused His Appeal, and now he only has the United States Court of Appeals left, and its a 99%

chance they'll also turn him down, and then he'll be Executed. *Shit Bro, this is really playing heavy on my conscious.* (sic) It's bad enough that I've cost this guy 9 years of his life, plus I have to look at him everyday now, but here he would also be executed during the next year because of me. I've done make my mind up Bro, that if the U.S. Supreme Court refuses his appeal too, then I'm going to come forward and tell them Exactly what happened, "even if it means I get another Death Sentence over it." Hell, the guy that was with me already has a Life Sentence, so it can't hurt him by me telling the truth now. Most likely the guy here on death-row will want to Kill Me after he fines (sic) out and I sure can't blame him. "What do *you* think I should do Bro??" Man, I can't just allow this innocent guy die over what I did"!! Give me some advice Bro?? [1]

On July 7, 1989, Mr. Perry's habeas attorney, Mr. Sam Heuer, conducted a recorded interview of Mr. Willett concerning information allegedly provided to him by Mr. Pruett. The pertinent portions of the transcript are quoted as follows:

WILLETT: You might remind me, that's an interesting issue as far as _____ and certainly you would be interested in coordinating with the New Mexico enforcement, perhaps because of the aspect that would add credibility to this, were there to be—well, just real quick, like the silence 22 that he had is supposedly with Sundance's body and along with a single shot 12 gauge shotgun that was used to kill Sundance with. Some more metal, the three logging chains, I thought a metal detector would be as efficient as anything at that rate. That's what I told Joe—

HEUER: Is he not in the—is his body not in the river?

WILLETT: Yes, it is. The Rio Grande is funny though. It's dry sometimes out of the year.

HEUER: Yeah.

WILLETT: This is in the deepest part of it and it's sandy, you know. My feeling is it would be down in the sand a little bit by now.

\* \* \* \* \* \*

HEUER: Now you've just gone over, apparently, in the jewelry store there was a Coke can and a Dr. Pepper can.

WILLETT: Uh-huh.

HEUER: Pruett now thinks that the match on the finger prints would be his, and as far as the Dr. Pepper can goes.

WILLETT: Most definitely, but just the fact that he's able to place a Dr. Pepper can in a particular location at the scene which—

HEUER: On the case with the—

WILLETT: Cash Register. He describes three horseshoe-type display cases in the store. One of them apparently has the cash register on it and the coke can was left on the counter with the cash register of the three horse-shoe display cases in the—in the Statton's at the time. Okay, he and Sportster Rick went on—Rick Anderson—

HEUER: Uh-huh.

WILLETT: —went on Rick's Sportster, they parked it at the Safeway across the street from Statton's. They parked it, apparently there was a bank right next to the Safeway and it was parked more towards the bank side of the Safeway by some trees there. They got the Dr. Pepper and Coca-cola that soft drink machine out in front of the Safeway. And those were the cans that were taken across the street into Statton's. That's where they were obtained, from the machine out front of the

---

1. It was in this letter that Pruett also complained that John Jake Dalton, with whom he had a contract to write a book on his life of crime, was apparently not going to complete the work. He then states:

> If Jake Dalton isn't going to have the Book published, or finish it, then I want to go to another author. "If I go ahead and tell the New-people that I did the Robbery and Mur-

ders that Arkansas is getting Ready to Execute a man on, then you can bet my name will be in "all the Newspapers Again," and if Jake Dalton isn't going to do something with it this time around then fuck him, I want to go elsewhere," if I can get out of that Book Contract with him." [Note: The quotation marks are Pruett's.]

Safeway, near where the Sportster was parked. Okay, silenced 22, I think that's in the case, is that there was a silenced 22 used. So, weighing credibility, I mean, as far as that being a matter of record that anybody could look up, I suppose. The 22 was wrapped also in a table cloth that was taken from a table back in the work area in the back of the shop. The tablecloth has sort of a flower pattern to it, and the table cloth was used to wrap the silence 22 in to make additionally sure that the report from the gun not alert anybody outside the door I have another point after that, but I'm going to stay with this point because there should be three holes in the quilt, he called it, used as a silencer around the 22. And just right on into it here, the three holes would be because as he described it, the silence 22, not only with the silencer on it but also with the tablecloth from the table in the back of the shop where the coffee and so forth was as he describe it, initially he shot her first in the temple. I got the impression it was the left temple, but anyway, in the temple. After that, he shot the man, Mr. Statton I believe it was, I'm looking at the case, anyway, right above the eyebrow, and as near as I was sort of more careful with him on this, again, the left eyebrow, I believe it was. As far as the initial two shots, one in each individual, and those were at close range. Certainly lab reports and so forth as far as forensics might show that the—those two initial wounds and entries were at quite close range. After that, he backed up some three to five feet he said and shot once at them each, more or less in the center of the forehead. Her first and then the man, Mr. Statton. And he moved, after the initial two shots, one in each of them, for the second two shots from the three to five foot range, he moved the table cloth after each shot so there would be more or less three holes there should be in that table cloth.

HEUER: Why wouldn't there be four?

WILLETT: Because the first two shots, one in her left temple and one in the—Mr.—over Mr. Stratton's right eyebrow were done without moving the table cloth to a new location on the barrel.

HEUER: All right.

WILLETT: Okay. Okay. as to details as far as the young lady. He said her dress was unusual. He says for one thing she had big tits. He says the man was a real short little guy. She had light brown hair, almost blonde. And he said her color scheme was unusual to him, something about the way he thought the color sort of clashed. He said she had on orange high-heels and sort of a blue slip. And something about, perhaps the skirt and this stood out in his mind anyway, sort of that the colors clashed he thought. Okay, once again, her in temple first, then in the middle of the forehead. Him above left eyebrow, then in middle of forehead. I described those as far as the entry wounds. Three holes in the quilt used as a silencer, okay. Pruett said he took the man's wedding band and he also had a red ring, like a sapphire or a ruby that was taken also. He took her diamond ring, but left the watch and necklace because he said those—the watch and necklace were kind of cheaper, you know, less valuable. He said he took a little sack of loose diamonds from the safe. They were in a little pouch and that was from the smaller of the two safes that were in there.

HEUER: Did he say how he got into the safe?

WILLETT: He said they were open. I asked that too, you know, I didn't know if he was a safe cracker too or something. But he said they were open since it was during business hours.

Okay, this is one that got me. I'm sort of fancy myself as half a mechanic, but I'll get into it. Okay, they took her Jeep. It was a green—he was trying to explain the color. Not a lime green, closer to an army green, he said. It had a white canvass top he thought. He recalled, he said black, and I said Gee, you—I wrote white a while ago and he says that's right. He says no, it was white. But he said the starter was defective on it. It just really whined and he didn't know if it would engage or not. He said the starter was really funny on it. He said his—like Chrysler products, they've got the double reduction and make

their own special noises, but this one, he said, he thought was really defective because it made a lot of noise and so forth when he started it up.

He said he used the same style of wig, sort of a sandy blonde color, as he used in the Mississippi robberies. Okay, we do the Coke can by cash—I mean Dr. Pepper can by cash register, three horseshoe show cases, Dr. Pepper can left on counter by cash register.

Oh, this is very good. There were three small diamonds in the man's wedding band, he recalled. He had on, and then just sort of as a quick aside, it's obvious he's bright enough to realize that these are details that someone who was not actually on the scene might not know. The dress. The man was dressed in blue slacks, a short sleeve shirt, and was on crutches. The short sleeve shirt he wasn't quite so clear about. It's been several years. He thought it was light colored with blue stripes. Okay. The starter hung bad, whined real bad on the Suzuki Jeep. Her Suzuki Jeep, when they got into it, was sitting by the light post out front when they got into it. He left it in front of the laundromat for an apartment complex that was about two miles from the Cloverleaf Shopping Center. The 22 gun that was used in this robbery/murder, was his—in the Rio Grande where Sundance was put along with a single shot 12 gauge shotgun that killed Sundance.

Here's another one. Sportster Rick, Rick Anderson, had Harley wings on one arm. He couldn't remember exactly if it was on the shoulder or upper arm, but he said on one arm. I asked him a little bit more about it, something I didn't write down here. I said, well, how did Rick act when this was happening? The way it came up, I asked him, I said, how did you keep people from coming in while this was going on since it was during business hours. And he said Rick locked the door. Something about he had some trouble locking the door and so forth. He said mostly he was pretty quiet and did what he was told and he said that's the only reason he didn't end up on the floor there too.

HEUER: Did he not get along with Rick, Sportster Rick?

WILLETT: He didn't even know Sportster Rick. He was real annoyed when he got—when they were planning this thing. Apparently, Sundance is the one that cased the deal and set it up. At the Terry Motel there was a room there. Pruett and his wife, Michelle, Pruett, who of course, was a federally protected witness at this time under the name of Charles Sonny Pearson. I call him Sonny.

HEUER: Uh-huh.

WILLETT: His wife would be then Michelle Pearson. He and Michelle showed up at the Terry Motel and Sundance had Sportster Rick there and Pruett said he was very annoyed about that. The security and so forth on it. Someone else being in it and knowing about it and so forth. Initially, he said he was very upset about Sportster Rick being in on it. But accepted it after a point apparently and because they did sort of cruise and case the joint, he and Sportster on—on Rick Anderson's sportster, which was also used to come to near the scene when the crime was committed. Parked, as I said before, at the Safeway over by the bank near some trees. He—and something else I didn't write down. When they took the Jeep, he took Sportster Rick back over to the Safeway parking lot and he turned in and he let Sportster Rick out, just sort of at the entrance to it. And then Sportster Rick went back to his sportster. And whereupon, Pruett stayed by himself in the Jeep. Another thing he said, when he got out of the—out of the Jeep at the apartment complex, in front of the laundromat at the apartment complex, he said a black lady hollered at him. I don't know why, I guess he didn't either, but he said he just kept moving. He didn't stop for that. Well, I'm out of my written notes. I'm just going to what I recall that was details.

HEUER: Has he told you how—tell me again how the transaction occurs between him and Perry that caused Perry's car to end up with some of this property.

WILLETT: Sundance had purchased a new Buick, apparently under the alias he was using, Damon—

HEUER:

WILLETT: Okay, or Malentino, apparently, but Peterson, I think, you know, on this could be checked as to how that car was registered. But under that alias, I d know from the cases that that was the name the warrant was under, was Damon Peterson or Malentino, when there was a warrant on it initially. Sundance, Damon Peterson—

HEUER: Uh-huh.

WILLETT:—had given this new Buick to Gene Perry. I don't know why exactly, but it was a new Buick. And so apparently, when they find Gene Perry in the new Buick, perhaps by then they had enough leads that the license plate as NCIC'd on the Buick or something, from what Pruett says, Perry wanted to keep that new Buick. He sort of says dumb shit, but then you'd have to know Pruett, I guess. Anyway, he says Gene Perry owned up to the alias of Damon Peterson because he wanted to keep that new Buick. And it was at that point when he owned up to that alias, apparently the arrest was made on the outstanding warrant, that apparently he did receive the death sentence pursuant to—

HEUER: But actually, the car was registered to Damon?

WILLETT: That's my understanding.

HEUER: And Damon was the one that was in northwest Arkansas and Gene wasn't in northwest, he was in Alabama at that time.

WILLETT: Actually, this happened down in Florida, is my understanding.

HEUER: But when he owned up—when he was arrested, he was in Florida.

WILLETT: Uh-huh.

HEUER: Okay.

WILLETT: With the new Buick.

LAMBERT: Where did the transfer of the Buick take place, was that in Florida?

WILLETT: I'm afraid I don't have any hard information on that. I meant to ask Pruett what they kept the goods in. I was sort of keeping in mind that it was Friday, and trying to, you know, not to be too late as far as confirmed with you with being the end of the week and me needing to be back to Texas, but I was interested—also, the cases speak to the jury at least as it got back to Beaver Lake and sort of some orange duffel bags. I meant to ask Pruett what they put the bootie in out of this and I didn't get a change to. It slipped my mind and we went on to more that could well be more pertinent.

\* \* \* \* \* \*

HEUER: All right. let me ask you this. Since we apparently on the money aspect, Pruett is now willing to cooperate with us without money?

WILLETT: No, I think . he's not yet. Willing to do this, I mean we are cooperating, he is certainly at this point where through me today.

HEUER: Okay.

WILLETT: but he told me that if he had the money he would give the deposition, he'd finally says I'll even provide in court testimony. The deposition would be interesting, no doubt, but well, anyway, for what it's worth at this point, these details that perhaps no one else would know. Anyway, his—he said if it comes out in the paper, he'll just deny the whole thing unless the money's been paid. Is that responsive?

LAMBERT: How does he feel about us coming down there and talking to him, do you know?

WILLETT: He'd like to see the money.

HEUER: Will he not talk to us without the money?

WILLETT: That was what he told me when I saw him last time. The issue didn't really come up this time.

HEUER: Do you have any objection, as his counsel, of us, knowing now that we're not going to pay any money to him for his testimony, and what not, do you have any objection to us going down and attempting to interview him as a witness?

WILLETT: I don't, but let me give a specific example. I think I know him as— or better than anyone in this room. You'll

recall perhaps that I had some hesitation in giving you a photocopy of the letter before. And I hope you'll understand that that was only because I didn't want to queer the deal, if you will, as far as his availability perhaps, somewhere on down the line as that may be advisable, further on down. My legal instinct is to let this jell and sit with it a little bit and then perhaps we can confer further on it. Certainly, I think if his deposition were to be made available and I will say, knowing him as I do, I really think he's going to—well, look any man in his position, you know, what's he got to lose, you know.

HEUER: Why would he be willing to do this for $7,500?

WILLETT: Because he doesn't have anything to lose really. He's not subject to any law enforcement—

HEUER: Why would he require a payment though, if he doesn't have anything to lose?

WILLETT: He does have some conscience I think, as far as Gene Perry's being there or this wouldn't have come out in the first place. In other words, he confided in me only because he had some conscience about it. But okay, he mentioned it today and certainly, you know, being there to be able to see his demeanor is worth something. the trier of fact, and then I'm sure you know, as far as appellate work. But he said oh, he was just being kind of hard about it, he said this happened to Gene Perry because of something else he did in his life and it's just his karma coming back on him.

Other statements about Pruett's knowledge of facts and circumstances relating to the Van Buren, Arkansas, murders will be found in other letters he wrote to Mr. Willett which were admitted into evidence. For instance, petitioner's Exhibit 19 which is the letter from Pruett dated March 21, 1990, contains the following:

Say Bro, that Mike Gallagher guy sounds pretty good, and I agree with you on the credibility issue. I'm gonna answer the questions you wrote down and you can give them to Mike, "plus have Mike call Perry's attorneys"!! If that'll help us get the Har-

ley Parts out of Geraldo, then good." but I'm not going to give Mike anymore than I've already given Perry's attorneys," cause I don't want those attorneys to have anymore evidence than they have now—unless they or Geraldo does come up with the Harley Parts. I'll write Jake Dalton today also and tell him to talk with Mike about Michelle and the Perry case. Maybe that will help Mike to believe me, "also help him to get interested in Michelle's Murder, plus help Jake sale the Book."!! Hey Bro, you did Damn Good, and I'm proud of you." Now let us see if we can get those Harley Parts."

"Answers to questions for Mike"

1. Sundance used the name, "*DAMON PETERSON,*" (birth Certificate Name)!! He also used "DAMON MALATINO" and had a birth certificate for it too!! Tell Mike if he can talk with the D.A. there in Alburge (sic). and get "Barbara Padilla's" address, and Guy Rogers address, then they can both tell him about Sundance." I hooked Barbara up with sundance in 1980, and he almost killed her!! "Also see if you can get her address for me too,—it may be in the Alburge (sic). phone book"!!

2. Pat's last name was "ETIER," But she also used the last name, "MALATINO"!! She use to have a Ole Cabin around "Mountainburg, Ark."!!

3. No tickets going or coming back. Michelle and I stayed in the Van in Fort Smith, "at the same place I killed the woman at in the robbery I'm convicted of now. Thats how I knew about that place and why I used it to dump the body at. Sundance was staying at the "Terry Motel in Van Buren," and Michelle and I met him there.

4. Guy Rogers watched my mobile home, dogs, trucks, and scooters while Michelle and I were gone and he is the only person who knew Michelle and I were gone.

Maybe this will help some. I also told Zeb Jones down in Miss. to call Perry's attorneys and give them a statement about me telling the FBI about a Jewelry Store robbery I done (I told them in 1981—in Jackson), but I refused to tell them where the Jewelry Store Robbery took place. Tell

Mike to also call Zeb Jones." Thats all I'm going to release now Bro, hell, if that don't help Mike believe me, then nothing will.

In addition to Mr. Pruett's letters and statements to Mr. Willett and his own testimony, Mr. Perry has brought forth the testimony of other witnesses in support of his Supplemental Petition. A great effort was made to show that Mr. Anderson may have said on one or more prior occasions that Mr. Perry was not the person who was with him during the robbery and murders on September 10, 1980. That effort has failed.

When Mr. Anderson was asked if he did not tell one of Mr. Perry's attorneys, prior to the Perry trial, that "Gene Perry is not the man I was with in Van Buren when I did the jewelry store," he responded, "I have never made that statement." And, the Court notes that Mr. Harrison (the attorney), when he testified, could not recall exactly what Mr. Anderson, in fact, said. He could not recall if Anderson said Perry was not the person with him ("because I don't know if Anderson admitted that") or that Perry was not the person known as Damon Peterson, or if he (Anderson) was not the person who was with Perry in Alabama. Of course, Anderson did, and does, deny being in Alabama in August 1980 with or without Perry. He claims to have been in Kansas.

Perry tried to make the point that Anderson did not identify him as "Damon Peterson" until 63 days after being returned to Arkansas from Vancouver, Canada, where he had been arrested. But it is clear from the evidence, and the Court so finds, that Mr. Anderson identified Mr. Perry as Damon Peterson, and as the one who murdered Mr. Staton and Ms. Ware, *before* he left Canada. And he has been consistent on this point since (even though at one point, after they were both in prison, he engaged in some "negotiations" with Perry concerning Perry's "help" in connection with Anderson's conviction of the Georgia murders).

This finding also thoroughly undercuts Pruett's explanation of why Anderson "fingered" Perry. Recall Pruett's statements in his May 8, 1989, letter to Willett, *supra:*

"... Sundance knew one of the police officers on the Van Buren Force and he told Sundance everything the police knew about the crime. Sundance paid the policeman to tell Rick (Rick was in the Van Buren Jail) that if he didn't say it was him and Gene Perry who did the crime, then I (me) would go kill his girl-friend and sister in Kansas. Rick was really scared of me, so he did just like Sundance told him to. About three months later. (After I seen Rick was going to do just like he was told), I went ahead and killed Sundance ..."

But, as found above, Anderson implicated Perry to Arkansas law officers while Anderson was still in Canada, i.e. shortly after his arrest there.

The Court finds that Anderson never met Pruett before 1981. And he could have known of no threat by Pruett at the time he identified Perry from a photo-line up in Canada. And, as pointed out below, it is difficult to identify any motive Anderson would have to say Perry was the same person as Damon Peterson if he were not that same person.

Here we have an egregious example of attempted manipulation of the justice system by an admitted murderer. And, although Mr. Pruett refers to his conscience, his most obvious motives are to obtain money and further notoriety. Mr. Pruett's cynicism and at least part of his motive ("Harley Parts" equals money) are revealed in several of his letters to Mr. Willett. For instance the letter dated June 17, 1991, Petitioner's Exhibit 12, states as follows:

As for Sam Huer, and Perry!! Well Bro, "fuck them, both"!! I'm not going to that Court Hearing unless we get the Harley Parts up front. And if Huer calls you to the Hearing, "then just get up there and tell the Judge you are handling My Appeal in New Mexico, and I have advised you to say NOTING"!! (sic)

Now, if the Judge Order's you to talk, "then thats different, cause I sure don't want you to go to jail but if the Judge doesn't Order You to talk, then don't say a word to help Perry at that Hearing. I'll show that Cocksucker how to be a Real Weasel.!! If they don't give us the Harley Parts, then fuck them.

As for Jack Gilliam, after Perry is Executed, then maybe I'll give him the gun that was used and the rest of the Evidents (sic) to prove I did it "just so I can make a fool out of the State's A.G's Office for Executing an innocent man, "Har!! Har!! I know that sounds cold, but I'm starting to believe now that the whole Pruett/Perry deal will be worth alot more after Perry is Executed, and since Perry and Huer wants to play games with Perry's life (by not giving us the Harley Parts) then fuck them. Like I said, the whole deal will sale (sic) better after Perry has been Executed—"so fuck them all"!! I know I can prove I did the murders and I'll really get the last laugh on them all," the State of Arkansas too"!!

Just remember this Bro, "you busted your ass to help prove Perry was innocent, and to get the wheels of Justice to help him"!! It was I who keep back part of the real good Evidents (not you)!! The State will spend millions to try and prove Perry did it!! And Perry and Huer both know that fact. If Perry and Huer are so dumb as to not see that fact and to damn dumb to give us the Harley Parts, "then let the State with all its millions and manpower go ahead and execute the wrong man."

You can only do as much to save a fool's life, and Perry is a fool. He knows I am the only one who can help him now and I'm not all that crazy over seeing the wheels of Justice move right now for Perry. So let the fool be Executed, "you did your part to try and save his life."

And after he is Executed, "then I'll give everything up to the Right Magazine or T.V. Show, and prove Perry was innocent"!! Then you and I will really make some good money off this story. So for now, just let things go, and if Perry wants to stay a fool, then let him, "cause I'll still get my money after he is Executed—and maybe even more too"!!

Along the same vein see the following comments contained in Mr. Pruett's letter to Mr. Willett dated July 12, 1991, Petitioner's Exhibit 13:

That reminds me, I have somemore good news, and some bad news to share with you. My Attorney's from New York City called here yesterday and told me that Judge Howard has sit (sic) a Nov. 25th Hearing Date for My Appeal in Federal District Court. They said they are gonna try and ask the Judge to set the Hearing Date off till after Jan. 1st, 1992, "cause they don't want to fly down here just for one day (the 25th) then back home for Thanksgiving, and then back down here for another four or five days. They seem to feel sure they'll get a new Hearing Date, so keep your finger's crossed that they will,!! Looks like the long wait here in Arkansas could be up pretty soon. Man, I don't mind telling you I'd like to be back in Miss.!! If I ever beat the Death Sentence here in Arkansas, then I'm gonna try and get transferred to New Mexico or Colorado.!!

Now, Gene Perry stopped by my cell door the other day on his way to take a shower and he let me read a letter he had just received from his attorney here. The letter said the Federal Judge seat (sic) Dec. 16th for Perry's Hearing Date And that he and the State Attorney General (from here in Ark.) were going to New Mexico to get *Statement from You* !!

I guess Perry's attorney feels he can squeeze you into giving a statement for Perry if he has the State A.G. with him. So like you wrote "Fuck–Them," you and I shot straight with them all from the word go. They are the ones who tried to put the squeeze on you because you are an attorney, and it was them who played the Waiting Game!!

Gene Perry had his chance for freedom, but instead of playing the Harley Parts, he listened to his attorneys and played the waiting game and squeeze game on you. So, in my books Gene Perry was as much in The Wrong as his attorneys were. All he had to do was shot straight with me and he would have his freedom. Since he went along with his attorneys, then let them worry over Perry's Execution, "cause I'm sure not going to, and neither should you"!!

Don't worry over any of this anymore. When Perry's Attorney and the Ark.A.G.

comes to see you, "then tell them the New Mexico Advisory Committee told you to do as I wish and its My wishs that you don't give a Statement or Testify for Perry in Federal Court!! And that should be the end of it. Then after Perry is Executed, we can both come forward and make a Killing off how the State and Perry's Attorneys let him be Executed,!! As far as I'm concerned, "Perry is Dead," and I'm just waiting to cash in on the Execution when its over with. So like I said, "don't worry over it, and just tell them all to Blame Themselfs"!!

Finally, note the language in Pruett's letter to Willett dated December 30, 1991, Petitioner's Exhibit 14:

I see now the only way you and I are gonna get any money out of this Perry Deal is to wait till after he is Executed. Then we'll get with that guy n England and sale (sic) the Whole Story,!!

That reminds me, I also got a Christmas Card and letter from John Jake Dalton.... Anyway, I hope he'll do something with the Book now, "because the U.S. Supreme Court ruled last month that the Son of Sam Law in New York wasn't any good"—that prisoners *can make* money and keep it, off the sale of a Book on their Crimes,!!

Other communications by Marion Pruett show him to have used the same approach in other situations that he is using here. For instance respondent's Exhibit # 1 is a letter to Ms. Pettigrew of the *Jackson Daily News,* written by Pruett on November 7, 1989. The daughter of one of his murder victims, Mrs. Lowe, had made many efforts to find out what happened to an expensive heirloom diamond ring that Mrs. Lowe had been wearing when she was kidnaped by Pruett. In this letter Pruett states, "Well, Ms. Pettigrew, I'll not only tell you what I did with that expensive heirloom but I will also give you the name and address of the woman who is still wearing it to this day." He then states what he wants for this "exclusive story": "A nice big donation to my legal fund to prove I did not murder my wife in New Mexico. So if the *Jackson Daily News* will donate 20,000 dollars to my New Mexico attorney (Mr.

Brian Willett) for my New Mexico appeal, then I will give you the person who still wears that expensive diamond ring and a first hand interview."

In a similar vein we find the letter written by Mr. Brian Willett to Geraldo Rivera on May 24, 1990, in an attempt to get Mr. Rivera interested in three subjects: "(1) Pruett—Perry, Arkansas (see newspaper clipping, copy enclosed). (2) Pruett—Ring offer (Mississippi, see copy enclosed). (3) Pruett—Body location offer (Florida; see below)." Mr. Willett then goes on to state that item 3 will bear on the credibility of the other two items. He states that item 3. is "that Mr. Pruett offers to disclose, and even point out, the location of a body resulting from his robbing a bank in Tallahassee, Florida. He proposes to do this through the auspices of your program." Finally, Mr. Willett states, "Mr. Pruett does expect some monetary compensation for providing such information and assistance in these matters."

Nevertheless, we must not forget that the focus here is on Mr. Perry's claim of actual innocence rather than on the ethics or morality of Mr. Pruett. Still the credibility of Mr. Pruett remains central to the issue. But the best tool we have for determining credibility in a judicial proceeding, that is, cross examination under oath, is not available to us because Mr. Pruett refuses to testify. So we are called upon to credit the unchallenged out-of-court statements of a felon whose admitted conduct reveals a criminal mind of seldom encountered depravity and evil. What guidance do we find in the law?

### THE LAW

The Supreme Court has recently clarified the law governing the consideration of habeas claims, such as petitioner's, that seek relief on the grounds that the petitioner is "actually innocent" of the crime(s) of which he has been convicted. In *Schlup v. Delo,* — U.S. ——, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Court recognized three possible scenarios in which such "actual innocence" claims can be raised, each of which must be evaluated under a separate analytical framework. First, where a petitioner is attempting to put forward a constitutional claim in a successor habeas proceeding, and cannot

make the requisite showing of "cause and prejudice" necessary to avoid the bar of the "abuse of the writ" doctrine, see *McCleskey v. Zant,* 499 U.S. 467, 493–94, 111 S.Ct. 1454, 1469–70, 113 L.Ed.2d 517 (1991), the petitioner may raise his claim of "actual innocence" as a means of persuading the habeas court to address the merits of his constitutional claim. In this scenario, the petitioner's claim of actual innocence is not itself a substantive claim for relief, but is rather a procedural gateway that will allow him to present the underlying independent, and otherwise barred, constitutional claim.[2] *Schlup v. Delo, supra,* —— U.S. at ——–——, 115 S.Ct. at 860–62. In order to pass through this gateway, the petitioner must prove that it is "more likely than not" that he is, in fact, actually innocent of the crime(s) of which he has been convicted. *Id.* at ——, 115 S.Ct. at 867; *see also Murray v. Carrier,* 477 U.S. 478, 494–96, 106 S.Ct. 2639, 2648–49, 91 L.Ed.2d 397 (1986). Second, a habeas petitioner can argue that, while he may be guilty of the crime(s) charged, he is actually innocent of the death penalty. See *Sawyer v. Whitley,* 505 U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Since such a claim does not assert that the petitioner's conviction was the product of a constitutionally infirm proceeding, the petitioner must meet a higher burden of proof and must demonstrate by " 'clear and convincing evidence' " that he is actually innocent of the death penalty. *Schlup v. Delo, supra,* —— U.S. at ——, 115 S.Ct. at 865 (quoting *Sawyer v. Whitley, supra,* 505 U.S. at ——, 112 S.Ct. at 2515) (emphasis omitted). Finally, a petitioner can argue that he is, in fact, actually innocent of the crime(s) charged, and that given this fact it would be constitutionally impermissible to allow him to be executed.[3] Under this scenario, the petitioner's claim of actual innocence is advanced as a substantive ground for habeas relief in-and-of itself. However, the Supreme Court did not discuss the parameters governing free-standing claims of actual innocence in its *Schlup* decision. See —— U.S. at ——–—— & n. 31, 115 S.Ct.

at 860–61 & n. 31. Accordingly, in addition to the gateway claim analysis set forth in *Schlup v. Delo,* the five opinions in *Herrera v. Collins,* 506 U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) relating to freestanding claims, set the stage for the discussion of petitioner's actual innocence claims.

■ First we must ask: Is there an independent constitutional violation in the underlying state criminal proceedings? Here petitioner reasserts the claim made in his first habeas proceeding that the trial court's refusal to permit the issuance of subpoenas to compel the attendance of four out-of-state alibi witnesses violated his Sixth Amendment right to compulsory process. This Court, see *supra,* denied this claim and its ruling thereon was affirmed on appeal. See *Perry v. Lockhart,* 871 F.2d 1384 (1989). But petitioner asserts that this Court should now revisit that issue in the light of the newly discovered evidence issue. The Court disagrees, concluding that the Sixth Amendment issue was properly resolved in the original habeas proceeding and that it is unaffected by the newly discovered evidence allegations.

There are no other unresolved constitutional claims arising out of the state proceedings up to and including the verdict and sentence. In short, petitioner received a fair trial in accordance with constitutional standards, and there was ample evidence to support the jury's verdicts. But how about *after* the verdict and sentence? Has the State of Arkansas deprived the petitioner of due process under the Fourteenth Amendment by not providing him with a *judicial procedure* for obtaining a new trial based upon newly discovered evidence of his actual innocence? Or, put another way, even if the state is required to provide some remedy in this situation, are the procedures incident to Executive Clemency not sufficient to satisfy the Fourteenth Amendment? Justices Scalia and Thomas are clearly of the opinion that, if indeed any due process is required in such

**2.** In habeas parlance, such claims of actual innocence have become known as a "gateway" (or "*Schlup*") claims.

**3.** In habeas parlance, such claims of actual innocence have become known as "free-standing" (or "*Herrera*") claims.

situations, Executive Clemency should be enough. Note Justice Scalia's language:

> We granted certiorari on the question whether it violates due process or constitutes cruel and unusual punishment for a State to execute a person who, having been convicted of murder after a full and fair trial, later alleges that newly discovered evidence shows him to be "actually innocent." I would have preferred to decide that question, particularly since, as the Court's discussion shows, it is perfectly clear what the answer is: There is no basis in text, tradition, or even in contemporary practice (if that were enough), for finding in the Constitution a right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction.

\* \* \* \* \* \*

> I nonetheless join the entirety of the Court's opinion, including the final portion (pages 869–870)—because there is no legal error in deciding a case by assuming *arguendo* that an asserted constitutional right exists, and because I can understand, or at least am accustomed to, the reluctance of the present Court to admit publicly that Our Perfect Constitution lets stand any injustice, much less the execution of an innocent man who has received, though to no avail, all the process that our society has traditionally deemed adequate. With any luck, we shall avoid ever having to face this embarrassing question again, since it is improbable that evidence of innocence as convincing as today's opinion requires would fail to produce an executive pardon.

Chief Justice Rehnquist's opinion is less clear on the point. Still, it appears that he is of the opinion that the potential of executive, i.e. not judicial, relief would meet any due process requirement. A great part of his opinion is devoted to laying the foundation for such a position. See *Herrera*, 506 U.S. at ——–——, 113 S.Ct. at 864–869. Therein he reviews the history of new trials in our state and federal jurisprudence and the current state of time limitations on the filing of motions for new trials on the basis of newly discovered evidence. Note his language:

In 1945, we set a two-year time limit for filing new trial motions based on newly discovered evidence and abolished the exception for capital cases Rule 33, Federal Rules of Criminal Procedure, 327 U.S. 821, 855–856 ("A motion for new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment"). We have strictly construed the Rule 33 time limits. *Cf. United States v. Smith,* 331 U.S. 469, 473, 67 S.Ct. 1330, 1332, 91 L.Ed. 1610 (1947). And the Rule's treatment of new trials based on newly discovered evidence has not changed since its adoption.

The American Colonies adopted the English common law on new trials. Riddell, New Trial in Present Practice, 27 Yale L.J. 353, 360 (1917). Thus, where new trials were available, motions for such relief typically had to be filed before the expiration of the term during which the trial was held. H. Underhill, Criminal Evidence 579, n. 1 (1998); J. Bassett, Criminal Pleading and Practice 313 (1885). Over time, many States enacted statutes providing for new trials in all types of cases. Some States also extended the time period for filing new trial motions beyond the term of court, but most States required that such motions be made within a few days after the verdict was rendered or before the judgment was entered. See American Law Institute Code of Criminal Procedure 1040–1042 (Official Draft 1931) (reviewing contemporary new trials rules). The practice in the States today, while of limited relevance to our historical inquiry, is divergent. Texas is one of 17 States that requires a new trial motion based on newly discovered evidence to be made within 60 days of judgment. One State adheres to the common-law rule and requires that such a motion be filed during the term in which judgment was rendered. Eighteen jurisdictions have time limits ranging between 1 and 3 years, with 10 States and the District of Columbia following the 2–year federal time limit. Only 15 States allow a new trial motion based on newly discovered evidence to be filed more than 3 years after conviction. Of these States, 4 have waivable time limits of less

than 120 days, 2 have waivable time limits of more than 120 days, and 9 States have no time limits.

In light of the historical availability of new trials, our own amendments to Rule 33, and the contemporary practice in the States, we cannot say that Texas' refusal to entertain petitioner's newly discovered evidence eight years after his conviction transgresses a principle of fundamental fairness "rooted in the traditions and conscience of our people." *Patterson v. New York*, 432 U.S. [197], at 202, 97 S.Ct. [2319,] at 2322[, 53 L.Ed.2d 281 (1977)] (internal quotation marks and citations omitted). This is not to say, however, that petitioner is left without a forum to raise his actual innocence claim. For under Texas law, petitioner may file a request for executive clemency. See Tex. Const., Art. Iv., § 11; Tex.Code Crim.Proc.Ann., Art., 48.01 (Vernon 1979). Clemency is deeply rooted in our Anglo–American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted.

In a footnote Chief Justice Rehnquist notes that 17 states, including Arkansas, require such motions to be filed within 60 days of judgment. The note states that Arkansas allows only 30 days. But see discussion below.

The other six Justices, in their concurring and dissenting opinions, appear to support a due process requirement that would provide some *judicial* ventilation of the claim of newly discovered evidence of actual innocence in death penalty cases, although that conclusion is subject to debate. Justice O'Connor, joined by Justice Kennedy, deals with this issue thusly:

> Consequently, the issue before us is not whether a State can execute the innocent. It is, as the Court notes, whether a fairly convicted and therefore legally guilty person is constitutionally entitled to yet another judicial proceeding in which to adjudicate his guilt anew, 10 years after conviction, notwithstanding his failure to demonstrate that constitutional error infected his trial. *Ante*, [506 U.S. at ——, n. 6, 113 S.Ct.] at 864, n. 6; see *ante*, [506 U.S. at ——, 113 S.Ct.] at 860. In most circumstances, that question would answer itself in the negative. Our society has a high degree of confidence in its criminal trials, in no small part because the Constitution offers unparalleled protections against convicting the innocent. *Ante*, [506 U.S. at ——, 113 S.Ct.] at 859 (opinion of the Court). The question similarly would be answered in the negative today, except for the disturbing nature of the claim before us. Petitioner contends not only that the Constitution's protections "sometimes fail," *post*, [506 U.S. at ——, 113 S.Ct. at] 876 (dissenting opinion), but that their failure in his case will result in his execution—even though he is factually innocent and has evidence to prove it.

Exercising restraint, the Court and Justice WHITE assume for the sake of argument that, if a prisoner were to make an exceptionally strong showing of actual innocence, the execution could not go forward. Justice BLACKMUN, in contrast would expressly so hold; he would also announce the precise burden of proof. Compare *ante*, [506 U.S. at ——, 113 S.Ct.] at 869 (opinion of the Court) (We assume, "for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim"), and *ante*, [506 U.S. at ——, 113 S.Ct.] at 875 (WHITE, J., concurring in judgment) (assuming that a persuasive showing of actual innocence would render a conviction unconstitutional but explaining that, even under such an assumption, "petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could [find], proof of guilt beyond reasonable doubt.' *Jackson v. Virginia*, 443 U.S. 307, 314, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979)"), with *post*, [506 U.S. at ——, 113 S.Ct.] at 882 (dissenting opinion) ("I would hold that, to obtain relief on a claim of actual innocence, the petitioner must show that he probably is innocent").

Resolving the issue is neither necessary nor advisable in this case. The question is a sensitive and, to say the least, troubling one. It implicates not just the life of a single individual, but also the State's powerful and legitimate interest punishing the guilty, and the nature of state-federal relations. Indeed, as the Court persuasively demonstrates, *ante,* [506 U.S. at —— ——, 113 S.Ct.] at 859–869, throughout our history the federal courts have assumed that they should not and could not intervene to prevent an execution so long as the prisoner had been convicted after a constitutionally adequate trial. The prisoner's sole remedy was a pardon or clemency. Nonetheless, the proper disposition of this case is neither difficult nor troubling.

Why not difficult or troubling? Because Justice O'Connor examines the record and finds that there is no possibility that Herrera might actually be innocent. Her conclusion: "Petitioner is guilty," *Id.* 506 U.S. at p. ——, 113 S.Ct. at p. 873. She thereby avoided having to decide the "sensitive" and "troubling" issue. So it is at least possible that Justice O'Connor, Justice Kennedy and Chief Justice Rehnquist, will join Justices Scalia and Thomas if there is ever any show-down on this issue. And, of course, Justice White and Justice Blackmun are no longer on the Court.

Of course, if Justice Scalia's position controlled, this Supplemental Habeas Petition would simply have to be dismissed without further ado. In that situation Mr. Perry's only recourse would be to seek Executive Clemency. But even Justice Scalia acknowledges that the *Herrera* opinion does not unequivocally leave the lower courts this option. Note his language:

My concern is that in making life easier for ourselves we not appear to make it harder for the lower federal courts, imposing upon them the burden of regularly analyzing newly-discovered-evidence-of-innocence claims in capital cases (in which event such federal claims, it can confidently be predicted, will become routine and even repetitive).

But he does suggest that lower courts could follow *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and certain decisions of various Courts of Appeals and thereby avoid this exercise. Again note his language:

A number of Courts of Appeals have hitherto held, largely in reliance on our unelaborated statement in *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), that newly discovered evidence relevant only to a state prisoner's guilt or innocence is not a basis for federal habeas corpus relief. See, *e.g., Boyd v. Puckett,* 905 F.2d 895, 896–897 (CA5), cert. denied, 498 U.S. 988, 111 S.Ct. 526, 112 L.Ed.2d 537 (1990); *Stockton v. Virginia,* 852 F.2d 740, 749 (CA4 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989); *Swindle v. Davis,* 846 F.2d 706, 707 (CA11 1988) (*per curiam* ); *Byrd v. Armontrout,* 880 F.2d 1, 8 (CA8 1989), cert. denied, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); *Burks v. Egeler,* 512 F.2d 221, 230 (CA6), cert. denied, 423 U.S. 937, 96 S.Ct. 297, 46 L.Ed.2d 270 (1975). I do not understand it to be the import of today's decision that those holdings are to be replaced with a strange regime that assumes permanently, though only "arguendo," that a constitutional right exists, and expends substantial judicial resources on that assumption. The Court's extensive and scholarly discussion of the question presented in the present case does nothing but support our statement in *Townsend,* and strengthen the validity of the holdings based upon it.

Is it possible that, under *Herrera,* this Court should dismiss this case because of petitioner's failure to exhaust state remedies, *i.e.* the remedy of Executive Clemency?

In light of the numerous opinions rendered in the Supreme Court's decision in *Herrera v. Collins,* the lower courts have been faced with somewhat of a quandary as to how exactly a claim of "actual innocence" should now be evaluated in the context of a successive petition for a writ of habeas corpus. In an effort to answer this question, the Eighth Circuit has since endeavored to piece together the Justices' various opinions, and has formulated a two-part analytical framework which is to be applied to claims of actual

innocence based on newly discovered evidence. In so doing, the Eighth Circuit has recognized two distinct claims of actual innocence, namely gateway claims and freestanding claims, each of which may, if proven, serve as a basis for habeas relief. See *Griffin v. Delo*, 33 F.3d 895, 906–08 (8th Cir.1994).

Since petitioner's attempt to raise his claim of actual innocence in this successive habeas petition is presumptively viewed as an abuse of the writ, *see McCleskey v. Zant, supra*, 499 U.S. at 477–93, 111 S.Ct. at 1461–69; *cf.* 28 U.S.C.A. § 2244(b) (West 1994), the Court must first consider his claim in the context of the "miscarriage of justice"-"actual innocence" exception to the abuse-of-the-writ doctrine articulated in *Sawyer v. Whitley, supra*, 505 U.S. at ——, 112 S.Ct. at 2519. *Griffin v. Delo, supra*, 33 F.3d at 906. As the Eighth Circuit has repeatedly recognized, in this context petitioner is not required to make the "cause-and-prejudice" showing that is normally required to avoid application of the abuse-of-the-writ doctrine, but rather must only prove that he is, in fact, actually innocent. See *Murray v. Delo*, 34 F.3d 1367, 1372–73 (8th Cir.1994); *Fairchild v. Norris*, 21 F.3d 799, 801, *cert. denied*, —— U.S. ——, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1994); *Battle v. Delo*, 19 F.3d 1547, 1552 (8th Cir. 1994). Under this analysis, however, petitioner's claim of actual innocence is not itself viewed as a cognizable claim for habeas relief. Instead, it functions as a gateway claim which, if proven, would allow the Court to reach the merits of an independent claim for habeas relief that would otherwise be construed as procedurally barred.[4] *Griffin v. Delo, supra*, 33 F.3d at 906–07 (quoting

*Herrera v. Collins, supra*, 506 U.S. at ——, 113 S.Ct. at 862). Since the current petition does not raise any claim for relief other than petitioner's claim of actual innocence, this mode of analysis is inapplicable to the present case.

However, the Eighth Circuit has also concluded that a meritorious claim of actual innocence can, standing alone, serve as a valid and independent basis for the issuance of a writ of habeas corpus. In so concluding, the Court of Appeals viewed the Supreme Court as having recognized in *Herrera* that the execution of a person who was actually innocent would violate the constitutional guarantees of due process.[5] *Griffin v. Delo, supra*, 33 F.3d at 908; *Schlup v. Delo*, 11 F.3d 738, 743–44, (8th Cir.1993), *vacated on other grounds*, —— U.S. ——, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, in the present context petitioner's claim of actual innocence must be viewed as a free-standing claim for habeas relief, the merits of which will ultimately determine the fate of his habeas petition. *See ibid.* In assessing the merits of petitioner's free-standing actual innocence claim, based as it is upon newly discovered evidence, the Court's inquiry is quite circumscribed:

> [The Court] must review the evidence [, including petitioner's newly discovered evidence,] to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[,]' not whether '[the Court believes]

---

4. The Supreme Court's recognition of such gateway claims is found Chief Justice Rehnquist's opinion for the Court in *Herrera*, 506 U.S. at ——, 113 S.Ct. at 862, which was joined by Justices O'Connor and Kennedy, *see id.* at ——, 113 S.Ct. at 870–71 (O'Connor, J., concurring), Justices Scalia and Thomas. *Id.* at ——, 113 S.Ct. at 875 (Scalia, J., concurring), and Justice White. *Id.* (White, J., concurring). Justices Blackmun, Stevens and Souter disagreed with this portion of the majority's analysis. *Id.* at —— ——, 113 S.Ct. at 880–82 (Blackmun, J., dissenting). *See Also, Schlup v. Delo, supra.*

5. Justices Blackmun, Stevens and Souter expressly adopted this legal principle under both

the Eighth and Fourteenth Amendments. *Herrera v. Collins, supra*, 506 U.S. at ——, 113 S.Ct. at 878–79 (Blackmun, J., dissenting). Justices O'Connor and Kennedy also apparently endorsed this principle as being compelled by the Constitution's due process guarantees, *id.* at ——, 113 S.Ct. at 870 (O'Connor, J., concurring), as did Justice White. *Id.* at ——, 113 S.Ct. at 875. Chief Justice Rehnquist assumed, without deciding, that it would be unconstitutional to execute an innocent person, *id.* at ——, 113 S.Ct. at 869, as did Justices Scalia and Thomas, though these latter two Justices expressed considerable doubt as to this assumption. *Id.* at ——, 113 S.Ct. at 875 (Scalia, J., concurring).

that the evidence ... establishe[s] guilt beyond a reasonable doubt.'

*Murray v. Delo, supra,* 34 F.3d at 1374 (quoting *Herrera v. Collins, supra,* 506 U.S. at ——, 113 S.Ct. at 861); *see also Griffin v. Delo, supra,* 33 F.3d at 908; *Battle v. Delo, supra,* 19 F.3d at 1552; *Schlup v. Delo, supra,* 11 F.3d at 743–44. Further, the Eighth Circuit has held that a petitioner must prove a free-standing claim of actual innocence by clear and convincing evidence.[6] *Schlup v. Delo, supra,* 11 F.3d at 740; *cf. Griffin v. Delo, supra,* 33 F.3d at 908.

■ However, before the Court may proceed to evaluate the merits of petitioner's free-standing claim of actual innocence, the Court must be satisfied that the Arkansas courts no longer provide a " 'state avenue open to process such a claim.' "[7] *Griffin v. Delo, supra,* 33 F.3d at 908 (quoting *Herrera v. Collins, supra,* 506 U.S. at ——, 113 S.Ct. at 869); *accord Schlup v. Delo, supra,* 11 F.3d at 743 (same). As this requirement is, in reality, nothing more than a corollary to the exhaustion-of-remedies doctrine that has long obtained in state petitioners' habeas corpus proceedings, 28 U.S.C.A. § 2254(b) (1994); *see Ex parte Royall,* 117 U.S. 241, 252–53, 6 S.Ct. 734, 740–41, 29 L.Ed. 868

(1886), the Court may not address the merits of petitioner's claim if "he has the right under the law of [Arkansas] to raise, by any available procedure, the question presented" in this habeas petition. 28 U.S.C.A. § 2254(c) (1994); *see also Castille v. Peoples,* 489 U.S. 346, 350–51, 109 S.Ct. 1056, 1059–60, 103 L.Ed.2d 380 (1989); *Dolny v. Erickson,* 32 F.3d 381, 383–84 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 902, 130 L.Ed.2d 786 (1994). If, however, none of the potential avenues for state relief remain open, then the merits of petitioner's actual innocence claim must be addressed. *See Griffin v. Delo, supra,* 33 F.3d at 908; *Schlup v. Delo, supra,* 11 F.3d at 743–44; *cf. Herrera v. Collins, supra,* 506 U.S. at ——, 113 S.Ct. at 869 ("We may assume ... that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would ... warrant federal habeas relief if there were no state avenue open to process such a claim."); *Coleman v. Thompson,* 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.").

---

**6.** The Court of Appeals derived this standard of review from *Sawyer v. Whitley, supra,* 505 U.S. at ——, 112 S.Ct. at 2522, wherein Supreme Court adopted the clear-and-convincing evidence standard for evaluating a petitioner's claim that he is actually innocent of the death penalty. Although the Eighth Circuit's extension of the clear-and-convincing standard to free-standing claims of actual innocence could be seen as being inconsistent with the law, of at least two other circuits, *e.g. Montoya v. Collins,* 988 F.2d 11, 12–13 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 1630, —— L.Ed.2d —— (1993); *Enoch v. Gramley,* 861 F.Supp. 718, 734–37 (C.D.Ill.1994), it is not inconsistent with the Supreme Court's *Herrera* decision. See 506 U.S. at ——, 113 S.Ct. at 856 (requiring a "truly persuasive demonstration of 'actual innocence' " in the free-standing context).

**7.** The Eighth Circuit has expressly declined to address the question of whether a petitioner must first seek executive clemency based upon his claim of actual innocence in order to satisfy this requirement. *Murray v. Delo, supra,* 34 F.3d at 1375 n. 3. While one judge of the Court of Appeals has twice advocated such a requirement, *Griffin v. Delo, supra,* 33 F.3d at 909 (Beam, J., concurring); *Schlup v. Delo, supra,* 11 F.3d at 743 n. 3 (opinion of Beam, J., not joined in part by Gibson, J.), this view has not yet garnered the

assent of any other judge for the Eighth Circuit. See *Griffin v. Delo, supra,* 33 F.3d at 906–09 (Opinion of Urbom, J., joined by Gibson, J.); *Schlup v. Delo, supra,* 11 F.3d at 743 n. 3 (Opinion of Beam, J., not joined in part by Gibson, J.); *id.* at 751–54 (Heaney, J., dissenting). The Court believes that an application for discretionary executive clemency cannot reasonably be seen as a process which effectively protects the rights of prisoners, see 28 U.S.C.A. § 2254(b) (1994), especially in light of the Eighth Circuit's conclusion that a state's clemency proceedings need not accommodate the Constitution's requirements of due process and fundamental fairness. *See Otey v. Stenberg,* 34 F.3d 635 (8th Cir.1994). Thus, the Court declines to require petitioner to make such an application prior to the court addressing the merits of his claim. *See Herrera v. Collins, supra,* 506 U.S. ——, 113 S.Ct. at 881 (Blackmun, J., dissenting); *cf. Solem v. Helm,* 463 U.S. 277, 303, 103 S.Ct. 3001, 3016, 77 L.Ed.2d 637 (1983). But see, infra, this Court's suggestion that the United States Supreme Court might consider requiring the states to provide a *judicial* remedy in this situation as a condition to the state's right to execute persons sentenced to death.

As this opinion has previously indicated, petitioner's claim of actual innocence is founded upon what he characterizes as newly discovered evidence. Arkansas law permits a person convicted of a crime to file a motion with the trial court seeking a new trial based on newly discovered evidence,[8] provided that such a motion is filed "[p]rior to the time fixed to file a notice of appeal." Ark.Code Ann. § 16–91–105(b)(1) (Michie 1987); *accord* Ark.R.Crim.P. 36.22 (Michie 1994) ("A ... motion for new trial ... must be filed prior to the time fixed to file a notice of appeal.). Arkansas law requires the filing of a notice of appeal, and hence a motion for a new trial, "[w]ithin thirty (30) days from the date of the sentence and entry of judgment by the trial judge." Ark.Code Ann. § 16–91–105(a)(1) (Michie 1987); *accord* Ark.R.Crim.P. 36.9(a) (Michie 1994). Clearly, petitioner's effort to secure a new trial based upon newly discovered evidence, coming as it does some 13 years following the trial court's entry of the criminal judgment of conviction against him, is well outside the time period prescribed by Arkansas law for the presentation of such claims. Thus, it is not terribly surprising that petitioner has made no effort to present his claim of actual innocence to the state courts.

This conclusion does not, however, dispose of the exhaustion problem presented by the present petition. Although petitioner's claim of actual innocence and request for a new trial is clearly untimely under Arkansas law, this fact does not necessarily mean that the Arkansas courts no longer provide a forum for the adjudication of his claim. This conclusion would only follow if the thirty-day filing period contemplated by § 16–91–105(b)(1) and Rule 36.22 operates so as to limit the state courts' ability to exercise jurisdiction over petitioner's claim. If, on the other hand, this limitations period operates only as a prudential consideration to be taken into account when considering whether to entertain an untimely motion for a new trial, then the state courts would have to be viewed as an available forum for the presentation of petitioner's actual innocence claim. *Compare Herrera v. Collins, supra,* 506 U.S. at ——, —— – ——, 113 S.Ct. at 860, 869–70 (the Supreme Court considered (and rejected) Herrera's actual innocence claim since Texas' thirty-day period for presenting a motion for a new trial imposed a *jurisdictional limitation* on the Texas courts).

Unfortunately, this inquiry is complicated by the fact that the Arkansas courts have not yet considered the question whether Arkansas' thirty-day filing period applicable to a motion for a new trial is jurisdictional in nature.[9] This circumstance could, arguably, justify the Court's dismissal of petitioner's petition, thereby requiring him to present this issue to the state courts.[10] *Cf. Collins v. Lockhart,* 707 F.2d 341, 343–44 (8th Cir. 1983). Alternatively, the Court could attempt to prognosticate the view that would likely be expressed by the Arkansas Supreme Court were it to be confronted by this question. *See Walker v. Jackson Nat'l Life Ins. Co.,* 20 F.3d 923, 924 (8th Cir.1994); *Carvin v. Arkansas Power & Light Co.,* 14 F.3d 399, 403–04 (8th Cir.1993). Although not without some hesitation, the Court elects to follow the latter approach.

While the Arkansas Supreme Court has not directly addressed the jurisdictional ramifications, if any, that result from failing to comply with the filing period specified by § 16–91–105(b)(1) and Rule 36.22, it appears that the court has provided an indirect answer to this question. In *Goodwin v. State,* 261 Ark. 926, 929–30, 552 S.W.2d 233, 235–36 (1977) (per curiam), the court concluded that the thirty-day period established by Rule 36.9 for the filing of a notice of appeal does

---

8. In this context, the Arkansas Supreme Court has defined "newly discovered evidence" by reference to the definition used in the civil context, see *Hall v. State,* 315 Ark. 385, 393, 868 S.W.2d 453, 457 (1993), which defines "newly discovered evidence" as that which "could not, with reasonable diligence, have [been] discovered and produced at the trial." Ark.R.Civ.P. 59(a)(7) (Michie 1994); *see also Newberry v. State,* 262 Ark. 334, 338, 557 S.W.2d 864, 868 (1977).

9. The federal courts have likewise not addressed this issue.

10. Arkansas does not have a statute or court rule which would allow the Court to certify this question to the Arkansas Supreme Court. *See* Ark. Sup.Ct.R. 1–2(d).

not limit the jurisdiction of the state's courts, since that rule expressly provides that the state's appellate courts "may act upon and decide a case in which the notice of appeal was not given or ... filed in the time prescribed," provided that good cause is shown for the delay.[11] *Id.* at 930, 552 S.W. at 235 (quoting Ark.R.Crim.P. 36.9 (1976)) (emphasis omitted); *see also* Ark.R.Crim.P. 36.9(e) (Michie 1994). As previously discussed, the time frame for the filing of a motion for a new trial is not itself defined as being thirty days, but is instead defined as "the time fixed to file a notice of appeal." See also *Penn v. State*, 282 Ark. 571, 574, 670 S.W.2d 426, 428 (1984); *Chisum v. State*, 274 Ark. 332, 334, 625 S.W.2d 448, 449 (1981). In light of *Goodwin*, it seems to follow, *a fortiori*, that the jurisdictional consequences for failing to timely file a motion for a new trial should mirror those which result from failing to timely file a notice of appeal, since the limitations period of § 16–91–105(b)(1) and Rule 36.22 is specifically defined by reference to that set forth in Rule 36.9(a). Accordingly, the Court concludes that compliance with the thirty-day filing period contemplated by § 16–91–105(b)(1) and Rule 36.22 is not a jurisdictional prerequisite to the state court's consideration of a motion for a new trial based upon newly discovered evidence. *Compare State v. Thurman*, 305 Ark. 448, 808 S.W.2d 762 (1991) (holding that the sixty-day period established by Ark.R.Crim.P. 36.10(c) for filing transcripts in appeals by the State, which does not expressly contain a provision for untimely filings, operates as a jurisdictional limitation).

This conclusion is not inconsistent with the Arkansas Supreme Court's application of § 16–91–105(b)(1) and Rule 36.22. The Court is aware that the Arkansas Supreme Court has relied upon this statute and/or rule in affirming lower court decisions not to address a motion for a new trial based on newly discovered evidence that was filed more than thirty days after the entry of the criminal

judgment of conviction. However, the court has never expressly held that this thirty-day period is jurisdictional. *See, e.g., Cigainero v. State*, 310 Ark. 504, 506–08, 838 S.W.2d 361, 362–64 (1992); *Smith v. State*, 301 Ark. 374, 375, 784 S.W.2d 595, 596 (1990); *compare State v. Thurman, supra*, 305 Ark. at 448, 808 S.W.2d at 762. Given that the thirty-day period contemplated by § 16–91–105(b)(1) and Rule 36.22 is expressly qualified by a "good-cause" exception (through its reference to § 16–91–105(a)(1) and Rule 36.9), this fact is hardly unexpected. *Cf. Chisum v. State, supra*, 274 Ark. at 334, 625 S.W.2d at 449 (Rule 36.22 fixes "the time for filing a motion for a new trial as that allowed for the filing of a notice of appeal (ordinarily 30 days)"); *Goodwin v. State, supra*, 261 Ark. at 930, 552 S.W.2d at 235–36.

In light of the good-cause exception that the Court considers to have been incorporated into § 16–91–105(b)(1) and Rule 36.22, the Court's answer to the jurisdictional question now presented also appears to be consistent with the approach that the Arkansas courts have historically taken when addressing a belated motion for a new trial based on newly discovered evidence. *See generally* Woodson W. Bassett, Jr. & James L. Sloan, *New Trial in Arkansas on Basis of Newly Discovered Evidence*, 4 Ark.L.Rev. 60 (1949). When one considers that the Arkansas Supreme Court has characterized claims of newly discovered evidence as "one of the least favored grounds for [a] motion for a new trial," *Cooper v. State*, 246 Ark. 368, 376, 438 S.W.2d 681, 685 (1969); *accord Gross v. State*, 242 Ark. 142, 145, 412 S.W.2d 279, 282 (1967), it is not surprising to learn that Arkansas has historically imposed rigid time constraints upon the filing of such motions. At common-law, a motion for a new trial in a criminal case was required to be filed before the end of the court term in which the judgment of conviction was entered. *See Howard v. State*, 58 Ark. 229, 232, 24 S.W. 8, 9 (1893). Arkansas incorporated this requirement into its 1869

---

11. In *Goodwin*, the Arkansas Supreme Court was construing the text of Rule 36.9 that had been adopted in 1976. See *In re: Rules of Criminal Procedure*, 260 Ark. 920 (1976) (per curiam). Although the text of Rule 36.9 has since been amended, see *In re: Amendment to Rule 36.9*, 315 Ark. 770 (1994) (per curiam); *In re: Changes to the Ark. Rules of Criminal Procedure*, 294 Ark. 674, 675–76 (1988) (per curiam); *In re Rule 36.9*, 264 Ark. 965 (1978), the language at issue in *Goodwin* was not changed.

criminal code, see Ark.Crim.Code §§ 266 to 270 (1869) (repealed 1987), and it appears that this requirement was originally viewed as being jurisdictional. *See Howard v. State, supra,* 58 Ark. at 229, 24 S.W. at 8–9; *but cf. Bussey v. State,* 69 Ark. 545, 547, 64 S.W. 268, 269 (1901) (apparently recognizing a "fundamental miscarriage of justice" exception to a defective motion for a new trial based on newly discovered evidence). However, while this limitation upon the filing of new trial motions continued to be included in later statutory compilations, see Ark.Stat. Ann. §§ 43–2202 to 2205 (1947) (repealed 1987), at some point the Arkansas Supreme Court appears to have stopped construing this time constraint as imposing a jurisdictional limitation upon the state courts. *See Taylor v. State,* 255 Ark. 65, 66–67, 498 S.W.2d 876, 877 (1973) (rejecting on the merits an untimely new trial motion based on newly discovered evidence); *Gross v. State, supra,* 242 Ark. at 144–48, 412 S.W.2d at 282–83 (same); *Hix v. State,* 189 Ark. 688, 691, 74 S.W.2d 966, 967–68 (1934) (same); *but see Delaney v. State,* 212 Ark. 622, 626–27, 207 S.W.2d 37, 38–39 (1948); *Thomas v. State,* 136 Ark. 290, 291–92, 206 S.W. 435 (1918). Thus, by declining to view the thirty-day filing period contemplated by § 16–91–105(b)(1) and Rule 36.22 as being jurisdictional, the Court has not only given effect to the good-cause exception that has been incorporated into this rule, but it has also has adopted an approach for addressing an untimely motion for a new trial, based upon newly discovered evidence, that is in accord with the approach which has evolved in the decisions of the Arkansas courts.

▆▆▆ Although the Court has determined that the thirty-day filing period established by § 16–91–105(b)(1) and Rule 36.22 does not itself operate as a jurisdictional bar to petitioner's presenting his actual innocence claim in the state courts, the Court must neverthe-less conclude that petitioner is time-barred from raising this claim in the Arkansas courts. As indicated in the preceding discussion, the Court has concluded that, under Arkansas law, the jurisdictional consequences for failing to timely file a motion for a new trial must mirror those which result for failing to timely file a notice of appeal. Although the thirty-day period established by § 16–91–105(a)(1) and Rule 36.9 for the filing of a notice of appeal is not jurisdictional, Rule 36.9 does impose an absolute time limit within which belated appeals may be considered. After setting forth the "good cause" exception to the thirty-day filing period, Rule 36.9 goes on to provide that "no motion for belated appeal shall be entertained ... unless application has been made ... within eighteen (18) months of the date of entry of judgment or entry of the order denying postconviction relief from which appeal is taken." [12] Ark.R.Crim.P. 36.9(e) (Michie 1994). Since this provision establishes an explicit and unqualified limitation upon the state court's ability to address the merits of an untimely appeal, the Court concludes that compliance with this eighteen-month limitations period was intended to be viewed as a jurisdictional prerequisite. *Cf. State v. Thurman, supra,* 305 Ark. at 488, 808 S.W.2d at 762. Accordingly, since the Court has concluded that the jurisdictional limits upon the state courts' ability to hear an untimely appeal serve also to define those established by § 16–91–105(b)(1) and Rule 36.22, the Court is forced to conclude that the Arkansas courts lack jurisdiction to hear a motion for a new trial, such as petitioner's, that has been (or would be) filed more than eighteen months after the entry of the criminal judgment of conviction. Therefore, since Arkansas does not have available any other procedure which would allow petitioner to present his actual innocence claim to the state courts,[13] the Court is required to consider the

---

12. This provision was added in the 1978 amendment to Rule 36.9. See *In re Rule 36.9, supra,* 264 Ark. at 965.

13. Arkansas' mechanism for obtaining post-conviction relief, see Ark.R.Crim.P. 37.1 (Michie 1994), may not be used to raise claims based on newly discovered evidence. *Chisum v. State, supra,* 274 Ark. at 334, 625 S.W.2d at 449. In addition, although Arkansas recognizes the writ of *coram nobis* and has expanded the scope of this writ to include claims based on newly discovered evidence, see *State v. Scott,* 289 Ark. 234, 235–36, 710 S.W.2d 212, 213–14 (1986); *Penn v. State, supra,* 282 Ark. at 574–77, 670 S.W.2d at 428–30, the state courts lack jurisdiction to hear claims brought under this writ once

merits of petitioner's free-standing actual innocence claim.[14] *See Griffin v. Delo, supra,* 33 F.3d at 908; *Schlup v. Delo, supra,* 11 F.3d at 743–44.

■ Assuming federal district courts must examine such newly discovered evidence claims, must they not first decide whether that which is proffered is, indeed, "evidence," that is, proof which, if available, would have been admissible at the original trial or would be admissible at any new trial that might be ordered? For, if what is proffered would not be admissible as evidence in a judicial trial, then it could in no event affect the outcome.

Here Mr. Pruett has written certain letters and made certain statements to his attorney and others acknowledging or suggesting that he, not Perry, murdered Mr. Staton and his daughter, Ms. Ware, on September 10, 1980, in Van Buren, Arkansas. Mr. Pruett's statements were not made under oath. He refuses to testify or to submit himself to cross-examination on the pertinent issues. Would Pruett's untested out-of-court statements be admissible to prove the truth of the matter asserted, that is, that he, not Perry, was the murderer? If not could his out-of-court statements be admitted for any other purpose?

When used in the context of a federal judicial proceeding, the term "evidence" applies only to proffers that qualify for admission under the Federal Rules of Evidence. *See* Fed.R.Evid. 101, 1101; *see also* Black's Law Dictionary 656 (4th ed. 1968) (Defining "evidence" as "[a]ny species of proof, or probative matter, legally presented at trial."); 1 *McCormick on Evidence* § 51 at 194 (John William Strong ed., 4th ed. 1992) (Defining "evidence" as the "rules and practices that make it clear when proof has been presented so that it is officially introduced and thereupon can be considered by the trier of fact."). Since these rules apply to proceedings involving habeas corpus petitions filed pursuant to 28 U.S.C.A. § 2254 (West 1994), Fed.R.Evid. 1101(e), petitioner's claim of actual innocence would surely be short-circuited if the proffers submitted in support of this claim do not qualify as legally admissible evidence. If petitioner's proffers do not meet the requirements established by the Federal Rules of Evidence, then his claim for habeas relief must fail, as there would, by definition, be no newly discovered "evidence" to support his claim of actual innocence.

As has been discussed, petitioner's actual innocence claim is based upon his assertion that another individual, Marion Pruett, was the person who in fact committed the murders for which he (Perry) was convicted. As has also been made clear, the linchpin of this claim is petitioner's allegation that Pruett has previously confessed to these crimes. To substantiate this allegation, petitioner has, in his present petition, proffered two documents which he seeks to have considered as substantive evidence, namely: (1) a May 8, 1989 letter handwritten by Pruett, which represented not only that Pruett was the actual murderer, but also that petitioner was not directly involved in those crimes; and (2) a transcription of a July 7, 1989 interview with Pruett's then-attorney, Brian Willett, wherein Willett revealed that Pruett had confessed, in detail, to having committed the aforementioned crimes. See Supplemental Petition for Writ of Habeas Corpus, exh. A & B

---

a conviction (such as petitioner's) has been affirmed on direct appeal. *Edgemon v. State,* 292 Ark. 465, 466, 730 S.W.2d 898 (1987).

**14.** Or is it? The Arkansas Supreme Court has never been presented with a *constitutional* attack on any and all time bars to the entertainment of a motion for a new trial based upon newly discovered evidence of actual innocence. One can only speculate on the viability of such a challenge under *Herrera.* If the State Supreme Court upheld the eighteen month jurisdictional limit then the next question would be: Does the failure of a state to provide such a remedy render the imposition of the death penalty unconstitutional? If so, federal courts, on habeas attack, could order the death penalty set aside unless the state court hears and disposes of such motions within a reasonable time. Ultimately, it would be up to the state legislature to create such a remedy in order to preserve the state's right to execute the death sentence in such cases. Of course, if the state provided a due process judicial procedure for hearing and disposing of such motions, then federal habeas actions such as this one would have to be dismissed for failure to exhaust state remedies and any follow-on successive habeas petition could be denied summarily. *But cf. Schlup v. Delo,* —— U.S. ——, 115 S.Ct. 851. But no explicit precedent yet exists which would permit such a disposition of this case.

(Document No. 105).[15] In addition, this petition also represented that "Pruett is now ready, willing and able to come forward and publicly confess," that Pruett would "testify regarding certain details of the robbery and murder[s] that only a person who was present would know about," and that Pruett's confession would be corroborated by additional evidence. Supplemental Petition for Writ of Habeas Corpus 5–7.

Despite these representations, Pruett repeatedly exercised his Fifth Amendment privilege against self-incrimination during the evidentiary hearing that was held in this matter, and he has continued to refuse to offer any testimony corroborating petitioner's claim that he (Pruett) was the person who committed the above-mentioned crimes. Moreover, after the Court determined that Pruett had improperly relied upon the Fifth Amendment in declining to answer several (but not all) of the questions put to him by petitioner's counsel, he persisted in refusing to substantively respond to most (but not all) of those inquiries, despite the Court's ordering him to do so. As a result of Pruett's testimony, or rather, his non-testimony, petitioner's allegation that Pruett committed the aforementioned crimes remains supported almost entirely by his own unsworn statements and writings. However, it is clear that these two documents and the other writings by Pruett must be legally viewed as hearsay, since they are founded upon out-of-court statements [16] by a declarant (Pruett) [17] which petitioner seeks to offer as proof of the truth of the matter asserted therein (that Pruett previously confessed to the aforementioned crimes). See Fed.R.Evid. 801(c); *United States v. Hazelett*, 32 F.3d 1313, 1316 (8th Cir.1994). Therefore, in so far as these documents have been offered to prove that Pruett, rather than petitioner, was one who committed the above-mentioned crimes, they cannot be viewed as substantive evidence unless they qualify for admission under some exception to the hearsay exclusionary rule. Fed.R.Evid. 802; *see Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1311 & n. 10 (8th Cir.1993).

In the Court's opinion, the only window through which Pruett's former statements, as reflected in his letters and the Willett interview transcript,[18] could be reasonably viewed as potentially admissible evidence is through that afforded by the "statement against penal interest" exception to the hearsay rule. See Fed.R.Evid. 804(b)(1). As applied to this case, Rule 804(b)(3) provides that "statement[s] tending to expose the declarant to criminal liability and offered to exculpate the accused [are] not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement[s]." Thus, for the above-referenced documents to qualify for admission under this exception, petitioner must show: (1) that Pruett is "unavailable" as a witness in this matter; (2) that Pruett's statements were in fact against his penal interest when made; and (3) that there are sufficient corroborative facts to clearly indicate that Pruett's statements were truthful. *United States v. Hazelett, supra*, 32 F.3d at 1316 (quoting *United States v. Riley*, 657 F.2d 1377, 1383 (8th Cir.1981)).

---

**15.** In addition to these two items (which were attached to the habeas petition) many additional letters and writings by Pruett, *See infra*, have been brought to the court's attention. The same evidentiary rules here discussed would likewise apply to those writings.

**16.** There is no doubt that both Pruett's letter and the transcription of Willett's interview constitute "statements" for purposes of the hearsay rule. Fed.R.Evid. 801(a)(1) (defining a statement as "an oral or written assertion").

**17.** Although Willett was technically the declarant who made the statements reflected in the interview transcription, this document was actually offered as proof of the prior statements made to Willett by a second declarant, namely Pruett.

Thus, this document is properly viewed as "double hearsay." See Fed.R.Evid. 805; *see also United States v. Reid*, 911 F.2d 1456, 1463 & n. 7 (10th Cir.1990), *cert. denied*, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991).

**18.** For purposes of this discussion, the Court will assume that Willett's statements are sufficiently reliable to qualify for admission into evidence, despite the fact that these statement do not fit neatly into any of the specifically recognized exceptions to the hearsay rule. See Fed.R.Evid. 803(24). This assumption will allow the Court to ignore the "double hearsay" problem presented by the Willett interview transcript. *See* Fed. R.Evid. 805; *United States v. Cruz*, 894 F.2d 41, 44 (2d Cir.), *cert. denied*, 498 U.S. 837, 111 S.Ct. 107, 112 L.Ed.2d 77 (1990).

As noted above, Pruett's refusal to offer substantive testimony during the evidentiary hearing resulted from his proper exercise of his Fifth Amendment privilege against self-incrimination, as well as his decision to remain silent in defiance of the orders of the Court. Since the Court has no indication that Pruett will deviate from this pattern of conduct in the future, he is properly viewed as being "unavailable" for purposes of Rule 804(b)(3). *See* Fed.R.Evid. 804(a)(1), (2); *United States v. Woolbright,* 831 F.2d 1390, 1395 (8th Cir.1987) (refusal to testify based on Fifth Amendment); *United States v. Carlson,* 547 F.2d 1346, 1354 (8th Cir.1976) (refusal to testify despite court order), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977). Next, the Court considers whether the statements which petitioner seeks to introduce were in fact against Pruett's penal interest when they were made. Under Rule 804(b)(3), statements are considered to be against a declarant's penal interest whenever " 'a reasonable person in the declarant's position would not have made the statement[s] unless believing [them] to be true.' " *Williamson v. United States,* — U.S. —, —, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994) (quoting Fed.R.Evid. 804(b)(3)); *see also United States v. Hazelett, supra,* 32 F.3d at 1316. On the surface Pruett's unqualified confessions would appear to satisfy this criteria,[19] as "no other statement[s] [are] so much against interests as … confession[s] of murder." *Donnelly v. United States,* 228 U.S. 243, 277–78, 33 S.Ct. 449, 461, 57 L.Ed. 820 (1913) (Holmes, J., dissenting); *see also Williamson v. United States, supra,* — U.S. at —, 114 S.Ct. at 2436; *id.* at —, 114 S.Ct. at 2438 (Scalia, J., concurring); *United States v. Bagley,* 537 F.2d 162, 165 (5th Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977); *compare United States v. Riley,* 657 F.2d 1377, 1383–85 (8th Cir.1981) (confession which inculpated a third party and which was likely made to secure favorable treatment from the authorities was not truly against declarant's penal interest).

Here we have the declarant (Pruett) already sentenced to death. And he is also subject to additional sentences of life imprisonment. Both Pruett and his attorney, Willett, have commented that Pruett really has nothing to lose by making such statements. And his motives are clear. He seeks money and further notoriety. The Court finds that, subjectively, Pruett has no fear of, or concern about, the possible penal consequences of his statements. Does this finding permit the Court to stop at this point and simply deny Mr. Perry's petition on the ground that there is no newly discovered *evidence* of his actual innocence? The Court cannot answer that question with any degree of confidence.

Mr. Pruett has his own habeas petition still pending. The Court must indulge the theoretical possibility that his death penalty might be set aside. While the Court does not see even the remotest possibility that, in such event, he would ever again be free, the State of Arkansas might then choose to try him for the Staton/Ware murders in an effort to obtain the death penalty. So there is some theoretical penal consequence that might be visited upon him as a result of these statements that he, not Perry, committed these murders.

In addressing the admissibility of Pruett's prior confessions, the only question that remains is whether there is sufficient corroborative evidence to indicate that these statements were truthfully made. This inquiry requires the Court to evaluate the totality of the circumstances, *see Williamson v. United States, supra,* — U.S. at —, 114 S.Ct. at 2437, and to determine whether the record "clearly indicate[s]" that Pruett's confessions were truthful. Fed.R.Evid. 804(b)(3); *United States v. Hazelett, supra,* 32 F.3d at 1316. While the Court of Appeals for the Eighth Circuit has established certain criteria that should ordinarily by considered when making this evaluation, *see United States v. Bobo,* 994 F.2d 524, 528 (8th Cir.) (quoting *United States v. Rasmussen,* 790 F.2d 55, 68 (8th

---

**19.** Of course, this conclusion only follows when, as in the present case, the declarant remains subject to punishment (or other adverse consequence) for the crimes to which he has confessed. *See United States v. Scopo,* 861 F.2d 339,

348 (2d Cir.1988), *cert. denied,* 490 U.S. 1048, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989); *cf. United States v. Rogers,* 549 F.2d 490, 498 n. 8 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977).

Cir.1986)), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993), in the context of the present habeas petition this inquiry ultimately requires the Court to assess the merits of petitioner's actual innocence claim. *Cf. Griffin v. Delo, supra,* 33 F.3d at 906–08; *Schlup v. Delo, supra,* 11 F.3d at 739–43; *cf. also Herrera v. Collins, supra,* 506 U.S. at ——, 113 S.Ct. at 861. Although this conclusion is undoubtedly circular—petitioner's actual innocence claim is based on hearsay that will be admissible only if his actual innocence claim has merit (i.e., that his claim is corroborated)—the Court believes that such a conclusion is compelled given the Eighth Circuit's (and the Supreme Court's) treatment of free-standing claims of actual innocence. Thus, the upshot of the Court's extended discussion of this evidentiary issue is the conclusion that, when evaluating future free-standing actual innocence claims for habeas relief, the courts of this circuit should probably proceed directly to the merits of such claims rather than attempting to evaluate their viability under the niceties of evidence law at least until the appellate courts declare otherwise.

As a practical matter, however, this conclusion is hardly surprising. If a habeas petitioner presents a federal court with clear and convincing evidence of his or her factual innocence, and thereby establishes a due process violation, *see Griffin v. Delo, supra,* 33 F.3d at 908; *Schlup v. Delo, supra,* 11 F.3d at 743–44, the Federal Rules of Evidence would have to be construed to allow the presentation of this evidence. Otherwise, they would have to be declared unconstitutional to the extent that they prevent the petitioner from doing so, since "the hearsay rule may not be applied mechanistically to

defeat the ends of justice." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). Similarly, if this Court were to grant petitioner's habeas petition on the strength of his free-standing claim of actual innocence, the state courts would be required to construe the Arkansas Rules of Evidence so as to allow petitioner to present his evidence of actual innocence upon retrial in order to prevent their evidentiary rules from being declared unconstitutional.[20] *See id.* at 300–303, 93 S.Ct. at 1048–49; *Turner v. Armontrout,* 845 F.2d 165, 169 (8th Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 333 (1988).

*ANALYSIS*

■ The proper standard of proof to apply in cases such as this under *Herrera* is far from clear. But regardless of which of the several possible standards is applied in this case, see discussion of law, *supra,* the Court concludes that Mr. Perry's proof falls far short of supporting his claim of actual innocence. Indeed, the overall effect of the proof and information adduced in this habeas proceeding has been to reinforce, rather than weaken, the conclusion reached by the jury.

In cases such as this we start with the presumption of guilt since the defendant has already received a full and fair trial and has been found guilty of capital murder. This is because, as stated by Justice O'Connor, see *supra:*

"Our society has a high degree of confidence in its criminal trials, in no small part because the Constitution offers unparalleled protections against convicting the innocent."

So, presumption-wise, Mr. Perry's present position is the opposite of what it was *before*

---

20. The Court also notes that since Arkansas has adopted a "declaration against penal interest" hearsay exception that conforms substantially with the federal rule, see Ark.R.Evid. 804(b)(3) (Michie 1994); *Williford v. State,* 300 Ark. 151, 154–57, 777 S.W.2d 839, 842–43 (1989); *Welch v. State,* 269 Ark. 208, 211–12, 599 S.W.2d 717, 720, *cert. denied,* 449 U.S. 996, 101 S.Ct. 535, 66 L.Ed.2d 294 (1980), a conclusion that petitioner's evidence was, as a matter of fact, sufficiently corroborated to qualify for admission under federal rule 804(b)(3) would seem to insure that this evidence would be admissible under the analogous Arkansas rule. *Cf. Crockett & Brown, P.A. v.*

*Wilson,* 314 Ark. 578, 581, 864 S.W.2d 244, 246 (1993) (issue preclusion precludes the relitigation of factual issues that were actually litigated and determined in a prior action and which were essential to the prior judgment). It must be stated, however, that this Court has not concluded that Pruett's statements meet the requirements of Rule 804(b)(3). It does believe that his statements "tend to expose the declarant (Pruett) to criminal liability," but, since subjectively, he is not affected by the possible penal consequences, how can those possible consequences tend to assure the reliability of such statements?

he was tried. Before he was tried he was presumed to be innocent; now he is presumed to be guilty.

## THE JUDGE AS INQUISITOR

Claims of actual innocence such as the one before the Court, have a tendency to place the judge in the unfamiliar role of an investigator or inquisitor. Even though the rules place the burden of proof upon the petitioner, courts, in dealing with such a serious matter, will naturally seek certitude. For example, in this case the Court sought to obtain a transcript of the plea of Cindy Sue Brown which was entered on February 11, 1985.[21] Obviously that transcript has the potential of simplifying the factual issues before this Court. However, the Attorney General's Office reported on March 31, 1993, that, despite diligent efforts the transcript could not be located. So the obvious next question arose: could Ms. Brown be located and produced as a witness in this case? The Court is advised she "has gone with the wind." And it might be helpful to produce FBI Special Agents Willie H. Covington and T. Scott Hendricks who interviewed Mr. Pruett back in December 1981, at the time Pruett was apparently confessing everything. His attorney at that time, Mr. Zeb Jones, and the authors of various articles found in the record are also obvious sources of useful information. Additionally, the record reflects that Mr. Pruett was in the Federal Witness Protection Program at the very time he admitted committing five murders and also at the time he claims to have committed the Staton/Ware murders. The Court made an effort to determine if the records of the Federal Witness Protection Program would reveal Mr. Pruett's location at or around the time of the Staton/Ware murders. At one point it was suggested that those records would indicate that he was in New Mexico at that time, but later the parties were advised that such records could not fix Pruett's location on September 10, 1980.[22]

The Court mentions these problems not to complain, but to point out the difficulties which arise when the Court ceases to rely solely upon the adversarial process and takes the initiative in its search for the truth. In this imperfect world the Court has now concluded that it should resist the obvious temptation to further "investigate the case." Indeed, it has already gone too far in that direction. Rather, it must basically rely upon the evidence provided by the parties.[23] In every trial the factual determinations must be based upon the evidence presented. Of course, if different evidence were presented, then different factual findings might result. That is simply the way the system works. And the Court reiterates: The burden of proof is on the petitioner.

When confronted with a habeas petitioner's claim of actual innocence based upon, essentially, a confession by another person, it becomes necessary for the Court to assess the creditability and reliability of that purported confession (the newly discovered evidence) in the context of a careful review of

---

21. Ms. Cindy Sue Brown was charged on August 31, 1983, with the crime of Criminal Conspiracy to Commit Aggravated Robbery on or about September 1, 1980, to September 12, 1980. Apparently this was reduced to Conspiracy to Commit Robbery, and Mr. Brown pled *nolo contendere* on February 11, 1985.

22. If the government has not already investigated the placing of Mr. Pruett in the Witness Protection Program and the handling of him while he was in that program, it certainly should do so now since the "surface information" made available to the Court raises serious questions. Since there has been so much publicity about this matter it is probably safe to assume that a thorough investigation and report have been made. If so, that full report might be a further aid to this Court in resolving the credibility, and other, issues raised by Mr. Perry's claim of actual inno-cence (based upon Mr. Pruett's statements). The United States Marshal's Service did provide some limited information, see below, but nothing approaching a full and comprehensive report. At one point the Court considered a direct request to the Attorney General but later concluded that it had sufficient information to resolve all issues in this case without pursuing this lead.

23. The Court might not feel comfortable in taking this position in every case. Sometimes the circumstances will be such that the Court must insist on additional information. Here, the Court has concluded that evidence already presented by the parties on their own initiatives and at the request of the Court is more than adequate to permit an informed decision to be made on the issues. To ask more here would be to simply guild the lily.

the *all* of the evidence in the state trial that led to the petitioner's conviction, together with all relevant ancillary information. The Court has done so here. And it concludes that there is no likelihood of Mr. Perry's innocence of the capital murders of Mr. Staton and Ms. Ware.

Another observation preliminary to a review of the evidence: in the various sections that follow there will be a great deal of repetition. This is because the Court wants to make each section stand on its own as much as possible and also because the same proof must often be analyzed over and over again in relation to a variety of other evidence and a variety of different contentions.

## MARION ALBERT PRUETT

 Mr. Pruett has given detailed confessions to the FBI involving numerous crimes. He has also given many interviews to the media which have resulted in a number of publications about him. So we know quite a bit about him.

For our purposes we can start in March of 1978, when, at age 29, Pruett was serving a twenty-three year sentence in the federal penitentiary in Atlanta, Georgia for bank robbery and other crimes. The record suggested that he was involved in the murder of a fellow inmate, William Rhett Zambito, who had apparently testified against some underworld figures, one of whom was Allen Benton. Benton was also doing time in the Atlanta Penitentiary. The records suggest that Benton arranged for Zambito to be murdered. There appears to be some question as to who actually murdered Zambito. Pruett has played games with this issue. At times he has stated he was a witness, but he has also stated that it was he who, in fact, murdered Zambito. From all that appears, the federal prosecuting authorities were so anxious to obtain a conviction of Benton that they made a deal with Pruett to release him and place him in the Witness Protection Program if he would testify against Benton. How much of this background is true the Court cannot say, but it is clear that Pruett was placed in the Witness Protection Pro-

gram in New Mexico in late 1979, provided with a new identity, "Charles Sonny Pearson" and paid a monthly stipend which one report states was $900.00 and another $700.00[24]. His girlfriend, Pamela Sue Carnuteson, whom Pruett married in April 1980, was also given the false name of "Michelle Pearson." New Social Security numbers were obtained for them.

On April 16, 1981, Pamela Sue Carnuteson's (Michelle Pearson) badly burned and beaten body was found by pipeline workers near Rio Ranch. She had been struck by a hammer and there were marks of strangulation on her neck. Her body had been doused with gasoline and torched. Pruett was arrested as a suspect but released two days later for lack of evidence. After an arrest warrant was issued on June 1, 1981, Pruett could not be found. Between that date and the date of his arrest on October 17, 1981, the known criminal activities of Marion Albert Pruett as listed in Joint Exhibit 2, the FBI file on Pruett, are as follows:

6/26/81 Robbed the Queen City Savings & Loan, Denny Regrade Branch, Seattle, Washington, and took the bank manager hostage, who was subsequently released, in connection with the robbery. Obtained $12,400.

7/29/81 Robbed the Gibraltar Savings Association, 3717 Leopard, Corpus Christi, Texas, and took a bank teller hostage, who was subsequently released, in connection with the robbery. Obtained $6,461.

8/26/81 Robbed the Sun federal Savings & Loan, 2437 North Monroe Street, Tallahassee, Florida, and took a bank teller hostage, who was subsequently released, in connection with the robbery. Obtained $13,907.35.

9/17/81 Robbed the Unifirst Savings & Loan, Metro Center Branch, Jackson, Mississippi, and took a hostage, Peggy Lowe, Commercial Loan Officer, in connection with the robbery. Obtained $6,893.

9/17/81 Took Peggy Lowe to a wooded area in Sumter County, Alabama, and shot

---

24. The U.S. Marshal's Service advises that Pruett was "removed from the financial portion of our Program effective July 31, 1980."

Lowe in the back of the head, which resulted in her death.

9/30/81 Robbery the Lincoln Savings Bank, Great Southern Shopping Center, Bridgeville, Pennsylvania, and took the branch manager hostage, who was subsequently released, in connection with the robbery. Obtained $7,800.

10/12/81 Robbed the Convenience Corner, Old Greenwood Road and Phoenix Street, Fort Smith, Arkansas. Took employee hostage and shot and killed her. Obtained approximately $150.00.

10/16/81 Robbed 7–11 Convenience Store, 408 Orion Court, Fort Collins, Colorado. Shot and killed store employee. Obtained approximately $28.00.

10/16/81 Robbed 7–11 Convenience Store, 1215 East Eisenhower Street, Loveland, Colorado. Shot and killed store employee. Obtained approximately $32.00.

A more detailed summary from that same report of Pruett's whereabouts from April, 1981, until his arrest near Stratford, Texas on October 17, 1981, is quoted as follows, to wit:

April, 1981 Murders wife in Albuquerque, New Mexico

May, 1981 Believed to be in Colorado

6/26/81 Robs savings and loan in Seattle, Washington.

6/28–7/9/81 Stays in Los Angeles, California—rents and subsequently embezzles brown Ford.

7/29/81 Robs savings and loan in Corpus Christi, Texas

7/30–8/81 New Orleans, Louisiana

8/26/81 Robs savings and loan in Tallahassee, FL

8/30–9/9/81 Myrtle Beach, South Carolina

9/9–16/81 New Orleans, Louisiana—steals girl friend's yellow Toyota on 9/16/81

9/17/81 Robs savings and loan in Jackson, Mississippi—takes Peggy Lowe hostage

9/21/81 Knoxville, Tennessee

9/24/81 Lexington, Kentucky

9/24–10/1/81 Columbus, Ohio

9/30/81 Robs savings and loan in Bridgeville, Pennsylvania

10/1–3/81 Ypsilanti, Michigan

10/4–5/81 Knoxville, Tennessee (Holiday Inn)

10/10/81 Little Rock, Arkansas

10/12/81 Fort Smith, Arkansas—robs convenience store and kills clerk. Obtained $150.00.

10/13/81 Albuquerque, New Mexico

Leaves Albuquerque, goes to Farmington, New Mexico—10:40 a.m., Presbyterian Medical Center

Leaves Yellow Toyota at Husky Truck Stop, Albuquerque

8 p.m.—Community Hospital Alamosa, Colorado

10/14/81 Laramie County Hospital, Cheyenne, Wyoming, and Motel 6.

10/15/81 Cheyenne, Wyoming—stayed at Motel 6

10/16/81 Fort Collins, Colorado—3 a.m.—robs convenience store and murders clerk. Obtained $28.00.

Loveland, Colorado—4:30 a.m.—robs convenience store and murders clerk. Obtained $32.00.

10/17/81 Lamar, Colorado—pawned diamond ring

Arrested Stratford, Texas

10/26/81 Returned to Jackson, Mississippi

10/28/81 directed law enforcement authorities to location site of Peggy Lowe's body in Sumter County, Alabama.

Since 1981, Mr. Pruett has accumulated the following record of conviction:

Mr. Pruett was sentenced to death in Mississippi in 1982, for the murder of Ms. Lowe but that sentence was later reduced to life imprisonment.

On June 9, 1982, Pruett was convicted in Colorado of murder in the first degree of James R. Balderson; murder in the first degree of Anthony Taitt; and two counts of aggravated robbery. He was sentenced to life imprisonment on each of the murders and to sixteen years on the aggravated robbery counts, each sentence to be served consecutive to the other sentences.

Mr. Pruett was convicted of capital murder in Ft. Smith, Arkansas, on September 9,

1982, in connection with kidnapping and murder of Ms. Bobbie Robertson and sentenced to death.

The Court was, of course, interested in obtaining information as to the whereabouts of Pruett and his wife during the period before and after the Staton/Ware murders.

The Marshal Service's records show Albuquerque addresses for them until May, 1980, at which time they show a new address in Corrales, New Mexico. During the period from July 1, 1980, until November 1, 1980, those same records document meetings between Ms. Carnuteson (Michelle) and agents of the Marshal's Service on the following dates: July 12, August 28, September 15, September 16, and October 22.

In that same period (July 1, 1980, to November 1, 1980) the Marshal's records reveal the following contacts with Pruett:

07/14/80 We possess a document which indicates Mr. Pruett met briefly with one of our agents in New Orleans, Louisiana on this date. It appears Mr. Pruett was in New Orleans for a one or two day meeting with agents of the Department of Justice.

07/16/80 We possess a document which indicates Mr. Pruett met briefly with one of our agents in Albuquerque, New Mexico on this date.

08/06/80 We possess a document entitled "Criminal complaint" which states Mr. Pruett committed a crime on or about the 6th day of August, 1980 in Bernalillo County, state of New Mexico. The "Criminal Complaint" was filed under docket number CR7259–80 on the 7th day of August, 1980.

08/29/80 We possess a document which indicates Mr. Pruett met briefly with one of our agents in Washington, D.C. on this date. It appears Mr. Pruett was in D.C. for a one or two day meeting with agents of the Department of Justice.

10/29/80 We possess a document entitled "Final Order on Criminal Complaint" which indicates Mr. Pruett pled nolo contendere on docket number CR7259–80 on

this day in the Metropolitan Court, county of Bernalillo. The document indicates Mr. Pruett was placed on six months unsupervised probation.

The Staton/Ware murders occurred on September 10, 1980, some twelve days after Mr. Pruett met with agents of the Department of Justice in Washington, D.C., and some 50 days before he pled *nolo* in the metropolitan Court in New Mexico. And the U.S. Marshall's records show meetings of their agents with Michelle Pearson, Pruett's wife, on September 15, 1980, just five days after those murders. It will be recalled that Pruett's statements indicate that he and Michelle returned to New Mexico after the Staton/Ware murders.

## CONFLICTS AND PROBLEMS

In its factual analysis, the Court must relate the alleged confession of Pruett to Mr. Perry's testimony in this proceeding concerning his own actions, knowledge, and whereabouts in the period from late August, 1980, until his arrest on September 23, 1980, in order to determine if the two are consistent or inconsistent. And then it must compare both with the other evidence introduced at Mr. Perry's state trial and with the other evidence and information produced during this habeas proceeding. The Court has done so. Some important generalizations arise from this analysis.

For Mr. Perry's version to be creditable at all, it must be accepted that he is the victim of a massive conspiracy by and among Richard Anderson, Chantina Ginn, and Pat Etier to conceal the truth and to give false testimony against him.[25] As will be pointed out in greater detail below, the likelihood of such a conspiracy approaches zero. At this point the court need note only certain fundamental conflicts and problems with the new Pruett–Perry scenario.

Mr. Perry claims that he met Mr. Richard Anderson in Alabama early in 1980. He states that he rented to Anderson and a

---

**25.** Considering the statements which the Court and the parties have found that were made to law enforcement officials and prison officials by Cindy Sue Brown, see *infra*, she, too, would have to be listed as a co-conspirator in the plot to railroad Perry. And possibly other witnesses who identified Mr. Perry as having been in the Van Buren and Northwest Arkansas area should be added to the list.

"Damon Peterson" a pop-up trailer and a car on August 30, 1980. (This weird transaction will be discussed later. See "Two Transactions" Section below.) On that occasion he states that Anderson told him that he had a girl friend in Arkansas living with a rich jeweler and that Anderson intended to use her to help steal the man's jewelry. The plan, according to Perry, was for Richard Anderson and Damon Peterson, after the theft, to contact Perry (standing by at his ex-wife's home in Oxford, Alabama) who would then arrange to "fence" the stolen jewelry for them. So it is Perry's position that he was not in Arkansas in September, 1980; that there is such a person as "Damon Peterson;" that Peterson and Anderson were going to Arkansas to engage in a jewelry heist; and that he, Perry, was to be their "fence." Pruett has no role in Perry's explanation of events.

Chantina Ginn testified she was working with a traveling fair in Topeka, Kansas, when she met Rick Anderson for the first time on August 29, 1980. (On another occasion she placed the date as August 31, 1980.) She then remained with Richard Anderson constantly (except for the brief hiatus when Perry and Anderson went to Van Buren) until he sent her home from Jacksonville, Florida, around September 19, 1980. Ms. Ginn unequivocally, repeatedly, and forcefully, has identified Mr. Perry as the "Damon Peterson" she and Rick Anderson met at the campground on Beaver Lake in Northwest Arkansas in early September, 1980, and with whom they traveled, along with Cindy Sue Brown, to Atlanta and then on to Jacksonville, Florida.

Richard Anderson's testimony is in all respects "in sync" with that of Ms. Ginn. Both insist that Eugene Wallace Perry, then age 36, is the same person that they met in Arkansas at the Horseshoe Bend camping area on Beaver Lake, who introduced himself and the woman with him as "Damon and Lorili Peterson." According to Anderson and Ginn, neither Ms. Ginn, then 18 years of age, nor Mr. Anderson, then 23, had ever met either of these persons before. It is undisputed that the woman using the name "Lorili Peterson" is Cindy Sue Brown, who

was Mr. Perry's almost constant girl-friend and perhaps wife, in the 1979–1980 period, right on up into July or August, 1980. He acknowledged that he lived with her "about a year" but claims they separated in July, 1980. (There is other information before the Court, including Mr. Perry's own testimony, see below, suggesting that she was with him in August, 1980, spending time at a Georgia campground where two persons were murdered under circumstances strikingly similar to those surrounding the Staton/Ware murders. The Georgia murders occurred on August 25, 1980.) Mr. Anderson fully admits his involvement in the Arkansas crimes committed on September 10, 1980. He admitted his guilt at his own (separate) trial but denied that he was the one who actually shot Mr. Staton and Ms. Ware. He identified Perry as the murderer. Anderson also denies any involvement in the Georgia murders although he stands convicted thereof.

Mr. Perry claims to have been a friend and associate of "Damon Peterson". According to Mr. Perry, "Damon" worked for J.V. Stovall's various businesses just like Perry did. Until Pruett's "confessions" entered the picture, it was Perry's position that Damon Peterson must have committed the Staton/Ware murders and that he, Perry, was simply not Damon Peterson. How does Perry explain his long standing girlfriend's (Cindy Sue Brown) being with Damon Peterson in Arkansas? He theorizes that when he and Cindy Sue broke up in July or August, 1980, she might naturally take up with a friend of his to make him angry.

Cindy Sue Brown, who was a fugitive for several years, pled *nolo contendere* in 1985 to her involvement in the Arkansas crimes. Although Cindy Sue Brown cannot presently be located, the record reflects that she has given statements identifying herself and Mr. Perry as the persons representing themselves as "Damon and Lorili Peterson" in Northwest Arkansas in the September 6–11 period. See, *infra*. The State also represents that Ms. Ginn identified pictures of Cindy Sue Brown as "Lorili." And Mrs. Staton has identified Ms. Brown and Mr. Perry as the two persons who spent time in the Jewelry Store on September 3, 1980.

Ms. Pat Etier, who lived in the small community of Graphic near Mountainburg, Arkansas, at the time, testified concerning her involvement with Rick Anderson and the man identifying himself as "Damon" on September 9 and September 10, 1980. She stated that she met them for the first time in her life on September 9 and saw them the last time (before their apprehension) on September 10, 1980. Her testimony will be set out in more detail below. For present purposes, suffice it to say, that she spent the night of September 9 with "Damon" at her home and returned him to the Terry Motel at around 8:00 a.m. on September 10, 1980. She contacted the police on September 11, 1980, as soon as she heard of the Staton/Ware murders, and provided them with descriptions of the two men. At trial she strongly and positively identified Mr. Perry as the "Damon" with whom she had been on September 9 and September 10 and as the man with whom she slept at her home at Graphic on the night of September 9.

All in all, some 7 witnesses identified Mr. Perry as having been in the Beaver Lake area or the Van Buren, Arkansas, area at various times between September 3, and September 11, 1980.

*TESTIMONY OF MR. PERRY*

Mr. Perry did not testify in his state court capital murder trial, but he did testify in this habeas proceeding. And the Court has found in the record reports of other statements made by Mr. Perry since the Staton/Ware murders on September 10, 1980.

The Court will summarize the important portions of Mr. Perry's testimony and attempt to relate that testimony to the other proof in the case. And then it will make its own assessment of the credibility of Mr. Perry.

Perry testified that he knew Damon Peterson who was "Basically a courier at the same place I was ... that is we drove cars to various places, worked with the same people" among whom were J.B. Stovall, Charles Bryant and Jack Roberts of Atlanta. He states he (Perry) was "into the distribution and transportation of narcotics" and was a drug user.

Perry's testimony about his connection with Mr. Anderson is revealing. It must be recalled that Anderson has testified many times, and again in this habeas proceeding, that he first met Perry, who identified himself as "Damon Peterson" around September 6, 1980, at the Campground on Beaver Lake in Northwest Arkansas.

Perry, on the other hand, says that he met Anderson for the first time in January or February of 1980 at the Windsor Wood Apartments on the outskirts of Gadsden, Alabama. He next met him at Bill's Go–Go Bar. He states that he introduced himself to Anderson using his true name, Gene Perry. He states his next contact was when Anderson drove him to Knoxville from Birmingham, Alabama, in March 1980. The only other time he claims to have seen Mr. Anderson before the Staton/Ware murders was on August 30, 1980, at Babe's Bar when he states he transferred a camper and a car to Damon Peterson and Anderson. This testimony will be discussed later but, first, the Court will attempt to account for Mr. Perry's whereabouts prior to August 30, 1980.

Perry testified that from early 1980 until J.B. Stovall died on July 25, 1980, he lived at Stovall's home on Elm Street in Hapeville, Georgia, a suburb of Atlanta. He says that "soon thereafter is when I moved to the Camper's Paradise Campground" which is also on the outskirts of Atlanta. He also admits that he stayed there at least a month, maybe six weeks. He testified he left the Paradise Campground on August 22, 1980, which is three days before the double murders at that campground.

According to Perry, Cindy Sue Brown stayed with him at the Georgia campground but was not there with him the last three or four weeks of his stay.

Perry acknowledged that he had the 1971 blue and white Cadillac with him at the Paradise Campground in Georgia (along with a "pop-up camper") and that it was the same car that ended up in Northwest Arkansas in September, 1980, in the possession of "Damon and Lorili Peterson." He does not know who they got the car from. He believes it belonged to J.B. Stovall or Damon

"or something." He then states "it may have belonged to someone else. I think it belonged to Tom Brackett." (This backing and filling in quite typical of Mr. Perry's testimony before this Court.)

We have now found in the transcript of Mr. Anderson's Georgia trial an FBI report on an interview of Mr. Perry conducted just 20 days after the Staton/Ware murders. The entire statement reads as follows:

On Tuesday, September 30, 1980, Special Agent Hardin and Detective Sgt. Tommy Nations interviewed Eugene Wallace Perry, white male, d.o.b. 7/8/44, at the Duval County Jail in Jacksonville, Florida.

Mr. Perry told the investigators that he had lived at Camper's Paradise in Tyrone, Georgia from June, 1980 until August, 1980. Perry said while living at Camper's Paradise, he was known as Jim Jackson, Pop–Up Jim and Fro.

Perry said he knew Barbara and Allen Price very well. Perry said Barbara Price knew that he was a fugitive from justice, but she never tried to obtain any information about his past. Perry said Barbara Price knew the name Jim Jackson was an assumed name, but she never questioned him about it.

Perry told the investigators the white female who stayed at Camper's Paradise with him, who was known as Sandy, was hi wife. Perry said her real name was cindy brown, but failed to elaborate on Cindy Brown's past.

When questioned about Richard Anderson, Perry said Anderson had never been to Camper's Paradise.

Perry said he had gotten together with Anderson after he had left Georgia, but would not say where he had joined up with Anderson

Perry said he left Camper's Paradise on Saturday, August 23, 1980. perry said he would have left he park three weeks sooner, but Barbara Price had asked him to stay because of a van show, which was coming to the Park. Perry said Barbara Price told him he could make some real good money selling drugs to the people in the van show. Perry said he remained at the park and sold cocaine and marijuana to people at the Park during the van show and split the profits with Barbara Price.

Perry said Barbara Price smoked marijuana. Perry said he supplied Barbara Price with most of the marijuana that she smoked.

Perry said he would not relate to the investigators his activities after he left Camper's Paradise on August 23, 1980, because he felt it could be incriminating.

When questioned about the Price murders, Perry said he was embarrassed that peopled thought he was involved. Perry said that he had been close to both Barbara and Allen Price and could not imagine who would have killed them.

When asked if he would take a polygraph in reference to the murders in Fayette County, Perry said he would not. Perry said the reason for not wanting to take a polygraph was that a polygraph could be manipulated anyway the police wanted it to be.

Perry said his attorney, George Simms from Talladega, Alabama, was the only person he trusted, and that if Simms arranged the polygraph and agreed for him to take it, he would.

Perry said he had been in a considerable amount of trouble in Anniston, Alabama and had served time in Alabama on Armed robbery and drug charges.

Perry said he had been in the drug business primarily and had made $150,000.00 in 1979 selling cocaine.

When questioned about Charles T. Bryant, white male, d.o.b. 2/9/77, and Ruban Deese, white male, Perry said he thought of Bryant as a father figure. Perry said he had first met Bryant four or five years ago.

Perry said he met Bryant through J.B. Stovall, white male, age 53. Perry said Stovall was deceased. Perry said Stovall had died from Cirrhosis brought on by drinking to much.

Perry said he knew Ruban Deese, but not as well as Bryant. Perry said he was well acquainted with everyone on Stewart Avenue.

Perry was questioned about Bobby Joe Upton and Ted Griffith.

This statement was offered by the defendant Anderson but excluded by the Court.

And we have found Ms. Cindy Sue Brown's statement made upon her admission to the Arkansas Department of Corrections in 1985, after her *nolo* plea to her own involvement in the Van Buren crimes. That statement fits well with other testimony showing that Perry and Cindy Sue Brown entered and "cased" the Staton Jewelry Store on September 3, 1980, one week before the murders, and then went up to the Beaver Lake Campground in Northwest Arkansas where they first came in contact with Richard Anderson and Chantina Ginn.

So we have Perry testifying that he left the Paradise Campground in Georgia on August 22, 1980, and telling the FBI that he left on August 23, 1980. We have several statements of Ms. Brown stating Perry committed the Georgia murders on August 25, 1980. We have Ms. Brown's guilty plea to her involvement in the Georgia Crimes. We have Ms. Brown putting herself and Perry in Van Buren, Arkansas in the first few days of September and then a few days later at the campground on Beaver Lake. We have statements by her corroborating the testimony of Ms. Ginn and Mr. Anderson on the events after the Arkansas crimes including the trip from Arkansas to Georgia and from there to florida. But we also have additional information which tends to account for Mr. Perry's and Ms. Brown's whereabouts for part of the period between August 25 and August 30, 1980. See discussion under section on "Camping Registration Forms," below.

In the Georgia trial of Mr. Anderson, three registration slips were introduced into evidence by a Mr. Harper, the owner of the Nanade Creek Camp Ground in Meridian, Mississippi. He testifies that on August 27, 1980, a "Lori Peterson" registered at the campground. She was accompanied by one male. They were driving a 1971 Cadillac with a pop-up camper. The three registration slips cover the date of August 27 to August 30. Each slip refers to a Cadillac with Georgia tags TG–563, the third letter being difficult to read. (The user permits issued by Horseshoe Bend Recreation area in Northwest Arkansas on September 6, and September 8 show the license as "TGM–593" and one gives the state as "GA".) Mr. Harper, when shown a picture of the "the boy they call Richard" (Anderson), stated he had never seen that man. If Cindy Sue Brown ("Lori Peterson") and Perry were in Meridian, Mississippi from August 27 until August 30 this would be inconsistent with Perry's testimony as to his whereabouts in that period. Further, if they had the '71 Cadillac on that date, that would be inconsistent with Perry's testimony that he returned the Cadillac upon leaving the Georgia campground. And it would also the contrary to his testimony that he broke up with Cindy Sue Brown in July 1980. It also casts a big shadow over his testimony about meeting with "Damon" and Anderson on August 30, 1980, and selling or "renting" to them the camper and an automobile.

When Mr. Perry was trying to explain the August 30, 1980, transaction, See "Two Transactions" Section, below, he was asked how he arranged to meet with "Damon" and Anderson on that date. To get the flavor of Perry's testimony, we quote his response at length:

Q. I understand that, but let me stop you and back up because my question was aimed at finding out how you made arrangements to meet Anderson and Mr. Peterson at Babe's Bar. Did you receive a phone call somewhere or letter, or how did you know to go there?

A. Yes I did. Damon Peterson knows Turkey Collins.

Q. Okay.

A. And he had called there to get in touch with me. When I had left my parents' house in Alabama on the 26th, I guess it was—maybe the 25th or 26th.

Q. Of August?

A. Right. I had received a phone call from Jack Roberts, and I was told by him to stay out of the Georgia area. I had instructed him at that time where I was going, which was to the Black Fox campground.

Q. The what?

A. Black Fox campground.

Q. Where was that?

A. The extreme outskirts of Knoxville .. It wouldn't be in Knoxville anymore. It would be probably in Maryville, Tennessee.

Q. All right.

A. And I told him that I would go there and stay, and his advice to me was to lay low, which I was doing. And then I went to see a couple of friends while I was there. I went by Turkey Collins' house. At that time I had a message from Damon that he had to talk to me. It was at this point in time that I told him I would be coming back through Gadsden, Alabama. So he knew that I was coming there to Frank King's apartment.

Q. So did you make arrangements to meet at Babe's Bar, or did he call you at Frank King's house?

A. I don't remember the specific arrangements that we made and what we discussed, but I know that he knows that I was there, and that's how we met up. But when we met up, I was just going down Megan Boulevard, I think is the title of it, and both of them were on their motorcycles. Damon on the Honda and Rick on his Harley, and I told them then that I was going to Babe's Bar, so when I pulled in they just pulled in behind me.

Q. So you just happened upon them on them street?

A. Yes, sir.

Q. And that's how you arranged this meeting?

A. Yes, sir. They were already there looking for me.

Q. Tell me this: Who is Turkey Collins? Is he a courier for illegal activities or a friend of yours or what?

A. No, he's not a courier or anything. He's just a friend.

Q. And you said that he knows Damon Peterson or knew him?

A. Yes, sir.

Q. Did you tell your attorneys about Turkey Collins.

A. No sir, I did not.

Mr. Perry was asked about the camper he was "renting" to Damon and Anderson:

THE COURT: You said you had used this camper before.

THE WITNESS: Yes, sir.

THE COURT: For several months, did you say.

THE WITNESS: Yes, sir.

THE WITNESS: Camping.

THE COURT: Where would you take it?

THE WITNESS: This was my connection, sir, to the Campers' Paradise, which has been referred to here as the double murder in Georgia. I had camped there at that campground.

THE COURT: An account?

THE WITNESS: I had camped there at that campground. I think from about the middle of July to August, but I am not real sure. I only know the date that I left there, which was the 22th, and that was pinpointed for me by GBI officials.

THE COURT: They told you you left there on August 22.

THE WITNESS: Yes, sir.

THE COURT: How did they fix that date?

THE WITNESS: I suppose by the witness accounts of people that they interviewed.

As a result of the August 30, 1980, transaction, Perry says he got the use of the Honda motorcycle Damon had been riding. He states he drove the Honda to Frank King's trailor where he parked it. "We then got in his (King's) car and continued to party in Gadsden, Alabama "until the next day, Labor Day." Then what?

THE COURT: And where did you go then?

THE WITNESS: At that particular time I carried the motorcycle back through the back woods through Cedar town—instead of going the Interstate I went through the back woods through Cedar Town and went back to Atlanta. I parked the motorcycle there at Car Circus and picked up my van.

THE COURT: What van is this?

THE WITNESS: A red van that my mother owned.

THE COURT: And what did you do?

THE WITNESS: I left Atlanta then after I picked up the van and went to spend the labor Day holiday there with my ex-wife and two daughters.

THE COURT: And where is that.

THE WITNESS: That is in Oxford, Alabama.

THE COURT: So what days were you in Oxford?

THE WITNESS: At that particular time, it happened Labor Day was on the 1st of September, and I left there the next day, which would have been the 2nd.

THE COURT: You left where on the second?

THE WITNESS: Oxford, Alabama.

THE COURT: I thought you said you partied until Labor Day.

THE WITNESS: Yes, sir. That was on the 30th of August when we—the 30th of August would have been Saturday. We completed the camper deal, I parked the motorcycle, we partied all night Saturday night. I stayed there until Labor Day. I stayed there that night, in other words, I was actually in both Gadsden, Alabama when I woke up, and I later carried the Motorcycle to Atlanta, Georgia and arrived at my ex-wife's house sometime after lunch on Labor Day.

THE COURT: Where is Oxford from Atlanta?

THE WITNESS: About 85 or 90 miles. It's right on the interstate. Oxford is right on the interstate, and it's no more than 90 miles. Eighty-five probably.

THE COURT: So you arrive on Labor Day.

THE WITNESS: Yes, sir.

THE COURT: September 1 that year.

THE WITNESS: Yes, sir, it was.

THE COURT: How long did you stay there?

THE WITNESS: Well, I stayed there that day and that night and left the next day.

THE COURT: September 2nd.

THE WITNESS: Yes, sir.

THE COURT: And then what did you do or where did you go?

THE WITNESS: Sir, I wish I could tell you what I did, but I am not absolutely certain what I was doing on the 3rd. I am almost 100 percent sure that I went to see my friend, Bill Underwood in Knoxville, Tennessee on the 3rd. I have asked him if he would verify that and that phone call was made even by my past attorney, Jeff Rosenzweig. He, too, didn't want to get involved. Aside from that, if I wasn't there, which I think that I was—and he may very well verify it to this day. I don't know. I haven't corresponded with him in quite some time.

THE COURT: Are you saying—where is the next place you know you were?

THE WITNESS: Okay. What happens here, after I leave Oxford, Alabama on the day after Labor Day, is that I only know of two things that I did. I don't know the sequence that I did them in. I know that I went to Tennessee, and I think that was on the 3rd. And I know that I carried some car titles to Panama City, Florida for Charlie. But I have in my mind I have from the second day of September to basically the 7th day of September to have done that. And I cannot tell you what I was doing during those times.

THE COURT: You either went to Tennessee or to where in Florida?

THE WITNESS: To Panama City.

THE COURT: What would you be driving.

THE WITNESS: I drove that Honda.

THE COURT: What do you mean taking titles.

THE WITNESS: Titles. Car titles.

THE COURT: To Charlie?

THE WITNESS: From Charlie, yes.

THE COURT: Who is Charlie?

THE WITNESS: Charlie Bryant.

THE COURT: To whom?

THE WITNESS: To a friend of his that he bought cars from down in south Georgia and Florida down there and brought them back up there and resold them. They could buy them real cheap there because of the damage—the salt water damage and

stuff. They were much cheaper there, so they would go down there and get them and transport them back up there and sell them.

THE COURT: You're talking about this period between September 2 and September 7?

THE WITNESS: Yes, sir.

THE COURT: And you're having trouble deciding—are you sure you went to Tennessee and you're sure you went to Florida, but you're not sure of the sequence.

THE WITNESS: I am not sure of the sequence. I don't know how long I stayed, and I can't think of anything else that I was doing at that particular time. What makes this difficult is the fact that I did not realize dates that I had to have an alibi for until almost a year later, and I just could not go back in my mind and figure out every single place I had been.

THE COURT: some of these things you're very certain about.

Let me ask you about Panama City. Where did you stay there?

THE WITNESS: I think it was a Gulf Breeze Motel. I think was the name of it.

THE COURT: Do you know how long you stayed?

THE WITNESS: I only think a night or two nights or something like that. It wasn't particularly pleasure, although that's what I used it for. I did go down there on business, but I don't recall having a lot of fun. I'll put it like that. Which I generally did.

THE COURT: Let's finish up before the break here. Where did you go when you left Florida?

THE WITNESS: Well, when I left Florida I ended up on the 7th—I think it was the 7th in Oxford, Alabama at my family's house.

THE COURT: Your mother and father's house?

THE WITNESS: No, sir, actually it was my ex-wife's house. She has a home about five miles from where my mother and father live.

THE COURT: So how long did you stay there?

THE WITNESS: From—I had to stay there. The reason that I had went back there is when I was—the answer to your question, of course, is three days or three days and a wake-up. But the reason I had went back there to start with is when I had left Gadsden, Alabama on the 30th and they were telling me they were fixing to go make some money and get this jewelry from Chantina's boyfriend, they asked me how they could get in touch with me, and I told them I would be at ex-wife's house on Labor Day, and they said, "No, that's too quick." I said, "Well, I would be there a week later then." so I appeared there on September 7th and I waited for their call. . September the 7th, 8th, 9th. I left there on the 11th.

THE COURT: And went where.

THE WITNESS: Back to Atlanta.

THE COURT: How did you go?

THE WITNESS: How did I go?

THE COURT: Yes. How did you get there?

THE WITNESS: I think, sir, that I was still driving the—let me see if I can look at my notes, please. I was driving the van at that time.

THE COURT: The red van.

THE WITNESS: Yes, sir. I had to recall the fact that I had let my daughter, my oldest daughter, drive the van while I was there.

THE COURT: How did you get—did you come from Florida to your wife's house.

THE WITNESS: No, sir. I came from Florida back to Atlanta, Georgia.

THE COURT: On the motorcycle?

THE WITNESS: Yes, sir.

THE COURT: And then what? How long did you stay in Atlanta?

THE WITNESS: Well, I don't know exactly the date that I got back simply because those days I don't even know that I was doing. Assuming that I got back from Panama City on, say, the morning of the 7th or the afternoon of the 6th, or whatever, I would have parked the motorcycle and picked up my van and then drove to Oxford, Alabama to be with my family for

the 7th, 8th, 9th, 10th, and then left the 11th.

THE COURT: And you drove the van back to Atlanta?

THE WITNESS: Yes, sir. Yes, sir.

THE COURT: And then you met these folks there what day?

THE WITNESS: I think that it was the 13th. And I think the 13th would agree with what the investigators have said. I have had to use their dates in order to place my own dates, so I am assuming that they are right on some of the things that they have said.

To better assess the reasonableness of Mr. Perry's explanation of the August 30, 1980, transaction, it is helpful to refer to his testimony concerning his use of this same pop-up camper and the 1971 Cadillac.

Mr. Perry testified that he stayed at Mr. Stovall's residence until Stovall's death on July 25, 1980, and "soon thereafter is when I took the camper that he had and I moved it to the Camper's Paradise Campground, on the outskirts of Atlanta." The Court made further inquiry:

THE COURT: Let's go back once again. You said shortly after he died you took this pop-up camper to this—

THE WITNESS: Yes, sir.

THE COURT:—to this Paradise campground right outside of Atlanta.

THE WITNESS: Yes, sir.

THE COURT: What did you do with it there?

THE WITNESS: I lived there.

THE COURT: How does that work?

THE WITNESS: You just rent. You just rent a space and just stay there.

THE COURT: And how did you get around?

THE WITNESS: Various ways. At that particular time I had possession of a '71 Cadillac. At other times I had my van down there. I have driven numerous other cars there as well. Those would have been the main ones.

THE COURT: How long were you there?

THE WITNESS: At least a month. Possibly more.

Tr. p. 121–122.

\* \* \* \* \* \*

Q. You made reference to having a '71 Cadillac at Campers' Paradise?

A. Yes, sir.

Q. Was this the blue and white '71 Cadillac that's in the photographs and the transcript in this case?

A. Yes, it is.

Q. Now, a while ago when you testified you indicated that you rented a '72 Mercury—

A. That's correct.

Q. —to Mr. Anderson and Mr. Peterson on August the 30th?

A. That's right.

Q. Do you have any explanation for how they wound up with the '71 Cadillac in northwest Arkansas?

A. I could give you my opinion, but it's not anything to do with any proof.

Q. Well, you don't know?

A. No, I don't know

Q. All right.

Whose '71 Cadillac was this? Did it belong to J.B. Stovall too?

A. Or Damon or something. I am not sure.

Q. This could have been Damon Peterson's own vehicle?

A. It may have belonged to someone else. I think it belonged to Tom Brackett.

Tr. 123–124.

\* \* \* \* \* \*

THE COURT: About the blue Cadillac once more. You used it at the campground.

THE WITNESS: Yes, sir.

THE COURT: Did you tow the camper up there with it?

THE WITNESS: Yes, sir. What I did there, when I left on the 22th I pulled the camper out from there. I parked the camper—and this is all verifiable through the GBI. I parked the camper there at the next exit at a service station which I

had been doing some business with and drove the Cadillac on to Car Circus and parked it, at which time I got my van. The camper then was to be picked up on a prearranged agreement by Damon.

T. p. 126–127.

"Weird" would be a charitable way to characterize Mr. Perry's testimony about this transaction. Here he is suggesting that the '71 Cadillac that he used at the Paradise Campground in Georgia, and which was also used in Arkansas, was actually owned by "Damon." But the August 30, 1980, transaction was, Perry says, motivated by Damon's and Anderson's need for a camper and a car to pull it. If Damon owned the '71 Cadillac, why did they need the '72 Mercury? Furthermore, Perry's testimony, above, is that upon leaving the Paradise Campground he parked the camper at the next exit on the interstate. He then states, "The camper then was to be picked up on a prearranged agreement by Damon." So it would appear that "Damon" would have had both the '71 Cadillac and the camper from around August 23, 1980, the date Perry claims he left the Paradise Campground.

Perry's testimony concerning his role as the "fence;" his testimony about how he came to call himself "Damon Malantino;" and his testimony concerning the circumstances surrounding his arrest in Jacksonville, Florida, are sufficiently described in other sections of this opinion. And his testimony about the alleged August 30, 1980, transaction and the September 15, 1980, deal with respect to the 1976 Cutlass will be found set out in considerable detail in the "Two Transactions" Section, above.

The Court made its initial assessment of the credibility of Mr. Perry's testimony at the time he testified in this habeas proceeding. Thereafter, the Court reviewed a transcript of that testimony in relation to the other proof and information in the case. Its conclusion on both occasions: Mr. Perry's explanation of his dealings with Mr. Anderson in Alabama in August, 1980, and his explanation of his role and actions after the Arkansas murders, carrying through to his arrest in Jacksonville, are in all important respects, incredible, inconsistent, contradictory and simply unworthy of belief.

The Court has already stated that the state's evidence as presented to the jury, if believed—as it obviously was—was overwhelming. The Court notes that the jury deliberated only approximately two hours before finding Mr. Perry guilty of capital murder. Mr. Anderson did not testify at Mr. Perry's trial, but he has testified in this proceeding. He has positively identified Mr. Perry as the "Damon Peterson" he met for the first time in his life at the Beaver Creek campsite on September 6, 1980. So, whereas the state jury had to rely on circumstantial evidence (since neither Mr. Perry nor Mr. Anderson—the sole eye witnesses to the murders—testified in Mr. Perry's trial), this Court now has had the benefit of the testimony of one of the two eye witnesses to these horrible crimes. Although Mr. Anderson has severe credibility problems of his own, the Court credits his testimony as to all of the essential events relating to Mr. Perry's role in the murders of Mr. Staton and Ms. Ware. And Ms. Cindy Sue Brown did not testify at Mr. Perry's trial. But the statements we now have from her further support the case against Mr. Perry. And the brazen "confessions" of Mr. Pruett have been discredited and undermined. The conclusion is obvious.

## THE TWO TRANSACTIONS

Two transactions described by Perry should be reviewed not only because they are central to his explanation of his role, and the roles of "Damon Peterson" and Richard Anderson, but also because they are demonstrably and inherently incredible, if not absolutely nonsensical. The substances of his testimony about these transactions and the manner in which he testified about them, has led the Court to completely discredit that testimony. In short, both are pure fabrications.

The first transaction, according to Perry, occurred at Babe's Bar in Gadsden, Alabama, on August 30, 1980. On this occasion he says he transferred "A camper that had previously been located in south Georgia at a Camper's Paradise Campground" and also a 1972 Mercury automobile to "Damon and Rich." But he says he really did not own the camp-

**1550**

er. "Those campers belonged to J.B. Stovall, as did all the cars that we drove." He "thinks" he represented to Anderson that he owned the camper. Then he explained:

A: When Damon first approached me, of course, we discussed a couple of other things, but one of the things that we discussed was the fact that Anderson did have a little money on him and he had more money on him than Damon wanted him to have and he wanted to have some of it, so he contrived the scheme that he would rent—

Q: "He"?

A: Damon would rent Anderson or asked me if I would rent Anderson the camper. The camper was to be rented for a thousand dollars, $250.00 rent, and the rest refundable when they brought it back. And my deal with Damon on the side was simply that I would give him back half of the money because the camper was not mine to rent. It was as much Damon's as it was mine.

Q. So Anderson pays you, thinking you own it, and then you split it with Peterson?

A. I split it with Peterson, right.

Q. How much did you get off Anderson on this deal?

A. One thousand dollars.

Q. And that was when?

A. That would have been August the 22nd, 1980.

Q. I thought you said you last saw him August the 30th of 1980?

A. I'm sorry. You're correct. That would be August the 30th of 1980. That's correct.

Tr. p. 223–224.

He was also asked about the transaction on cross examination. Again, we will use his own language:

Q. Now what was the nature of this contact you had on August the 30th?

A. The contact that we had there was for some reason or another Damon needed to rent this camper that he had—I assumed at that point that he and Anderson had just got through doing something that made some money.

Q. Wait a minute. Let me stop you now. You met with whom at Babe's Bar? Who did you meet with? I was under the impression it was Mr. Anderson you met with.

A. No, it was also Damon Peterson and Anderson there.

Q. So Damon Peterson and Richard Anderson met you at Babe's Bar in Gadsden?

Tr. p. 83.

\* \* \* \* \* \*

Q. Go ahead.

A. At this particular time I was under the impression that Damon and Rick had just done something that made them a little bit of money because Damon knew that Anderson had a specified amount of money and he wanted to get some of it. The agreement with the camper—to rent the camper was basically just to get some of his money. It was not to rent the camper on an as it appeared to be.

Tr. p. 84.

\* \* \* \* \* \*

Q. So when you were driving on the streets in Gadsden, Alabama you were driving a blue and white Cadillac pulling a camper?

A. No, sir, I was driving a '72 Mercury pulling a camper.

Q. So you pulled in some place and made this transaction with Peterson and Anderson about this camper and this Cadillac that they were going to rent from you?

A. Yes, sir, it was on a side street. I don't know the name of the street. It's in the record. Third Street, Fifth Street, Sixth Street, whatever it was there beside Babe's Bar.

Q. And you all did your business. Did you get money then or were you going to meet later?

A. We concluded that transaction then.

Q. How were they going to get this car and camper? You didn't have it with you.

A. I did. I did have the car and camper with me.

Q. You indicated you were driving on the street in some sort of a Mercury?

A. Yes, sir.

Q. Was the Cadillac and camper parked by Babe's Bar?

A. Yes, sir. Let me back up and I can explain it to you a little more. When I came from Black Fox into Gadsden, Alabama I went by the Quality beverage store. I was pulling the camper with the Mercury. They were about to close the books and get ready to go do their weekend thing, and I was going on to Babe's bar and they were to come pretty close in behind me. So when I pulled back upon the four lane, Megan Boulevard, this is when I ran into Peterson and Anderson.

Q. You were just in a car. You didn't have a camper behind you?

A. I had the camper.

Q. It was hooked up to this Mercury automobile you were driving?

A. Right.

Q. Where did the Cadillac come from? Did you rent them a Cadillac and a camper or a Mercury and a camper?

A. No, I rented the Mercury and a camper.

Q. So you don't know anything about this blue Cadillac?

A. Not at this particular time, no.

Tr. p. 88–89.

* * * * * *

Q. So you have rented a Mercury and a camper. Incidentally, this camper was stolen; correct?

A. I heard testimony to that, yes.

Q. Now you testified on direct examination that you were renting this camper on behalf of J.B. Stovall. Was it his camper? That's how you got hold of it was from him?

A. Yes.

Q. And you don't know this camper was stolen?

A. No. I didn't. I suppose he had bought it from somebody.

Q. You thought he bought it from someone?

A. He owned quite a bit of cars, campers and various things, so—

Q. One thing I guess I don't understand is this is on August 30th of 1980 and you told us he died on July 25?

A. That's true, yes.

Q. So he gave it to you before he died or told you to rent it out before he died. How did that happen?

A. Basically what occurred there, we were just capitalizing on the way the operation was set up in that he had numerous cars. I don't know how many. Maybe as many as 50. Many of them were parked at Car Circus, many of them were parked on the side street next to Car Circus, and many of them were just parked all over town in various locations.

Q. Were these all stolen cars?

A. No, he didn't deal in stolen cars. That's one thing they didn't do. There's too much heat.

Q. But he dealt in stolen campers apparently?

A. Apparently he did. Of course, he may have had all the bill of sales that he could have covered it. I don't know.

Q. Did you ever notice that the VIN number on this camper had been popped off?

A. No, I didn't. Let me conclude—the reason that we had access to these vehicles is when he died, these vehicles were just parked in various parts of the city and Damon and I were the only ones that knew exactly where they were. They were parked for our benefit in case we needed them.

Q. Why would they be parked in different places? You say for your benefit. So you could transact illegal activity by using these various cars?

A. Basically.

Q. So, he wasn't in the stolen car business; he was in the illegal drug business; is that right?

A. That would be pretty accurate, yeah.

Q. All right, so you have rented—

THE COURT: Did you rent—how did you get the car and the camper? Who

did you deal with? Or did you deal with anybody.

THE WITNESS: I didn't deal with anybody, sir. We had access at that time to a dozen cars that were just parked, and when J.B. died, it was only Damon and I that knew where the cars were parked. His son—which I don't know his name became I didn't know he had a son until it almost that time—but his son came over there and rounded up a lot of the cars and carried them back to a place of business that he owned in Georgia—another part of Georgia. But the cars that he had that were parked—just scattered around, we just continued to use them. We didn't turn them in. We just continued to use them.

THE COURT: Where did you get this car and camper?

THE WITNESS: From the side street of Car Circus. That would be Stewart Avenue.

THE COURT: How did you get the keys? How did you know it was one of his cars?

THE WITNESS: We had been using these cars for several months.

THE COURT: You had been using this camper and this other car.

THE WITNESS: Well, yes, sir, the camper I had been using it personally.

THE COURT: For several months.

THE WITNESS: Yes, sir.

THE COURT: So when you wanted to take it, you already had the keys to the car? I don't know about the camper, whether it was locked or not.

THE WITNESS: Basically what we always had was a small magnet little key, magnet that you put the key up under the running board, and when we would get out we put the key there underneath that. And any car that was parked at this particular place was available to us to get in it and drive off if that's what we wanted to do.

THE COURT: Mr. Stovall never made you account for any of these cars? You take them out and sell them and do whatever you want to?

THE WITNESS: They wasn't ours to sell. That's the reason I was explaining the appearance of a legitimate transaction of the rental of the camper. It wasn't mine to sell. It wasn't mine to rent. Damon had concocted the rental thing to extort a little money out of Anderson because he had more money that he wanted him to have. So he just concocted the thousand dollar rental scheme so he could get $500.00 basically.

THE COURT: And was that for both the car and the camper.

THE WITNESS: Yes, sir.

THE COURT: And did you not have to account to Mr. Stovall or anybody about what happened to those things?

THE WITNESS: Mr. Stovall had passed away. The reason we had access, he had passed away July the 25th and these cars and campers and stuff that we just continued to use were actually his. But nobody knew they were his except us, so we just continued to use them. Like I say, his son did come over there and gather up a bunch of them and took them home.

Tr. p. 90–94.

\* \* \* \* \* \*

Q. Okay, and going from there, now, you have rented this Mercury and this camper to someone you allege to be Damon Peterson and then to Mr. Anderson?

A. Yes, sir.

Q. And this occurred on August 30th in Gadsden outside of Babe's Bar. They gave you money and they take the car and camper and they leave?

A. That's correct.

Q. How were you going to get Damon Peterson this $500.00 that he was going to slip from

A. He got it right then.

Q. Did Mr. Anderson see it and wonder what was going on?

A. He said, "Why don't you loan me some of the money now that you've got it" and I just give it to him.

Q. So they get in the car and take the camper and they are on their way?

A. That's correct.

Tr. p. 97.

\* \* \* \* \* \*

THE COURT: Before I leave it, what was the financial arrangement now on this car? How much money changed hands.

THE WITNESS: There was a thousand dollars changed hands. My recollection of it is there was only a $250.00 rental fee and he was putting a thousand dollars like a deposit or something which he would have got back, is my recollection of the deal.

THE COURT: When you say "rental," for what period of time?

THE WITNESS: I don't know that there was anything about that on the thing. Probably 30 days or something. They had a specific thing to do, and it may have just covered that particular specific thing.

THE COURT: Go ahead.

BY MR. GALLEIN:

Q. Who paid you this thousand dollars? Did it come from Richard Anderson, all 1250, whatever it was? What was the amount?

A. I think it was a thousand dollars even.

Q. A thousand each?

A. No, I think it was just one thousand dollars and I split the two thousand dollars then with Damon.

Q. With Mr. Peterson. Who paid the thousand? Did Damon Peterson ante up some of the money along with Richard Anderson, or did Richard Anderson pay all thousand?

A. No. The way I interpreted what was going on there, which they had had some discussion on this obviously before I got involved in it, but the way that I interpreted what was going on was that they had just done something and made some money and he knew how much he had.

Q. "They" made money. Damon and Richard?

A. Damon and Richard.

Q. Who knew how much then they had?

A. Damon knew how much money Rick had.

Q. In your direct testimony, if I understood it at all, you indicated—you said Damon knew Richard had some money and wanted to relieve him of some of it.

A. That's what I am saying.

Q. Half of it was Mr. Peterson's if what I am hearing you say now is true?

A. This would not be—you're kind of confusing—

Q. Well, straighten it out.

A. Let's just say, for instance, that prior to the time that I met them at Babe's Bar—say three hours before that—they had robbed somebody and maybe had gotten $2,000.00 let's just say. And Damon Peterson knew that Rick had a thousand dollars. And I don't know that that is the case; I am just giving you a hypothetical situation. Damon wanted Rick to spend some of his money, so he concocts the scheme to rent the camper, which he could have got the camper, you see, absolutely for nothing. All he had to do was say, "Look, let me borrow it." He had as much right to borrow it as I did.

Q. Damon Peterson did?

A. Sure.

Q. Because he knew Mr. Stovall too?

A. Right. It was not my camper.

Q. So they had a large sum of money and Mr. Peterson wanted to get some of it from Mr. Anderson but didn't want Mr. Anderson to know about it?

A. That's true.

Q. So you had a side deal and you gave him $500.00 in front of Mr. Anderson?

A. Right. Basically, what we accomplished was I got rid of the camper and car and got the motorcycle and made $500.00.

Q. Did you have a—

THE COURT: What do you mean you go the motorcycle.

THE WITNESS: I also took Damon Peterson's 750 Honda. He said, I will throw this in as collateral. It was the fact I had to have something to drive—ride. The motorcycle itself was also one of J.B.'s deals, so while he was saying,

"You can hold this for collateral," I had as much right to be riding it as he did.

Tr. p. 98–101.

Mr. Perry was asked if the parties entered a written agreement on August 30, 1980. He answers: "Not a real formal agreement, just something scribbled out on a piece of paper" which, he concedes, has not turned up. Further inquiry was made concerning the Honda he got from Damon:

Q. And you also indicated in connection with that transaction that you took a Honda 750 as collateral or to hold?

A. That was the deal.

Q. In addition to the $1,000.00 cash that was given to you?

A. Yes, sir, that was the appearance of it, yes.

Q. And what became of that motorcycle. The last I heard from your testimony it was left at Frank King's trailer house. Where did it go from there?

A. Well, I am not sure what happened to it, but the night that I ran from room 16 at Jacksonville motel, I was trying to get to it which would have been over in the next parking lot.

Q. So this Honda was in Jacksonville at the time you were arrested?

A. Yes, sir.

Q. And this Honda belonged to—

A. J.B. Stovall.

Q. But Mr. Peterson had had it in his possession at the time he took possession of the Mercury and the camper?

A. That's true, yes.

Q. So you took possession of it from him. So it really wasn't offered as collateral. I mean it belonged to Mr. Stovall?

A. That's true.

Q. So if you testified it's collateral, that's not so?

A. I said the appearance of the deal. I didn't really rent him the camper. That was just an appearance.

Q. This was a sham for Mr. Anderson. Something he was to believe?

A. True, and he says, "And I will just let you hold the motorcycle for collateral," which the motorcycle wasn't his. Wasn't mine either.

What does Perry say his understanding was of "Damon Peterson's" and Richard Anderson's purpose in acquiring the camper and the car?

Q. Back on August 30th when you rented them the car and the camper, you have indicated that you rented the car and the camper to Richard Anderson and someone you identify as Damon Peterson and that they were going to go and take this stuff that belonged to the boyfriend of Chantina Ginn; is that right?

A. I am not following you all the way through.

Q. August 30 you're renting a car and camper to Richard Anderson and someone you identify as Damon Peterson and you knew they were going to go pull a job and that's the reason they wanted the vehicle and the camper; correct?

A. That's correct.

Q. Was it at that point they told you they were going to rip off the boyfriend of Chantina Ginn?

A. Yes, it was.

Q. But she wasn't present when they rented the car and camper?

A. No, she was not there. It was just made reference to Anderson, his girlfriend lives with somebody who has a lot of money and she is just going to leave him.

Q. Did they even say the name Chantina Ginn at that point?

A. Yeah, before we left at that particular point—well, I's not sure. No, I'm not sure it was at that particular point because I thought that was at the point they gave me the name but that's not—they gave me the name when they called my—

Q. Did he tell you where they were going to pull this job?

A. I understood them to say Oklahoma, but apparently that was not where it was.

Q. And was it your understanding that the people to be involved in it were Richard Anderson, his girlfriend, and this person you say was Damon Peterson?

A. That was my understanding, yes.

Tr. p. 114–115.

Mr. Perry's final comments on this transaction were in response to the Court's questions:

> THE COURT: When you sold or rented the pop-up and car and drove it away there, were you there when they left or did you leave first?
>
> THE WITNESS: I think probably we would have walked on in first. I can't recall as to who would have left first or anything. it seems like when we consummated the deal, I turned around and went on in with Hays to where Frank King was already there. I don't have any memory of watching them drive off or anything like that.
>
> THE COURT: Just the two of them there getting the camper.
>
> THE WITNESS: Camper.
>
> THE COURT: Just the two of them. Nobody else?
>
> THE WITNESS: That's right.
>
> THE COURT: But you did make plans to meet again around a certain date?
>
> THE WITNESS: Yeah. When they first said that they was just going to rip off a man that she was dating or something like that, they asked me where I would be, and I made reference where I will be at my wife's house on Labor Day. They said, "No, that's not enough time." I said, "Well I'll come back a week later."
>
> THE COURT: You don't remember if you saw them leave or whether you just left them after you made the transaction?
>
> THE WITNESS: No. I probably walked on in and just left them to drive off probably.
>
> THE COURT: Go ahead.

Tr. p. 156–157.

This leads us to the second transaction which involves the purchase of the 1976 Cutlass in the name of "Damon Malantino" on September 15, 1980 from Car Circus in Atlanta. Mr. Perry's own words will be used:

A. After I had rented the car and camper to Damon and Rick—and I say Damon because it was actually Rick—they were, of course, to bring it back. They did not bring it back. They said the car broke down in Mississippi or parked it or something and the camper was stored, and they gave me a receipt on the storage where it was. At this particular time what Damon contrived to do was to buy a car from Car Circus, from the same people that we work for, and that he would buy about a $3,000.00 car and that he would go in on this car 50–50 with Anderson. Again, this was a scheme to get some more of Anderson's money. So he would buy the car for $3,000.00 or thereabouts, which the car cost $2,650.00. Anderson was to pay half of it and they were just going to give it to me for what they had lost in the camper and the car that they had rented. Now I did split that with him on that. My deal then—

Q. Split it with who?

A. With Damon Peterson.

Q. Was Anderson there when you sold the car to him?

A. Well—

Q. Or acted like you sold the car to him?

A. Yeah, I suppose so. I can't remember that.

Q. What date was this?

A. This would have probably been August the—I mean July the 13th, probably.

Q. July?

A. I can remember this simply because my friend, Charlie was hospitalized on July the 12th at Citizens Hospital and I had to go there and stay with him and so I know that this transaction took place probably one day after I went there. This is the only reason I can pinpoint—

Q. July or September, Gene?

A. You're correct. This would be September.

Q. Okay.

A This had been a long time, sir. Thirteen, 12 years.

Q. And in your testimony you jumped from leasing the U–Haul to when you appeared in court together, but now we have

this September the 13th thing with Anderson; is that right? Just take your time.

A. September the 13th was when they bought the '76 Cutlass in Atlanta, Georgia, and they bought it to give to me for what they had lost in the earlier deal of the camper and the car.

Q. All right. Did you travel with them to Florida?

A. No, sir, I did not.

THE COURT: But you saw them at the time of the September 13th transaction? Mr. Anderson.

THE WITNESS: I beg your pardon.

THE COURT: You dealt with Mr. Anderson about this Cutlass?

THE WITNESS: Actually, what Damon had done is had a side conversation with Mr. Anderson that since they had rented my camper and rented my car and had took it to Arkansas and left it, that it would only be right then that they purchase another car and just give it to me. This was not exactly a hundred percent upright deal because Damon had not lost the camper and he intended to get it back. And I didn't own the camper anyway, as I said.

Damon had proposed that he would propose this to Rick, and when Rick paid him the half of the car, which ended up being a $2650.00 car that would mean that Anderson had to pay him 1325, I suppose. So all I had to do then to get total possession of this car was to drive to Jacksonville, Florida where they were going to buy more guns and pay Damon the 1325. So I would have had the $3,000.00 car for 1325.

Later the Court inquired further about the transaction:

THE COURT: Well, did you buy the car and then sell it?

THE WITNESS: No, sir, I didn't buy the car. But it was understood that I would get the car simply by going to Jacksonville with them and picking it up when they got through with every what they had to do down there.

THE COURT: Did you help them get the car?

THE WITNESS: No.

THE COURT: Do you know that they got the car?

THE WITNESS: Yeah, I know they got the car.

THE COURT: Where did they get it?

THE WITNESS: From Car Circus.

THE COURT: Did they pay for it?

THE WITNESS: See, Damon worked for these people just like I did. All he had to do was go and buy whatever they had on the lot and they gave him a good buy and he bought it.

THE COURT: He bought it?

THE WITNESS: Yes.

THE COURT: How does his buying it involve you?

THE WITNESS: Okay. They had rented a camper and car from him and they had lost it. Damon proposed to Rick that what they should do would be—to make it right to keep me from being mad—was to buy a car and just give it to me. So, he said, "I'll put up 50 percent and you put up 50 percent."

THE COURT: Meaning you?

THE WITNESS: No.

THE COURT: Rick and Damon.

THE WITNESS: Damon is telling him, "You put up 50 percent fo the car and I put up 50 percent." They knew they was fixing to have a lot of money, or already had it, and they were going to buy about a $3,000.00 car, which would have been equivalent to the cost of the camper and the car that they had just lost or left. Damon's scheme behind that was that he was just getting another $1325.00 out of Rick because I was to pay Damon back for his half of the car after I got to Jacksonville, Florida and took possession of the car. I realize that's a little—

THE COURT: They had all this jewelry and they're making deals. Why didn't they just pay you what they thought they owed you.

THE WITNESS: Well, they did not—I was to arrange a purchase—I was to arrange a sale for the jewelry. That's what I was supposed to do. My only involvement in that was to sell the jewelry and make a commission off it and sell it at a good enough price they could make a commission. I did not make any money off anything else. These other details was just stuff that Damon continually throwed in there. You never did one deal with him. It was always something else involved.

When asked on cross-examination if he choose the name "Damon Malantino" to put on the title papers for the 1976 Cutlass, Perry replied, "I told him Raymond Malantino and he misunderstood me and put Damon Malantino on there."

Q. So there is a coincidence between the name Damon Peterson and Damon Malantino?

A. I understand that, sir, and it's caused me lots of problems.

This second transaction was also discussed during the cross examination of Mr. Perry:

Q. Now tell me about these arrangements that were made for the purchase of the automobile. Was that business transacted when you met them at the LaQuinta, or did that come up later?

A. I'm not following your question.

Q. Well, there was a sham deal that you had going that you were going to wind up with a car after they got through with it after going to Jacksonville, Florida. When did you make arrangements with them about you winding up with this automobile. I think this was going to involve ripping Mr. Anderson off for some more money; isn't that right?

A. Basically, yeah.

Q. When was that transaction made?

A. That transaction would not have been made at the LaQuinta Inn. It would have had to have transpired sometime after the Scottish, Inn. Either the second or the third motel. I'm not sure there was three motels. I'm not sure that was there was three. I know there was two. I know it

for a fact. I am thinking there may have been a third, but I just can't recall.

Q. So that whole plan came up later after that first transaction involving the jewelry?

A. It came up—the actual completion of it did, yeah. I couldn't correlate it to exactly where it was at when we had a conversation, and this and that.

Q. And, again, this was a sham deal that you and Damon, the person you identify as Damon Peterson, concocted to make Mr. Anderson feel bad, thinking he had rented a car from you that broke down and he didn't return. So he was led to believe he needed to provide you another car to make up for the one he lost. Is that what you're saying?

A. That's basically it, yeah.

Q. So we know from looking at the documents that have been introduced that this car transaction took place on September the 15th.

A. Yes.

* * * * * *

Q. So you make this car exchange on the 15th. Were you present when this '76 Cutlass was picked up?

A. No, sir, I wasn't.

Q. This was something that Damon Peterson did on his own?

A. Yes.

Q. Do you know if Mr. Anderson was present when all that was taking place.

A. No, I don't know where he was.

Q. And the name that the car was ultimately registered to was Damon Malantino?

A. Damon Malantino.

Q. Do you have any idea how that name came to be?

A. Yes sir, my next door neighbor, that's his name.

Q. That was your next door neighbor where?

A. In Alabama.

Q. Where in Alabama?

A. In Oxford, Alabama.

Q. This was where Glenda Perry and your daughters lived in Oxford, Alabama.

Your next door neighbor at that house was a gentleman by the name of what?

A. It was the next door neighbor to my mother and father. And they live in Oxford, Alabama also.

Q. So your parents' next door neighbor, his name was what?

A. His name was Raymond Malantino.

Q. Raymond Malantino. Is this the situation where you had told this person you identify as Mr. Peterson to have this car titled in the name Raymond Malantino and he got it wrong?

A. He got it wrong.

Tr. p. 117–178.

## USE OF THE NAMES "DAMON PETERSON" AND "DAMON MALANTIO"

Until Mr. Pruett entered the picture with his "confession" in 1989–1991, Mr. Perry's defense was that he was simply not in Arkansas in September, 1980; that there was such a person as "Damon Peterson;" and that "Damon Peterson" was not just an alias that he (Perry) used (along with "Damon Malentino" and others). But Mr. Pruett's statements have changed the *dramatis personae* by injecting himself and his wife, Michelle, into the picture and by identifying "Damon Peterson" as "Sundance." (In his letter of March 21, 1990, Pruett states: "Sundance used the name 'Damon Peterson' . . . he also used the name 'Damon Malatino'").

Pruett and Michelle were in the Federal Witness Protection program in the 1979–1981 period under the name of Pearson. They resided in a mobile home in Albuquerque, New Mexico. Pruett says he "hooked Barbara Padillo up with Sundance (Damon) in 1980." This was said to be in New Mexico. And he says Pat Etier of near Mountainburg, Arkansas, also used the last name of "Malatino." In his letter of May 8, 1989, he states that Pat Etier was Sundance's (Damon's) "ole lady" and that Michelle, Pat Etier and Sundance (Damon) stayed back at the Terry Motel while he and Anderson did the Staton/Ware robbery-murders.

Perry testified he first met Pruett in the Sebastian County jail where both were being housed in 1982, Perry in connection with some post-trial hearing, and Pruett in connection with the case against him for the 1981 murder of Ms. Richardson in Fort Smith. They spent less than one day together. They did not see each other again until Pruett was transferred from Mississippi to Arkansas in 1988. So there is no claim that they knew each other before the Staton/Ware murders in 1980. But they both claim to have known a "Damon Peterson." Pruett claims he knew him as "Sundance" in New Mexico in 1980 and Perry claims he knew him as "Damon Peterson" in Alabama and Georgia in 1980. Perry admits he has used the alias "Damon Malantino" and was in fact using that name when he was arrested in the Jacksonville, Florida, shoot-out on September 23, 1980.

Mr. Perry states that he hit upon the name "Malantino" because a person with the name of "Raymond Malantino" lived next door to his father's house. But the first time he states he used this name was when he told Rick and Damon to title the car they purchased in Atlanta (in mid-September, 1980) in the name of "Raymond Malantino" and they made a mistake and used the name "Damon Malantino." (This was in connection with Mr. Perry's explanation of why he identified himself as "Damon Malantino" to the police in Jacksonville, Florida: He wanted to claim the automobile. The Court will review this strange story in more detail below. See "Two Transactions" section, *infra.*) But that raises serious problems. Here we have Pruett saying "Sundance" also went by the name "Damon Malantino," as did Pat Etier.

It is clear that Pruett does not claim that either he or the person he says he knew as "Damon" (Sundance) saw Pat Etier at anytime *after* the Staton/Ware murders. In fact, Pruett states they could not find her. If she had used the name "Malantino", then for that circumstance to have come to Pruett's attention, that name would have had to have been used by Pat Etier sometime *before* the murders on September 10, 1980, i.e. *before Perry states he first decided to use that name.* Of course, she did not go to Georgia and Florida with "Damon", "Lorili," Richard Anderson and Chantina Ginn. Perhaps "Damon" (Sundance) could have learned of Per-

ry's use of the name "Malantino" in Georgia and Florida and then used that name in Pruett's presence after going to Albuquerque. (Although it is difficult to understand why he would, knowing that Perry had been apprehended under the name in Jacksonville.) But what can explain any use of that unusual name by Pat Etier before the Arkansas murders? Mere coincidence is not a good answer. Nor does it explain the use of the unusual name "Damon" in connection both with "Peterson" and "Malantino."

Another observation: Perry now has an explanation of why he can not produce "Damon Peterson." He was killed by Pruett and buried in the Rio Grande. But there should be some one who could testify as to his existence and whereabouts in 1980.[26] The Court does not dismiss the possibility that a person by the name of Damon Peterson may have existed in the Georgia–Alabama area in 1980. Many criminals pick alias from known names just as Perry says he picked the alias "Malantino." But all of the evidence, except Mr. Perry's own testimony, supports the conclusion obviously reached by the jury that the person calling himself "Damon Peterson" at the Horseshoe Bend Campsite and in the Van Buren–Fort Smith, Arkansas, area, was one and the same as Eugene Wallace Perry.

Although this whole exercise is unnecessary because the Court fully credits the testimony of Ms. Ginn, Ms. Etier, and Mr. Anderson on the crucial issues bearing upon Mr. Perry's guilt, and, on the other hand, finds Mr. Perry's explanations and Mr. Pruett's "confessions" incredible and unworthy of belief, the Court, nevertheless believes it is important to point out the inconsistencies and problems which inhere the new Pruett–Perry scenario, *independently* of the other evidence in the case.

## THE EXISTENCE OF A DAMON PETERSON

Except for the testimony of Mr. Perry there is no evidence in the record establishing the existence of a Damon Peterson: No such evidence in the record of Mr. Perry's state court trial for capital murder; no such

evidence in his first habeas proceeding back in 1986; and no such evidence in this habeas proceeding. Perry was questioned about this on cross-examination:

Q. Now, you have also testified that you knew a Damon Peterson and that you worked with him as—I guess this Damon Peterson individual was a courier for these three people that you identified that you worked for as a courier; is that correct?

A. That's correct.

Q. And the three people you have identified are individuals by the name of J.B. Stovall—is that S-t-o-v-a-l-l?

A. Yes, sir.

Q. And a Jack Roberts?

A. Yes.

Q. And a Charlie Bryant?

A. That's correct.

Q. And you and Damon Peterson, your testimony is, both worked for these three individuals as couriers?

A. This is true.

Q. Did you tell your defense attorneys, Mr. Sharum and Mr. Harrison, about these three individuals?

A. I am sure that I did because they went down and interviewed Charlie Bryant at that particular time. They couldn't interview J.B., of course, because he had passed away on July the 25th, just prior to when all of this occurred. I am not sure what the disposition of Jack Roberts was, but they may have interviewed him simply because I had given him as a reference as to where I worked through a given period of time. It was referred to in my transcripts as—I think Frank King referred to it as Jacks Auto Sales is what he said. "A walking man's friend". That was Jack Roberts auto car lot.

Q. Now, did these three people work together, Stovall, Roberts and Bryant? Did they operate one business, or did they each have their own businesses?

A. At the particular time the witness Frank King asked me where I was work-

---

**26.** For Mr. Perry's explanation, see the section, below, captioned "The Existence of A Damon Peterson."

ing, I had told him I was working for Jacks Auto Sales. At that time the businesses were separate. Jacks Auto Sales being on Jonesboro Road, I think it was, and sometime later on—which I never did tell this witness anything about this—but sometime later on, maybe six months later, they combined the businesses and were operating out of the Car Circus address which you have there before you.

Q. Now let me get this straight. Jack Roberts owned a business called Jacks Auto Sales?

A. Yes, sir.

Q. And at some point he combined that business into this Car Circus business that you have referred to. When. When did that occur, approximately?

A. It would probably have been early '80, but I am not for sure about that. It could have been mid—say March or April even of '80.

Q. And before Jacks Auto Sales became a part of Car Circus, did this Mr. Bryant operate a business called Car Circus on his own?

A. Yes, he did. It had been there for several years.

Q. What about J.B. Stovall? Was he in with Mr. Bryant in this Car Circus, or did he have a separate business?

A. At the particular time when we first started discussing this Jacks Auto Sales, J.B. worked for both of them actually.

Q. Was he a courier too?

A. No, sir, he was—if anybody had any rank, and if I was a sergeant he would have been a lieutenant. I mean, he was just the one that told me what I was supposed to do.

Q. Now you indicated that this J.B. Stovall died in July of 1980?

Yes, sir, July the 25th, I think it was.

Q. Now, then, did you have any testimony at your trial from Jack Roberts or Charlie Bryant establishing that there was a person different from you who was Damon Peterson?

A. They would have accepted a subpoena and they would have helped me if I had of demanded it, but they preferred that they

stay out of it for obvious reasons. They were continually being investigated by the GBI for good reason.

Q. These people were involved in illegal activities the way you were—

A. Sure.

Q. —and you're working for them in illegal activities. I certainly, I guess, can understand why they may be reluctant to get involved, but your life is on the line and you didn't bring either of these people or take depositions from them at your trial to establish there was a separate person named Damon Peterson?

A. My lawyers did go down there and interview these people.

Q. Did they get a deposition from them? Did they bring them to the trial and have them testify?

A. No, sir, they didn't, but they had considered it. They did have the information at that time.

Q. Well, I mean one might assume the reason they didn't is because either Mr. Roberts or Mr. Bryant wouldn't offer any testimony that would be favorable to you.

A. Well, they didn't want to be involved. What I did was—I did it of my own free will. Nobody twisted my arm. Nobody made me do anything. I made a choice to do that, and I understood that when I got busted for anything, I had to do the time for what I had done.

Q. All right. What about by the time of your habeas hearing—your first one in 1986? Did you tell Mr. Rosenzweig about this Jack Roberts or this Charlie Bryant?

A. No, but quite possibly the name Charlie Bryant is on a motion that I filed pro se into Judge Eisele's court. If my memory serves me correctly, I filed a pro se motion to—I forget what it was titled, but it was a list of witnesses who had additional testimony. At the past habeas hearing I had a problem with Mr. Rosenzweig, which I later asked the Court to remove him, and they did. He would not subpoena any witnesses. He did not want me to have witnesses here. He wanted to re-do the case through my two trial attorneys. Ron Harrison and Steve Sharum were called to

the past habeas hearing, and their testimony was very much like it was this time. Their memory had gotten bad, so—

Q. Mr. Rosenzweig's reluctance wouldn't have anything to do with suborning perjury, would it?

No, but what I'm saying is—

MR. HEUER: I will object to that. That's argumentative, I think.

THE COURT: He's answered it. Let's go ahead.

Pruett in his letter to Mr. Willett dated March 21, 1980, makes the following statement:

Sundance used the name *"DAMON PE-TERSON"* (birth certificate name)!! He also used "DAMON MALATINO" and had a birth certificate for it too!!

While it is possible that there are birth certificate records out there for persons of such names, petitioner has totally failed to establish that a "Damon Peterson" separate from himself was involved in the Arkansas crimes. On this issue the Court fully credits the testimony of Ms. Etier, Ms. Ginn, Mr. Anderson, Mrs. Staton–Morrison and the other witnesses that place Perry in Van Buren, Ft. Smith, and at the campground at Beaver Lake, Arkansas in the September 3–September 11, 1980, period.

*CIRCUMSTANCES BEARING ON THE CREDIBILITY OF PRUETT'S "CONFESSION"*

(1) *Comparison of Pruett's 1989–91 "confessions" with his 1981 confessions.*

Mr. Pruett obviously realizes that his failure to mention the Staton/Ware murders back in 1981, when he was "telling all" and bragging about his many crimes, casts great doubt upon his 1989–1990 statements. So in his letter of March 21, 1990, he states:

"I also told Zeb Jones down in Mississippi to call Perry's attorneys and give them a statement about me telling the FBI about a jewelry store robbery I done (I told them in 1981 in Jackson) but I refused to tell them where the jewelry store robbery took place."

But the Court has been advised that Mr. Zeb Jones does not confirm this, and the detailed statements and reports of the FBI setting forth Mr. Pruett's confessions of many crimes, do not mention a jewelry store robbery or the Staton/Ware murders, even though Mr. Pruett in those statements appears to be trying to take credit for as many crimes as possible. See Joint Exhibit 2, a 37 page confession by Pruett taken by Special Agent Covington of the FBI on December 16, 1981. Not only was Mr. Pruett confessing to law enforcement officers during this period but he was also actively seeking media coverage as a "mad dog killer." None of the media stories received in evidence refer to the 1980 Arkansas murders. And yet it is clear that Mr. Pruett's confession to the Staton/Ware murders would have greatly added to the image he was obviously attempting to project.

The Court also notes that in 1981, Mr. Pruett confessed to Officer Hammond the details of his murder of Ms. Robertson in Fort Smith earlier that year and, once again, he did not mention the Staton/Ware murders even though in his March 21, 1990, letter he relates the Robertson murder to the information he claims he obtained in connection with the Staton/Ware murders on September 10, 1980. Indeed, it does not appear that Pruett even mentioned being in the Fort Smith, Arkansas area at anytime prior to the Robertson murder.

Given Mr. Pruett's attitude and behavior after he was captured in Texas back in 1981, it is difficult to think of any reason that he might have had for not telling the agents of the FBI, the representatives of the media, or Officer Hammond of the heartless Staton/Ware murders *if* he were in a position to take credit for those murders. The newsworthiness is obvious, particularly when one considers the dates of Perry's and Anderson's trials and the dates that Mr. Pruett was confessing all. Anderson was convicted in Arkansas on October 14, 1981. Perry was convicted in Arkansas on July 27, 1981. Pruett made long statements to Special Agents Willie Covington and Linda L. Keene of the FBI on November 13, 1981. And on December 16, 1981, he made the 37 page recorded interview, referred to above, with the same agents and in the presence of

his attorney, Mr. Zeb Jones. See Respondent's, 3–1 and 3–2. And earlier on November 8, 1981, he made the long (19 page) question and answer statement to Detective Larry Hammond referred to above. See Respondents' Exhibit 5. But nowhere do we find a mention of the Staton/Ware murders.

### (2) *The Witness Pat Etier*

Mr. Pruett makes several references to Pat Etier in his various statements. In his letter of May 8, 1989, to Mr. Willett he states that his wife, Michelle, was involved in the "Van Buren deal." Then he states:

> "she, me, Sundance, Pat (Sundance's old lady) and Sportster Rick. Me and Sportster Rick are the two who went in the jewelry store, (Stanton's), on September 10, 1980, and did the robbery, and it was I who shot the old man and his daughter (around 23 years old). Michelle, Pat and Sundance stayed back at a motel (Terry's) in Fort Smith.... Sundance's old lady, Pat, got mad because Sundance left her in Fort Smith after the robbery, and he took off with another woman, so she, (Pat) went to the police and said Sundance was involved in the crime. I made Sundance go with me to Van Buren looking for her but we couldn't find her...."

And then in his letter of March 21, 1990, to Willett he states, "Pat's last name was 'ETIER' but she also used the name 'MALATINO'!! She used to have an old cabin around 'Mountainburg, Arkansas'!!"

It will be recalled that according to Rick Anderson and Pat Etier, she (Pat Etier) spent the night of September 9, with Perry at her place near Mountainburg, Arkansas. She made this known to the police the day after the murders, i.e. on September 11, 1980. But Anderson last saw Pat Etier on September 10, 1980. He then went off to Northwest Arkansas, to Atlanta, Georgia, and then to Jacksonville, Florida, and finally to Canada, where he was later arrested. In one of his first statements to the police after being captured in Canada, Rick Anderson told the police of the meeting between him, "Damon," and a woman (later identified as

Pat Etier) and with the circumstances leading up to her spending the night with "Damon" whom he then identified from photographs as Perry. This was in Canada, before Anderson was brought back to Arkansas. It occurs to the Court that there is no way that these two stories could have been the same (if the story was not true) unless Rick Anderson had communicated with Pat Etier *immediately* after the crime, that is, *before* she went to the police on September 11, 1980. And that did not happen. And, again, in the handwritten statement signed by Anderson on January 20, 1981, while at the Crawford County Jail, he states:

> When we got to the motel room we got back on the cycle and went to Van Buren to the Wal Mart where we met the girl who was driving a pickup that belonged to the local Harley Davidson shop. He pointed out the jewelry Store and I walked in and looked at the Jewelry Store. Damon rode back to the motel with the girl and I rode by cycle. We sat around the Motel drinking beer. Damon went home with the girl around 7 or 8 and came back the next day.

There are other problems with Pruett's statements about "Sundance" and Pat Etier. He suggests that Pat Etier was Sundance's "old lady" and that she "used to have an old cabin around Mountainburg Arkansas." But the evidence shows that Pat Etier lived in the Crawford–Sebastian Counties area for some six years before the Staton/Ware murders. And she lived there after the murders. Pat Etier did not know either Perry or Anderson before September 9, 1980—the day before the murders. She testified that she gave "Damon" a photo-snapshot of her and wrote on the back thereof detailed instructions how to get to her place.[27] So the question arises: why would "Sundance's old lady" have to give him detailed written instructions to find her place? And why could Pruett and Sundance not find her if they came looking for her in 1981?

The Court has carefully reviewed all of the testimony of Pat Etier and compared same with statements that she has given to the

---

27. That photograph is found in the transcript of Perry's trial as State's exhibit No. 16, T. 2288. It

was found in the storage shed with the pop-up van in Fayetteville, Arkansas.

police starting on the day after the murders. Her testimony and her description of "Damon" have been remarkably accurate and consistent.[28] It is obvious that she had an extraordinarily good opportunity to observe "Damon." And her identification of Perry as the person she met on September 9 and as the person with whom she spent that night is clear and without any doubt. ("I believe Damon is that guy right there" pointing at Perry. And, when asked if there was any doubt in her mind "Damon" was Perry, she responded, "No doubt.")

Pruett states Pat Etier went to the police because she was angry because "Sundance," whom he identifies as Damon Peterson, left her in Ft. Smith after the robbery. Such might suggest some motive for harming or involving Sundance ("Damon"), but it suggests no motive for her falsely accusing Perry. And the Court has found none in its search of the record.

The testimony of Pat Etier at Perry's trial has not been undermined or weakened by any evidence submitted during this habeas proceeding.

At the time of the trial Mr. Perry had a small tatoo on his lower abdomen. The defense introduced a photograph of the tatoo. See defendant's Exhibit 10, State T. 2761. Although Ms. Pat Etier briefly observed "Damon" undressed she did not notice any tatoo. It is apparent that this did not shake the jury's confidence in Ms. Etier's identification of Mr. Perry. Furthermore the Court notes the testimony of Mr. Wayne Hicks of the Van Buren Police Department who on September 25, 1980, saw the man identified as "Damon Malentino" while he was in custody in Jacksonville, Florida. He was shown State's Exhibit 25, T. 2418, and identified the person in that picture as the man he talked to in Jacksonville. Mr. Hicks brought that man back to Arkansas. The man was strip searched in Jacksonville and again after his arrival in Arkansas. During those strip searches the man was required to take off all of his clothes. On neither occasion did Mr. Hicks notice any tatoo on the man's body. Mr. Hicks also testified that the defendant in the courtroom, Mr. Perry, was one and the same person as the man he saw in Florida and brought back to Arkansas. There is much other evidence in the record suggesting that Mr. Perry attempted to change his appearance between the time of his arrest and the time of his trial.

Mr. Pruett states that his wife Michelle, Pat Etier, and Sundance stayed back at the Terry's Motel while he and Anderson did the deed. But there is no evidence, other than Mr. Pruett's statements, that Michelle and he were anywhere near Van Buren, Arkansas on the date of the murders. Nor is there

---

**28.** Even Mr. Perry acknowledged in his testimony before this Court that "I ended up looking like the composite drawing that Pat Etier had made." Less than twenty-four hours after the murders of Mr. Staton and Ms. Ware, Pat Etier gave the following description of the two men she had met and been with on September 9 and September 10:

The two men are described as follows. Both white males. One man about 22 years of age the other about 34 to 36 years of age. Both men were wearing black motorcycle helmets. The younger guy was driving the motorcycle. (the older guy always carried briefcase).

The older guy called himself DAMON and gave no last name. He was about 35 years of age and had bleached blonde hair which was styled like ROD STEWART (the rock singer) and wore a over the ear length cheap looking wig which was light brown to dark blond in color. His sideburns and mustache indicated to PAT that his true hair color was dark brown. The mustache was full and came down to a point past the corners of his mouth. He was about 5'10" to 5'11" tall and his face was chubby and he had a double chin. He was stocky built, with poor muscle definition and had no tattoos or scars on his body. He wore a light colored —— over shirt and jeans and black colored biker type boots and carried a folding case knife and a leather case on his side.

The younger guy called himself RICK or RICKY, and also gave no last name. He was about 22 years of age. He had medium brown hair down past his ears. He was about 5'8" to 5'9" tall, and slimmer built. He had a tattoo of a set of gardien Harley Davidson wings on his right upper arm which were approximately five inches tall. He wore a black leather jacket with a Harley Davidson emblem on the back across the shoulder and he also carried a folding knife in a leather case on his belt (make of knife was Buck). The motorcycle which they were riding was a medium blue 1974 or possible 1975 Harley Sportster Hog Roadster with a chrome sissy bar on the back, it had no windshield and was bearing Florida license tags number unknown.

any other evidence that anyone in any way connected with the crimes stayed at the Terry Motel while the crimes were being committed. Ms. Etier dropped Damon off at the motel around 8:00 a.m. on September 10, 1980, and that was the last she saw of "Damon" or Anderson. And none of Pruett's scenarios account for the roles of Cindy Sue Brown or Chantina Ginn or the events in Northwest Arkansas. Are we to assume that "Sundance" dropped his "old lady," Pat Etier, on the day of the murder and then, on that same day, somehow picked up Cindy Sue Brown at Beaver Creek Lake in Northwest Arkansas for the trip to Atlanta—the same Cindy Sue Brown who Perry was living with, and about to marry, in July or August of 1980, and the same Cindy Sue Brown with whom he had lived and engaged in criminal conduct in 1979 and 1980, and with whom he shared his bed in Jacksonville before the "shoot-out" on September 23, 1980, and with whom he was still in indirect contact while in the Florida jail after his arrest?

And, although Cindy Sue Brown can not presently be located, the state prosecutor has advised the Court that Chantina Ginn identified photographs of Cindy Sue Brown as the woman she met at Beaver Lake as the companion of "Damon Peterson" (Perry). At that time Cindy Sue Brown was using the alias of "Lorili Peterson." Such information, although not ordinarily admissible as evidence, may, of course, be considered in evaluating claims of newly discovered evidence of actual innocence. And now we have found the statement of Cindy Sue Brown made upon her admission to the Arkansas Department of Corrections, which thoroughly "nails" Mr. Perry and completely undermines and refutes Perry's contention that he was not in Arkansas at all during September, 1980. See discussion of Cindy Sue Brown below.

(3) *Differing Methods of Operating*

If one compares the evidence relating to the criminal "M.O." (Method of Operating) of Mr. Pruett with that of Mr. Perry, certain differences quickly jump out. Mr. Pruett always acted alone as he, himself, pointed out in his statement to the FBI on November 13, 1981. His planning was minimal; his approaches consistent. With respect to the robberies of the savings and loan associations, it was his practice to kidnap one bank employee and depart the scene in that employee's car, switching to his own vehicle later. He murdered, or not, almost on impulse. The convenience store robberies and murders display similar characteristics.

Perry, on the other hand, never worked alone and always carefully planned his crimes. According to the evidence in the Perry state trial, he and Cindy Sue Brown planned the Van Buren crimes, and "cased" the jewelry store for some 30 to 45 minutes on September 3, 1980. Perry had brought the rope to bind the victims. He had obtained the silencer .22 pistols in Georgia according to his statements to Anderson. Anderson states Perry told him he paid $1,000 for them. Perry showed Anderson just how proceed and decided on the timing of the crimes and the approach to be followed by both himself and Anderson in entering the jewelry store and engaging Mr. Staton and Mr. Ware in conversation. Perry planned ahead to get the keys to Ms. Ware's vehicle in orders to depart the scene in her car.

The information presented to the Court, including the statements made by Ms. Cindy Sue Brown to the FBI and other law enforcement officials, clearly implicate Mr. Perry in the Georgia murders of Mrs. Barbara Price and her twelve year old son, Charles Allen Price, on August 25, 1980, at the Campers Paradise Campground near Tyrone, Georgia. This was just two weeks before the "copycat" murders of Mr. Staton and Ms. Ware. The victims were tied and gagged in similar fashion and killed with the same weapon used in the Arkansas murders. Mrs. Price's pickup truck was found abandoned about a quarter of a mile from the campground, indicating that the murderers had used her vehicle to leave the scene just as they used Ms. Ware's vehicle in connection with the Arkansas crimes. So the differences in the "M.O.s" of Pruett and Perry are quite dramatic.

(4) *Pruett's statements relating his 1981 murder of Ms. Robertson to the Staton/Ware 1980 murders.*

Mr. Pruett states in his March 21, 1991, letter:

"Michelle and I stayed in the van in Fort Smith at the very place I killed the woman at in the robbery I am convicted of now. That's how I knew about that place and why I used it to dump the body at."

But Mr. Pruett detailed description of the 1981 murder of Ms. Robertson together with the actual location of the convenience store from which he kidnapped her, and the actual location at which her body was found, make the above quoted statements entirely improbably.

Petitioners Exhibit 4–1 is the map of the Fort Smith–Van Buren areas. Van Buren is north of the Arkansas River and Forth Smith is south of that river. The location of the convenience store and the place where Ms. Robertson's body was found are indicated on the Exhibit. They are in the vicinity of the Fort Smith airport. Both are some nine miles from the Van Buren area where the Staton/Ware murders occurred in 1980. Mr. Pruett states that he and Michelle returned Albuquerque, New Mexico, immediately after the Staton/Ware murders. If so, there would have been no occasion for them to get anywhere near the 1981, murder scene. So Mr. Pruett's statements:

"That's how I knew about that place [the convenience store]" and "why I used it to dump the body at,"

appear to be contrived and certainly are not credible.

(5) *Possible Sources of Detailed Information found in Pruett's "Confession"*

The petitioner Perry and some of his witnesses have attempted to show that it was unlikely that he and Pruett would have had any real opportunity to discuss Perry's case and, ergo, Pruett's detailed knowledge of the facts of the Staton/Ware murders must have come from his personal involvement in those crimes. But it is clear to the Court that there were, and still are, many such opportunities, and that they did, in fact, talk about the case and related matters. For example, in petitioner's Exhibit 18, a letter dated October 10, 1989, from Pruett to Mr. Willett we find, inter alia, the following:

Now Perry told me that he would sign a Biography Contract with you, giving you all the Rights to a Book and Movie on his life story. If he does that, then I will give a signed Confession to Perry's Attorney's (but Perry does not want his attorneys to know about the Biography Contract he signs with you)." So Bro, you need to draw-up a Biography Contract for Perry and mail it to me. "I'll get him to sign it, have it notarized and returned to you." You need to get this done and fast, because it could mean big bucks for you in the future.

And in his July 12, 1991 letter he states:

"Now Gene Perry stopped by my cell the other day ... and let me read a letter he had just received from his attorney here."

The very detailed knowledge of the Staton/Ware murders-robbery evidenced in Mr. Pruett's letters and statements to his attorney, Mr. Willett, has raised the following question: how could even an actual participant in the Staton/Ware murders be able to recall in 1989–1991 the many small details mentioned by Mr. Pruett without having available some source for refreshing that person's recollection? And if that is a logical question, then it becomes necessary to search for the possible source of such detailed information. Here that detailed information will be found in the transcripts of the trial and other proceedings in Mr. Perry's case, which Mr. Perry acknowledges that he obtained and studied at great length. So even if Mr. Perry himself could not remember the facts in such detail in the 1989–1991 period, he could refresh his own recollection and also obtain and provide those details to Mr. Pruett from those transcripts.

The Court concludes that everything Mr. Pruett professes to know about the crime, and the detailed circumstances surrounding same, could have come directly or indirectly from Mr. Perry who is on death row with him. And there is circumstantial evidence that this is, in fact, what occurred.

The Staton/Ware murders were committed in 1980. Mr. Pruett's first statements concerning those crimes occurred in May of 1989, almost fourteen months after he arrived (from Mississippi) at the Arkansas

death row where Perry had resided since 1981.

The Court notes the following details which are included in Mr. Pruett's many statements that even a participant would not likely remember after nine years, but which are easily obtained, from the transcript of the Perry proceedings.

1. On one occasion Mr. Pruett states that the deceased, Ms. Ware, was about 23 years old. On another occasion he stated she was about 25 years old. Her mother, Mrs. Staton, testified that she had just turned 24.

2. Mr. Willett states that Mr. Pruett described three "horseshoe type" display cases in the store. This information could be obtained from the transcript including photographic exhibits.

3. Mr. Pruett states that the motorcycle was parked "more towards the bank side of a Safeway by some trees there." Such a description could be obtained from the transcript.

4. Mr. Pruett stated that the table cloth (used to muffle the sound of the pistol shots) "has sort of a flower pattern to it." This information can be obtained from the Perry state trial transcript and particularly from State's Exhibits 3 and 4.

5. Mr. Pruett states that there should be three holes in the tablecloth because the first two shots were fired without moving the cloth, whereas the cloth was moved separately before firing each of the last two shots. This information could be obtained from the transcript and, of course, from Mr. Perry.

6. Mr. Pruett identified to Mr. Willett the precise location of the shot wounds on both victims (Mr. Staton, above right eyebrow and in forehead; Ms. Ware, right temple and forehead). This information could be obtained from the transcripts. State Transcript, p. 2223.

7. Mr. Pruett stated that Ms. Ware had "light brown hair, almost blond." Again this information could be obtained from the transcript.

8. Mr. Pruett stated that Ms. Ware's color scheme clashed and that she wore orange high heel shoes. This information can be obtained from the transcript.

9. Mr. Pruett told Mr. Willett that he took Mr. Staton's wedding band and a red ring and also took a diamond ring from Ms. Ware, but that he left "the watch and necklace." This information can be obtained from he transcript.

10. According to Mr. Willett, Mr. Pruett stated that Mr. Staton was dressed in blue slacks and wearing a short-sleeved shirt of light color and with blue stripes. This information can be obtained from the transcript.

*CAMPING REGISTRATION FORMS*

Lawrence R. Grey, a park technician with the Corps of Engineers stationed at Beaver Lake, testified during Perry's trial. (Tr. 2514–2522). Mr. Grey testified that he regularly patroled the Horseshoe Bend Recreation Area in September of 1980. Through Mr. Grey, the state introduced the user fee permits that reflected that "Damon Peterson" was registered at Horseshoe Bend as a camper on September 6, 1980 and on September 8, 1980. (States's Exh. Nos. 49, 50, Tr. at 2520–21). The copies of the user permits both indicate that two people were in Damon Peterson's party. There is a space entitled "Car License" and "State" on the form. The first form identifies Mr. Peterson's car license as "TGM 593" and fails to identify the state. The second form also identifies the car license as "TGM 593", but it also identifies the state as "GA."

In Richard Anderson's criminal trial in Georgia, three registration slips from the Nanabe Creek Camp Ground in Meridian, Mississippi, were introduced through the testimony of William Everette Harper. (Def.'s Exhs. 9, 10, 11; GA Tr. at 1125–27, 612). Mr. Harper, the owner of the campground, was called as a witness for the defense and he testified that on August 27, 1980, a "Lori Peterson" registered at the campground, and that she was driving a 1971 Cadillac with a pop-up camper. Mr. Harper testified that Lori Peterson was accompanied by one male. A total of three registration slips indicate that Ms. Peterson and her male friend stayed at the campground from August 27th until August 30th of 1980. Each of the registration slips refers to a Cadillac with Georgia

license plate "TG___ 563". The third letter of the tag number is not decipherable, but it may be a "J" or an "I".

The defense attorney showed Mr. Harper a photograph marked state's exhibit number six, which was a color photograph of "the boy they call Richard" according to the testimony of Mrs. Carolyn Black.[29] (GA Tr. at 277). Mr. Harper testified that he had never seen the man shown in that picture (Anderson). Mr. Harper testified that he remembered that his campground was broken into and robbed during the same time that Ms. Peterson and her male friend were registered at the campground. (GA Tr. at 615).

Now we can see the progress of Cindy Sue Brown ("Lori Peterson") and Perry from the Fayette County, Georgia crime scene to a campground in Arkansas close by Van Buren, Arkansas, and then on to Beaver Lake where they used the names "Damon Peterson" and "Lorili Peterson" while pulling the same pop-up trailer with the same 1971 Cadillac.

Mr. Perry has acknowledged that he lived at Camper's Paradise in Georgia with Cindy Sue Brown and that he used the alias of "Pop-up Jim." He has also acknowledged that he used the same 1971 Cadillac while residing there that was later used by the "Damon" and Cindy at Beaver Lake in Northwest Arkansas. And now we have found a statement by Cindy Sue Brown that she and Perry, in the summer of 1980, "stayed at various places—came to Arkansas—stayed at the Oaks Campground" and, after going into the jewelry store, "We left there and went to Beaver Lake in Northwest Arkansas" and that there they met "Ricky" and that after the robbery, "We left—went to Georgia and Florida." The Oaks Campground is located just a few miles from Van Buren, Arkansas. So much for Perry's claim

that he was not "Damon Peterson" and that he never came to Arkansas in September, 1980.

## THE MURDER WEAPON

According to the testimony of Ms. Ginn and Mr. Anderson, the motel room occupied by them and Perry and Cindy Sue Brown in Atlanta was robbed on the last night of their stay in Atlanta while the four of them were out to dinner. Clothes were stolen as were Perry's guns, among which was the .22 silencer murder weapon.[30]

But according to Pruett's statements, he was the murderer of Mr. Staton and Ms. Ware. · After the crime he says he and his wife, Michelle, returned to New Mexico. Later he states that he killed Sundance (Damon Peterson) and buried him together with the Staton/Ware murder weapon in the Rio Grande.

But we also know that the Georgia murders were committed with the same weapon. Question: is Pruett, by inference, involving himself in the Georgia murders also? There is absolutely no evidence of Pruett's presence in Georgia in August, 1980. And we have records showing Michelle (Pruett's wife) meeting with agents of the U.S. Marshall's Service on August 28, 1980, in New Mexico and there is document showing a meeting between Pruett and agents of the U.S. Marshall's Service on August 29, 1980, in Washington, D.C. The Marshall's Service further explains the entry by stating, "It appears Mr. Pruett was in D.C. for a one or two day meeting with agents of the Department of Justice." See section on "Marion Pruett" supra.

The only reasonable explanation is that the

---

**29.** Mrs. Black testified that she lived at Campers' Paradise during July and August of 1980. Further, she identified photographs of the murder victims, Barbara Price and her son Allen, and stated that she had known Barbara for about five years and that they had been "real good friends." (GA Tr. at 237). Mrs. Black described finding Barbara lying on a bed in her trailer with her hands and feet tied behind her on the morning of August 25, 1980. She testified that "Pop-up Jim" and a young lady named "Sandy" who she

later learned was Cindy Sue Brown, lived in a trailer next door to her. (GA Tr. at 251–52). She testified further that Barbara Price had stated that she was romantically involved with "Pop-up Jim." (GA Tr. at 253–54).

**30.** One of the principal reasons for the trip to Jacksonville, Florida was to get a resupply of weapons, which objective was accomplished before the shoot-out on September 23, 1980.

murder weapon belonged to Mr. Perry [31] and that he used it to commit the Georgia murders and the Arkansas murders.

Conclusion: Pruett's story about burying the Staton/Ware murder weapon has no credibility on this record.

## FAYETTEVILLE SELF STORAGE PEN AND STORAGE RECEIPT

Mr. Perry has testified that he planned to go to Fayetteville, Arkansas, *immediately,* if he was released by the authorities in Jacksonville, Florida to recover the pop-up camper. He states that Damon or Anderson had given him the receipt for the camper. Of course, the idea that he would be entitled to recover the pop-up camper is completely inconsistent with his explanation about "renting" it to Damon and Anderson and with his explanation of the reason Damon and Anderson had for giving him the 1976 Cutlass.

More incriminating, the authorities recovered from Perry in Jacksonville, Florida an ink pen with "Fayetteville Self Service Storage, 1790 Birch Avenue, Fayetteville, Arkansas" printed thereon.

## WITNESSES RUTH STATON MORRISON AND KAREN BOOTH

Some of the strongest evidence against Mr. Perry at his state court trial will be found in the testimony of Ruth Staton and Karen Booth, the widow and surviving daughter, respectively of Mr. Kenneth Staton. And they both testified again in this proceeding.

The widow, Ruth Staton (now Ruth Staton Morrison) had testified at the trial that Mr. Perry and a young woman came into the jewelry store in Van Buren on Wednesday September 3, 1980, a week before the murders. And she identified two rings that had been found in Mr. Perry's possession in Jacksonville, Florida, as having belonged to the deceased. Her testimony before this Court greatly reinforced her testimony at Perry's state trial and also added some new information that further supports the correctness of the jury's verdict.

It will be recalled that Mr. Perry's explanation of the rings, which he acknowledges were in his possession when he was arrested in Jacksonville, Florida, was that he purchased the "gent's" ring and his girlfriend, Cindy Sue Brown (Perry?) purchased the wedding band on May 28, 1980, and July 7, 1980, respectively, at Peacock Jewelers in Attalla, Alabama. He produced what purport to be two receipts or sales tickets evidencing those purchases. (One of those receipts is in the name of "Cindy Brown Perry.") See Petitioner's Exhibit 30 and 31. One would assume that the rings, if and when purchased, would have been new.

Mrs. Morrison identified, in her testimony before this court, one of the rings found in Mr. Perry's possession as follows: "This was a diamond wedding band that I had given to him in 1975 on our 25th wedding anniversary." She noted that the ring later had to be sized, that is it "had to have an extra piece put in it." She further explained, "later we had to add a piece of gold in it to make it bigger." And she pointed out that the ring she was holding (which had been State's Exhibit 18 in Perry's state trial) reflects that it had been sized the way her husband's ring had been.

So here we have clear proof that Mr. Perry was in possession of Mr. Staton's wedding ring when he was arrested in Jacksonville, Florida, on September 23, 1980. But, according to Mr. Willett, "Pruett said he took the man's wedding ring" and Pruett also said, "There were three small diamonds in the man's wedding ring." And Pruett, according to his letter of May 8, 1989, returned to New Mexico immediately after the Van Buren, Arkansas crimes. ("Michelle, Pat and Sundance stayed back at a motel (Terry's), in Ft. Smith, then me and Michelle drove back to Alberge (sic) with half of the jewelry, (over $75,000 dollars worth)")

So how did Perry come into possession of the ring? He does not claim he got it from Pruett or "Damon." His answer, see above, is that the ring he was caught with was not Mr. Staton's but, rather, one that had been purchased earlier in that summer in Alabama

---

31. According to the testimony of Mr. Anderson, Perry told him when they were in Arkansas that he had acquired the "silencer" .22 weapon in Georgia for $1,000.00.

by Cindy Sue Brown. That story is simply not credible on this record.

And Mrs. Ruth Staton Morrison again positively identified Mr. Perry in this habeas proceeding, just as she had in his state trial, as one of the two people who entered the Staton Jewelry Store on September 3, 1980. She knows that September 3 was a Wednesday because that was Karen's day off. Mrs. Staton had two daughters who worked at the store so she worked mostly as a substitute on their days off.

But the *new* testimony of Mrs. Staton Morrison has to do with her identification of the woman who accompanied Mr. Perry on September 3, 1980.

It will be recalled that Cindy Sue Brown did not testify at either Mr. Perry's trial or Mr. Anderson's trial. Although she was finally arrested in 1982, it apparently was not until 1985 that she pled no contest to a charge of conspiracy in connection with these very Arkansas crimes. Efforts have been made to locate the transcript of her plea and sentencing proceedings, but so far those efforts have been futile. Likewise the Court has been told that she cannot presently be found. Nevertheless, Mrs. Staton Morrison's testimony in this habeas proceeding provides some additional important information about Cindy Sue Brown's role in these crimes.

To put Mrs. Staton Morrison's new testimony in perspective the Court must review some of the testimony of Mr. Richard Anderson and Ms. Chantina Ginn. Anderson testified that "Damon" told him that he had already staked out the Staton's Jewelry Store before he met Anderson in Northwest Arkansas. And, as already noted, Mrs. Staton positively identified Perry as one of two persons that came into the jewelry store on September 3, 1980. The other person was a young woman who, it is assumed, was Cindy Sue Brown. Ms. Ginn testified that, when the men returned to the camp after the crimes, and displayed the jewelry, Ms. Cindy Sue Brown asked where a certain earrings and a set of rings were, i.e., why those items

were not among the loot. Perry's reply was that the older lady (who apparently was wearing the ring when he and Cindy Sue cased the store) was not working at the jewelry store at the time of the robbery-murders. But missing was any direct evidence that Cindy Sue Brown was, indeed, in the jewelry store on September 3, 1980. Mrs. Staton Morrison has now supplied that testimony.

Mrs. Morrison testified that she has seen Cindy Sue Brown since the Perry trial, and that she was the same woman who was in the jewelry store on September 3, 1980, with Mr. Perry. She stated also she had not been called upon to identify Cindy Sue Brown because she understood Ms. Brown had admitted to having been in the store on September 3, 1980.

Mrs. Morrison testified that she was in the Courtroom when Ms. Brown entered her plea. Her daughter, Karen, and she were the only two spectators in the Courtroom at the time. She then testified:

> "We were seated and as Ms. Brown walked in from the back of the courtroom alone, there was that recognition—that she recognized somebody in the courtroom, and she immediately turned her back. I recognized her."

When asked if Cindy Sue Brown made any statement in Court, Mrs. Morrison replied, "She asked if she could make a public apology to the Staton family." So we now have strong evidence that Mr. Perry and Ms. Brown were in the jewelry store before they turned up at the Beaver Lake Campground a few days later.[32]

Mrs. Karen Booth, the Staton's surviving daughter, and sister of the deceased, Suzanne Ware, testified that State's Exhibits 17 and 18 in Perry's state trial had been returned to the family after the trial. These were a man's cluster diamond ring (Exhibit 17) and another ring which she stated appeared to be her father's wedding band (Exhibit 18).

---

**32.** It was not until late 1994 that the Court became aware of the statement Ms. Cindy Sue Smith had made on her admission to the Arkansas Department of Corrections. That statement confirms that she and Perry went in the jewelry store in Van Buren, Arkansas, before they went on to Beaver Lake. This dramatically confirms Ms. Staton Morrison's testimony.

The Court asked Ms. Booth if the wedding band was her father's. Her answer:

"Yes it was. There's a place underneath where after a period of time shows where it had been sized, and that would have been sized probably by him. You can see where it is tarnished underneath. The very bottom piece was added."

At this time she was referring to State's Exhibit 18 from Perry's state trial.

Again, the testimony of the widow and surviving daughter of Mr. Staton is cogent and forceful. On the other hand, the Court finds Mr. Perry's explanation of his possession of these particular rings incredible. This is not to say that he and Cindy Sue Brown did not buy rings from the Peacock Jewelry Store in Attalla, Alabama, although that itself is far from clear. It is to say that Mr. Perry was in possession of Mr. Staton's rings when he was arrested in Jacksonville, Florida, and his testimony to the contrary is a fabrication. The Court also notes that Mr. Anderson testified that he and Perry pawned a ring belonging to Mr. Perry on the morning of September 10, 1980, which was confirmed by the pawnbroker and the business records.

## THE WITNESS CHANTINA GINN

Ms. Ginn verified Anderson's testimony that they had met for the first time in Topeka, Kansas on August 29, 1980. She was 18 years of age at the time. She had been working at a traveling carnival.

She and Anderson then stayed at Anderson's sister's house in Topeka a few days. They left on September 2 and went to Olatha, Kansas where they got together with another couple who were also involved with the carnival. They then followed along with them to the Horseshoe Bend Campground on Beaver Lake in Arkansas. The other couple had a car. Ms. Ginn and Anderson went on his motorcycle. Mr. Ginn believes they arrived on September 4 and the other man (not Anderson) checked them in for the camp space. She and Anderson always used their true names. Anderson recalls that the man with them was called "Pete." The two couples later had a "falling out" and "Pete" and his girlfriend decided to leave the campground. Just before the other couple left on September 6, 1980, the four of them helped another couple, who introduced themselves as "Damon and Lorili Peterson," to move their pop-up camper and old Cadillac into the adjacent camp site. After their erstwhile companions left, Chantina and Rick Anderson were invited by "Damon" and "Lorili" to join them in their camper. Having only a tent for shelter, they accepted.

Ms. Ginn states that she stayed there for six more nights, that is from September 6 until September 12, 1980. But she also testified that "Damon" and Rick Anderson left the site on Anderson's motorcycle on the morning of September 9, 1980, and returned later on the night of September 10, 1980. When Damon and Anderson left the campground, Damon took with him a brief case, a woman's light brown wig (not quite shoulder length), some rope and a change of clothes. The guns used later in Van Buren—the .22 with silencer and a .38 subnosed pistol—were put in the briefcase.

Ms. Ginn remained at the campground with Cindy Sue Brown (then known to her as "Lorili"). The men telephoned back to a pay phone at the campground at prearranged times.

Damon (Perry) and Rick Anderson came back to the camp about 10 p.m. on September 10, 1980. There were one or two men visiting with the girls when Perry and Anderson returned, but those visitors left shortly. Then "Damon" (Perry) brought out two bags containing the loot and dumped the contents on the floor of the trailer. Lorili was happy, jumping around. They separated out the jewelry, rings, necklaces and watches. And they all (including "Damon") tried on rings and jewelry.

Mr. Ginn states that "Lorili" asked Anderson "how he liked the way Damon worked." Anderson did not reply. And Damon, acting out, stated, "Get down on the floor, dog!" Lorili asked Damon where a set of earrings and rings were. Damon responded he could not get them.

The jewelry was placed in the briefcase after the tags and labels were removed.

The next morning, September 11, 1980, Anderson and "Damon" went to a car lot while the girls waited at a discount store. They apparently traded in the '71 Cadillac on a car Ms. Ginn described as a four door, dull green with a black top which she thinks was a Ford. (Anderson recalls it as a Plymouth). Then the four of them went back to the camp and packed. They burned the trash, including the tags off the jewelry, the watch boxes, and some rope at the adjacent camp site. Then they hooked the trailer to the car and went to a storage facility in Fayetteville, Arkansas. There they put the trailer and Anderson's motorcycle into a storage shed. They also left the helmets there. Then all four left around 5:00 p.m., heading for Atlanta.

At Atlanta they stayed at three different motels, two nights at the first, two nights at the second, and one night at the third. Ms. Ginn believes she checked in at the third motel using her own name. In her testimony in Anderson's Georgia trial she identified the three motels as the La Quinta, the Omni, and the Landmark Inn.

Most of the jewelry was "fenced" in Atlanta by Damon (Perry) but some was retained by each of them. And some was also stolen when their hotel room was broken into on their last night in Atlanta when they were out for dinner. In addition to the jewelry their guns and some clothing were stolen.

While in Atlanta, they left the green car they had got in Arkansas at the Atlanta Airport and then Perry purchased a 1976 Oldsmobile Cutlass (This car was titled in the name of "Damon Malantino"). After their guns were stolen they decided to go to Jacksonville, Florida where it was easy to acquire weapons since Anderson had a Florida driver's license.

Ms. Ginn stayed with Anderson, Perry and Cindy Sue Brown in Jacksonville, Florida for several days. When Perry suggested to Anderson that he (Perry) would kill Chantina Ginn for him, Anderson gave Chantina $200 and told her to go home to Kansas. She spent one more night in Jacksonville and then returned to Kansas. She did not know what happened to the other three until contacted by police investigators in February 1981.

The Court will now note some particular parts of Ms. Ginn's testimony:

1. She did not believe "Damon" and Anderson had ever met before September 6, 1980. Everything indicated they had not met before. Nothing suggested that they had met before that date. And the Court notes that Ms. Ginn was with Anderson and Perry from September 6, 1980, until September 19, 1980.

2. She viewed Damon and Lorili as "schemie" and "scary."

3. At Perry's Arkansas state trial, Ms. Ginn positively and definitely identified Mr. Perry as the person she met as "Damon Peterson" or September 6, 1980.

4. She herself kept some of the stolen jewelry but later sold, gave away, or pawned it.

5. She has no criminal record.

6. She very definitely recalled that "Damon" had green eyes.

7. She identified Perry as "Damon" in a photo-lineup in Topeka.

8. Anderson was never called, or referred to, as "Sportster Rick."

The Court has again read all of Mr. Ginn's testimony in Mr. Perry's state court case, but, in addition, it has read her testimony in Mr. Anderson's Georgia trial covering essentially the same ground. And the Court has had the benefit of Ms. Ginn's testimony in this case via a telephone deposition. Finally, the Court has reviewed statements taken from Mr. Ginn by law enforcement officials. This review strengthens, rather than weakens, the credibility and likely accuracy of Ms. Ginn's very strong testimony, including her unequivocal identification of Mr. Perry as the person she knew at the Horseshoe Bend Campground (and thereafter) as "Damon Peterson."

And the Court has now been advised by the respondent that Ms. Ginn has also identified a photo of Cindy Sue Brown as the "Lorili Peterson" she met on September 6,

1980, and with whom she remained until September 19, 1980.

## WHO IS CINDY SUE BROWN AND WHAT HAS SHE SAID?

A key absent witness during the habeas proceeding is Cindy Sue Brown. Much of the delay in disposing of this matter was occasioned by the difficulty in finding statements made by Ms. Brown concerning her relationship with Mr. Perry and their involvement in the Van Buren crimes. Late in the process, however, certain evidence has been found which tends to fill in the picture and lessen the significance of her absence as a "live" witness. The testimony of Mrs. Staten, (Morrison) who was present at Ms. Brown's plea, is very significant and is discussed elsewhere herein. See, *supra.* But Ms. Brown's own statements are equally important.

Ms. Cindy Sue Brown was convicted of the crime of Conspiracy to Commit Robbery in the Crawford County, Arkansas, Circuit Court on February 11, 1985, for her involvement in the September 10, 1980, robbery of the Staton Jewelry Store in Van Buren, Arkansas. She was received by the Arkansas Department of Correction on February 13, 1985. The Admission Summary, only recently noticed by the Court, identifies her accomplices as Eugene Wallace Perry, Richard Anderson, and Chantina Ginn. The section of the Admission Summary which is captioned "Inmate Version of Crime" reads:

> NOTE: THE FOLLOWING STATEMENT IS TYPED FROM HAND–WRITTEN STATEMENT SUBMITTED BY RESIDENT BROWN.
>
> In the summer of 1980, Eugene Perry called me at my grandmother's house and told me that I had to meet him or else. I went and we stayed in various places—came to Arkansas—stayed at the Oaks Campground. One day he told me that we were going shopping—we went into a grocery store, a drug store, and a jewelry store. He told me he wanted to replace a ring of mine that he had sold. We went into the store and looked at a few rings. I didn't get one. We left there and went to Beaver Lake in Northwest Arkansas—camped by two other couples—they helped

us set up, etc. One couple left. Gene and Ricky talked a lot by themselves—they left, and were gone about three (3) days. When they came back they had a lot of jewelry. At this point I knew *something*—that they had stolen this—but I did not know where or that they had killed anyone—until later—like years later. We left—went to Georgia and Florida. In Florida is where I got away from Gene—I went to Texas, was arrested in California. END OF STATEMENT.

The Court also notes that Ms. Brown lists "Lorili" as one of her aliases on the Admission Summary.

The criminal "rap sheet" on Ms. Brown shows that she was arrested in Gadsden, Alabama, on October 12, 1979, for the possession of controlled substances. She was arrested on May 2, 1980, in Atlanta, Georgia for conspiring to distribute cocaine and conspiracy to sell cocaine. She was convicted of the latter crime and sentenced to 36 months probation.

Ms. Brown was arrested on November 5, 1982, by the Sheriff's Office in Fayetteville, Georgia, and charged with two counts of murder and armed robbery in connection with the deaths of Ms. Barbara Price and her twelve year old son, Charles Allen Price, on August 25, 1980, at the Campers Paradise Campground, near Tyrone, Georgia. These charges were apparently disposed of in the same way the Arkansas charges against her had been handled: she pled to a charge of Theft by Receiving Stolen Property and was sentenced on April 13, 1983, to ten years imprisonment. She was paroled to the Crawford County, Arkansas, detainer in August, 1984. Finally, Ms. Brown was paroled from the Arkansas Department of Corrections on November 28, 1988. As pointed out elsewhere, efforts to locate her in connection with this habeas proceeding have been unsuccessful.

The Court has been given a copy of a report made by the Georgia Woman's Correctional Institution at the time Ms. Brown was imprisoned there in 1983. That report contains, inter alia, the following:

*Criminal History:* Ms. Brown states she is here on her first incarceration. She was convicted of Theft by Receiving Stolen Property and has received a 10 year sentence. Ms. Brown states she became involved with a man named Gene Perry who conned her into loving him. She states she later discovered he was a murderer, robber and big time drug dealer but she was too afraid for her life to leave him. She states the law was after Perry in a big way and convicted her to get to him. She states her offense involves accepting $200 from Perry which the police determined had been stolen. She feels she was railroaded. Perry is currently on death row in Arkansas. Cindy states she was extradited from California to face these charges for conspiracy to transport, sell and distribute Cocaine for which she admits her guilt. She states prior to this arrest she was in the process of selling 3½ pounds of Cocaine for $40,000. She states her current offense is a reduction of an original murder/armed robbery charge. She states she also has a past drug possession offense in Alabama. Her current Earned Release date is March 13, 1988 and her parole consideration date is March, 1986.

\* \* \* \* \* \*

*Drug/Alcohol Abuse:* Ms. Brown states she began smoking pot when she was 13. She graduated to Quaaludes, Cocaine, Morphine, THC, MDA and Dilaudid. She states she is a narcotic addict and had a $2,000 per week habit. She states Cocaine, Quaaludes and Valium are her favorite drugs and she has overdosed twice on Coke. She states "I don't know if I can live drug free." She states she drank alcohol on a daily basis and is probably an alcoholic. She stated "If I had a drink right now I'd take it," "I prefer liquor to drugs." She states she drinks all kinds of booze including golden grain alcohol by the pitcher full. She is interest in the Drug Abuse Program.

The FBI reports contain references to other statements of Cindy Sue Brown made to FBI agents. For instance in an interview on October 13, 1982, we find this report:

Brown indicated that she was aware of the fact that she was being sought by the Federal Bureau of Investigation (FBI) in conjunction with her probation violation status. She expressed great surprise when told that she was a suspect in an armed robbery and murder case in the State of Georgia. When told that the murder and armed robbery charges stemmed from the killing of a woman and her 12 year old son, she indicated that she knew the crime that was being referred to but declined any involvement. She stated that these crimes had been committed by her former boyfriend, Eugene Perry, a white male, approximately 36 years old, who is currently in the Arkansas State Penitentiary facing the death penalty for similar crimes in the State of Arkansas. She stated that she had nothing to do with these crimes and additionally, that Perry had forced her at a previous time to plead guilty to cocaine charges which had resulted in her current probation violators status. She indicated that she had kept her mouth shut too long and that all of her problems stemmed from supporting Perry and not cooperating with the authorities.

And on October 14, 1982:

Brown was asked how familiar she was with the activities of Eugene Perry during a five month period that he lived in a trailer park managed by a Mrs. Price. This trailer park was located within 20 to 30 minutes of Atlanta, Georgia. Brown stated that she did not live with Perry at this trailer park but had visited him there on several occasions. Brown was asked how familiar she was with Mrs. Price and her son at which point Brown stated that she did not know them. Brown was told that information developed during the course of a homicide investigation indicated that she had known the Prices and had been in their trailer on several occasions and had been socially active with them. At this point, Brown stated that she no longer desired to be interviewed and declined to make any further statements until she contacted an attorney.

In this connection the Court also notes the FBI report of January 6, 1981, advising of an

interview with Mrs. Sue Brooks, Cindy Sue Brown's grandmother:

> She also stated that the murdered victim in Fayette County called her several times looking for Perry and she knew Perry before he killed her and her twelve year old son.
>
> \* \* \* \* \* \*
>
> Cindy also has "drug connections" in Cobb County, Georgia, and on Stewart Avenue, Atlanta, Georgia. She has been with Perry for approximately two years and Perry's ex-wife Glenda Perry, Anniston, Alabama, has also been in telephonic with Brooks.

An FBI report dated December 9, 1981, concluded by stating that Brown "has bragged to friends and associates she has been involved in seventeen murders."

It is obvious that Ms. Brown has severe credibility problems. But her recorded statements concerning Mr. Perry's involvement in the Van Buren, Arkansas, crimes are in keeping with the other credible evidence in this case. It is equally clear to the Court that her statements miss-state and minimize her roles in crimes in which both she and Mr. Perry were involved. But most importantly here is the corroboration, if any be needed, that she was the "Lorili Peterson" and that Mr. Perry was the "Damon Peterson" who met Mr. Anderson and Ms. Ginn at he campground on Beaver Creek and that the four of them, after the robbery and murders went on to Georgia and then to Florida.

When Ms. Brown was up for parole in January, 1986, Mr. Ron Fields, who prosecuted both Perry, Anderson, and Ms. Brown wrote to the Administrator of Probation and Parole. His summary of the evidence as to Ms. Brown's involvement is important:

> Cindy Brown is charged with Conspiracy to Commit Robbery. The charge she pled to involved her coming to Van Buren, Arkansas in September of 1980 along with Eugene Wallace Perry (an inmate currently on death row). Brown and Perry went to the Staton's Jewelry Store located in Van Buren and examined several items of jewelry. Several days later Eugene Wallace Perry returned to the store in the company of Richard Anderson (also an inmate of the Department of Correction serving life) and proceeded to bind and gag Kenneth Staton, the owner (a man who for many years had been confined to a wheel chair and crutches) and Susan Ware, his daughter. The victims were bound hand and foot and then both were shot twice in the head with a .22 pistol with a silencer. The amount of loss to Staton's Jewelry in property exceeded $100,000.00. In addition to the general merchandise of the store that was taken, the robbers and murderers also removed the wedding ring of Kenneth Staton, and the personal jewelry of Susan Ware. This fact became of vital importance later in the prosecution as it was the positively identified personal jewelry that was used to great effect in convicting Eugene Wallace Perry.
>
> According to the police investigation and the testimony of Richard Anderson and another young female who was with Cindy Brown at the times referred to, Perry and Anderson then went to the location where Cindy Brown was and examined the jewelry. Cindy Brown asked Perry where the diamond ring was that the woman who waited on them during their earlier casing of the jewelry store was wearing. She was told that the woman was not on duty at the time of the robbery and murders. That woman in fact was Ruth Staton, the wife of Kenneth Staton and mother of Susan who had left the store prior to the robbery and murders. Cindy also asked Anderson how he liked working with Perry, a person who she had known for a substantial period of time. Two weeks prior to the Staton Jewelry murders, Perry had murdered a young woman and her ten-year old son with the same MO and same weapon. For her participation in that crime, Cindy Brown was sentenced to the Penitentiary in Georgia prior to her return to the Arkansas Judicial System.

Mr. Field then made the following request of the Parole Board:

> Although Cindy Brown I am certain makes a good appearance in person, I would hope the Parole Board would take into consider-

ation the string of violent crimes and homicides that she has become involved in.

He then concluded:

In the eleven years that I have been in this office, I don't believe I have ever met any other woman who was capable of carrying out the actions that Cindy Brown has in her short life.

*REVEALING COMMENT*

When the prosecutors and police were questioning Perry, they told him of some of the evidence they had against him. The following colloquy insured:

BALL: We've got people that's put you and Rick and two girls at Horseshoe Bend . . .

PERRY: But who actually did what he says I did?

FIELDS: Well do you know? If you do, tell us. That's what we're saying.

PERRY: God damn—I mean—maybe I'm guilty of camping out somewhere but that don't make me a jewelry store robber.

Tr. 146.

Of course, if he is "guilty" of camping out at Horseshoe Bend, everything else falls into place.

*ANDERSON'S CONVICTION OF GEORGIA MURDERS*

In 1982 Mr. Anderson was convicted of the murders of a woman and her twelve year old son, Barbara and Allen Price, at a trailer park at Tyrone, Georgia, a small community near Atlanta. Those murders occurred on August 25, 1980, just two weeks before the Van Buren, Arkansas, murders. Although the Georgia crimes are not before this Court, the evidence in this proceeding has forced the Court to conclude that the Georgia proceedings probably resulted in the conviction of a person who was innocent of those particular crimes. Mr. Anderson, while he admits his role in the Van Buren, Arkansas, crimes, denies he was ever in the Georgia community where the Georgia murders occurred and denies he had any connection whatsoever with those crimes. He claims that he was in Kansas on August 25, 1980—the date of the Georgia murders. This Court, based on all

of the information before it, is almost compelled to credit Mr. Anderson's testimony.

In coming to this conclusion the Court does not wish to suggest that it has any sympathy for Mr. Anderson. The record clearly shows that he has lied under oath about his knowledge before the fact, that Perry was going to kill Mr. Staton and Ms. Ware during the jewelry store robbery. If he had told the truth fully when he testified in his own separate Arkansas trial, he very likely would have received the death penalty. And Mr. Anderson acknowledges his guilt in connection with a homicide that occurred in Canada while he was on the run. (Note: a detainer has been filed against him by the Canadian authorities on a Second Degree Murder charge.) And he has acknowledged other crimes for which he has not been convicted. Too, his acknowledged behavior during the shoot-out in Jacksonville points up his complete indifference to the value of human life. So the Court's statement that an error probably occurred in the Georgia case simply reflects this Court's view of the facts. While the Court concedes the possibility that Anderson was involved in the Georgia murders, the likelihood, in the Court's opinion, ranges from very, very slight to zero.

Anderson's problem is establishing his whereabouts at the time of the Georgia crimes (August 25, 1980). The Court will have more to say about that later. First the court will review some of the investigative reports about the Georgia case.

Although the parties have not been able to produce Cindy Sue Brown to testify in this proceeding, they have produced several FBI reports of interviews with her. In one interview on October 13, 1982, the report states:

When told that the murder and armed robbery stemmed from the killing of a woman and her twelve year old son, she indicated that she knew the crime that was being referred to but declined any involvement. She stated that these crimes had been committed by her former boyfriend, Eugene Perry, a white male, approximately 36 years old, who is currently in the Arkansas State Penitentiary facing the

death penalty for similar crimes in the State of Arkansas.

Ms. Brown pled guilty to her role in the Georgia murders and received a ten year sentence therefor, just as she pled *nolo* to similar charges in Arkansas arising out of the Staton Jewelry Store crimes.

In an interview conducted on October 14, 1982, the FBI report states:

Brown was asked how familiar she was with the activities of Eugene Perry during a five month period that he lived in a trailer park managed by a Mrs. Price.... Brown stated that she did not live with Perry at this trailer park but had visited him there on several occasions.

And an FBI report of December 12, 1980, provides information received from Special Agent Mike Carruthers of the Georgia Bureau of Investigation (GBI) which advises that Anderson and Cindy Sue Brown had been charged with the Georgia murders. That report then goes on to state:

However, the case against Anderson is very weak. Cindy Sue Brown and Perry are responsible for the murders in Fayette County, Georgia. The victim and her son ran a trailer court where Perry and Brown stayed.

In an FBI teletype from Little Rock to Seattle dated January 16, 1981, concerning Anderson, we find the following:

Since the arrest of Perry and Anderson in Jacksonville Beach, Florida, Georgia Bureau of Investigation (GBI) has been able to associate Perry with a double murder and robbery that took place at a campground in Tyrone, Georgia, on August 25, 1980. The GBI feels that Sidney Sue Brown might have been involved with Perry during this incident but probably Anderson was not.

And in an FBI Airtel from Little Rock to Atlanta dated January 6, 1981, there is a report of an interview with Sue Brooks, the maternal grandmother of Cindy Sue Brown. She stated that she had been corresponding with Gene Perry (who was then incarcerated in Florida) concerning her granddaughter. Ms. Brooks' reported that Perry had written to her "that he loved Cindy Sue and she is

getting letters to him through a friend who is believed to be in the Knoxville, Tennessee, area." Ms. Brown went on to say that "the murder victim in Fayette County called her several times looking for Perry and she knew Perry before he killed her and her twelve year old son." The proof, including Mr. Perry's own testimony, makes it clear that Mr. Perry had an extensive relationship with Cindy Sue Brown during the year 1980. There is evidence that they either married or contemplated marriage. According to an FBI Airtel dated January 8, 1981, Perry, while in custody in Jacksonville, Florida, was questioned about Cindy Sue Brown and "stated that she was alive and okay but he declined to say any more." On that occasion he identified a photograph of Cindy Sue Brown. More importantly the Court has found, as Defendant's Exhibit 5 in Anderson's Georgia trial, a report of an FBI interview with Perry that occurred on September 30, 1980, only twenty days after the Arkansas murders. That report which is set forth in its entirety in the section captioned "Testimony of Mr. Perry," *supra*, should be reviewed again at this point.

And Defendants Exhibit 3 in that trial reports on an interview with Anderson that occurred in Van Buren, Arkansas, right after the Arkansas law officers brought him back from Canada after his capture there in January, 1980. The first four paragraphs of that report read as follows:

On Wednesday, January 21, 1981, Special Agent Robert Hardin and Detective Lt. Tommy Nations and Griffin Judicial Circuit District Attorney Johnnie Caldwell, Jr. traveled to Fort Smith, Arkansas, where they were met by Investigator Don Taylor of the Arkansas State Police. Investigator Taylor transported the officers to the Crawford County Sheriff's Department located in Van Buren, Arkansas, where they, along with Sheriff Trellon Ball, interviewed Richard Phillip Anderson, white male, d.o.b. 2/8/57.

Richard Anderson was advised of his Constitutional Rights by Special Agent Robert Hardin and questioned in reference to the robbery/double homicide in Van Buren, Ar-

kansas, and the robbery/double homicide in Fayette County, Georgia.

Anderson told the investigators that he did not have any involvement, whatsoever, in the robbery/double homicide in Georgia, and that the only time he had ever been in Georgia was during the summer of 1980, when he moved from the state of Florida and drove through the state of Georgia, enroute to Kansas. Mr. Anderson told the investigators that the second time he was in Georgia was when he traveled through Georgia in September, 1980, after leaving the state of Arkansas and on his way to the state of Florida.

Anderson told the investigators that he first met Eugene Perry and Cindy Brown at Beaver Lake Campground in Arkansas in September, 1980, while he was traveling with a white female, Shantina Ginn. Anderson told the investigators he was camping at Beaver Lake Campground in Arkansas with a white male, first name Pete, and a red-haired female, name unknown. Anderson said that Pete and the unknown female were letting him and Shantina Ginn stay with them in their International Travel–All camper. Anderson told the investigators that he had an argument with the subject, Pete. Anderson told the investigators that he was preparing his motorcycle to leave when Eugene Perry, who was camping next to Pete and the red-haired female, Anderson and Shantina, spoke up and told Anderson that he (Perry) and Cindy Brown had plenty of room in their camper, and that he and Shantina were welcome to camp with them. Anderson told the investigators that Perry asked him if he was interested in making some money—that he (Perry) had a scheme in which they could make some money. Anderson told the investigators that his actual involvement in the robbery/double homicide in Van Buren, Arkansas was that he tied and gagged the victims. Anderson told the investigators that he carried in a .38 caliber revolver; however, he did not shoot either of the victims.

The Court notes that Cindy Brown was convicted in Georgia of drug related charges in which Perry was also involved and, as pointed out above, was also convicted of criminal conspiracy as a result of her involvement in the Arkansas crimes for which both Anderson and Perry have been convicted. Mr. Perry has not been tried for the Georgia offenses.

The Court notes the following language from the opinion of the Supreme Court of Georgia when dealing with Mr. Anderson's appeal:

Richard P. Anderson appeals his conviction of two counts of malice murder and one count of armed robbery for which he was sentenced to two consecutive terms of life imprisonment and a consecutive 20–years' imprisonment. We affirm.

The crimes were committed on August 25, 1980. Anderson was convicted and sentenced on April 8, 1982.

\* \* \* \* \* \*

the victims were the manager of a trailer park and her 12–year–old son—Barbara and Allen Price. When the manager did not bring the weekly rental receipts to the owner on time, a search was conducted, during which the victims' bodies were found in their trailer. They had been bound with hemp rope, gagged, and shot by a .22–caliber pistol through cloth materials and a homemade silencer—to muffle the sounds. They died of gunshot wounds to their heads. Anderson had been observed riding through the trailer park on his motorcycle. The trailer had been ransacked, and cash boxes were found lying in and near the manager's motor vehicle. Approximately $1,000 was missing from the week's receipts. A report of a similar crime was received from Arkansas. The Arkansas victims had been tied, gagged, robbed, and shot in an almost identical manner, having been shot through folded fabric by a .22–caliber pistol with a homemade silencer. A similar crime was reported in Florida. When the Florida crime was committed, Wallace Perry, another suspect in the Georgia murders, was in custody, but Anderson had been released on bond and had fled the state. When Anderson was arrested in Canada, he had in his briefcase a piece of metal

tubing suitable for a homemade silencer, pieces of terry cloth suitable for gags, and some hemp rope. He denied to investigating officers that he had participated in the Georgia crimes, but admitted the Arkansas crimes, saying that he committed them with the other suspect, Wallace Perry. He admitted to the investigator his use in Arkansas of a weapon with a silencer, and a bedspread. He admitted having bound the Arkansas victims "the way he always tied the knots." He also admitted that he and Perry committed the Florida crime. Ballistics testimony indicated that the same weapon was used to commit the Arkansas and Georgia crimes. Testimony indicated that the appellant could have travelled the distances between the scenes of the crimes on his motorcycle during the time intervals between the crimes.

\* \* \* \* \* \*

The trial court did not err, as urged in enumerated errors 6, 17, 18 and 19, in admitting evidence of independent crimes which occurred before the crimes in the present case. Some of this evidence was corroborative of the appellant's own voluntary statement, and all of it was admissible to show motive, intent, bent of mind, etc. See *Lobdell v. State*, 256, Ga. 769, 771(1), 353 S.E.2d 799 (1987) and cits.

\* \* \* \* \* \*

There was no error, as contended in enumerated error 8, in denying the appellant's motion to suppress his in-custody statement, where he was given the opportunity to attack the voluntariness and admissibility of his statement at the proper time in a Jackson v. Denno hearing. *Jarrell v. State*, 234 Ga. 410(3), 216 S.E.2d 258 (1975). In the absence of any evidence that the finding in said hearing that the statement was voluntary was clearly erroneous, we will not look behind the finding of the trial judge. James v. State, 257 Ga. 62(3), 355 S.E.2d 60 (1987) and cits.

\* \* \* \* \* \*

Enumerated error 10 is the denial of the appellant's motion to suppress the identification testimony of several specified persons. Some of these persons did not testify at the trial. As to those who were witnesses, there is no showing that the pre-trial photographic displays were impermissibly suggestive, or that the in-court identifications were unreliable under the totality of the circumstances. See *Hamilton v. State*, 255 Ga. 468(1), 339 S.E.2d 707 (1986).

\* \* \* \* \* \*

We have reviewed all the evidence in light of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and find in the light most favorable to the jury's verdict that a rational trier of fact could have found Anderson guilty of armed robbery and two counts of malice murder beyond a reasonable doubt.

Judgment affirmed.

While it is easy to see how the Georgia jury, with the evidence of the very similar Arkansas crime (which Anderson admitted) before it (including the use of the same murder weapon), arrived at its guilty verdict, the evidence in this habeas proceeding strongly indicates that Anderson met Perry for the first time at Beaver Lake near Rogers, Arkansas around September 6, 1980, and that Anderson had been in Kansas at the time of the Georgia murders.

During the hearings in this case an effort was made to determine the whereabouts of Mr. Richard Anderson during 1980 and particularly during the month of August, 1980.

Mr. Anderson was divorced in the first part of 1980 and sold his "escort" business in Fort Lauderdale, Florida at that time. Then he rented a U–Haul and moved to Kansas City, Missouri, where he lived briefly at the Diplomat Apartments in the Riverside area. He again tried to set up an escort service and took ads in the Kansas City newspaper for that purpose. This was in the late spring or early summer of 1980. He states that he rented the Kansas City apartment for a couple of months and then he was "invited" by the local police authorities to leave town. After moving out of the Kansas City apartments he moved in briefly with a friend, Mr. Tom Payne, in Topeka, Kansas, with whom he stayed for a week or two.

Mr. Anderson then states that he attended a motorcycle rally in Sturgis, South Dakota in the first week of August. At that time he had an old "51 pan head Harly Davidson." He had trouble with the motorcycle on his way back from Sturgis. He states that his brother wired money to him in Sturgis. He believes the amount was $100.00, part of which he used for parts to fix his motorcycle.

On the way back from Sturgis he came through Nebraska and stopped at Salina, Kansas. He was again short of money and his bike was leaking oil.

As stated above, the Georgia murders occurred on August 25, 1980. Mr. Anderson states that he believes that it was around that date that he went to the Salvation Army in Salina and that they fixed him up with oil and gas and fed him. He states that he has been told that there is some record of this occurrence in Salina, Kansas, but he has not be able to obtain it.

Mr. Anderson states that the trip from Topeka to Sturgis, South Dakota is close to 800 miles in distance and that he spent two days on the road going and two days coming back. When he got back to Topeka he states that he stayed with his sister until he met up with Ms. Chantina Ginn.

There is documentary evidence that Mr. Anderson was in Topeka, Kansas, on August 27, 1980. Respondent's Exhibit 13 is an application to work for a McDonald's restaurant in Topeka. It is in his handwriting and is signed by him. Respondent's 14 is a pawn ticket which Mr. Anderson signed. He testified that he pawned his .38 revolver on that date in order to get clothes so that he could work at McDonald's. Respondent's 15 are check stubs dated August 26, 1980 with respect to work he performed for his brother's business, Topeka Storage Pool.

In a further effort to establish that he was in Kansas, Mr. Anderson testified that he went to a bikers' party in Pomona, Kansas which is south of Topeka. He picked up a girl and got V.D. from her (gonorrhea). As a consequence he went to a clinic a few days later for a treatment. He states that the biker party was a "big deal" for which there should be some historical record.

It appears that Mr. Anderson met Ms. Ginn around August 29. They spent at least one night with his sister before going on to Olathe, Kansas. Suffice it to say that Mr. Anderson has yet to produce the "smoking gun" which would unequivocally establish his location in Kansas at the time of the murders on August 25, 1980. Nevertheless, the existing evidence, as will be detailed elsewhere herein, does strongly support Mr. Anderson in this regard.

Of course, the testimony of Ms. Cindy Sue Brown, if she could be found, would be very important. Her statements fix responsibility for the Georgia murders on Perry and corroborate Anderson's statement that he first met Perry and Ms. Brown in Arkansas on September 6, 1980.

The Court does not credit at all Mr. Perry's testimony that he had met Richard Anderson in Alabama before September of 1980 and that he rented or sold to him and a "Damon Peterson" the camper and an automobile on August 30, 1980. This is discussed at greater length elsewhere herein. And Perry's statement of September 30, 1980, to the FBI states, "Perry said that Anderson had never been to Campers' Paradise."

But the Georgia transcript contains the strongest and most detailed proof, and offers of proof, relating to Anderson's whereabouts in late August, 1980, including many items of documentary evidence, some received and some not, and much testimony supporting Anderson's contention that he was in Kansas during the entire month of August, 1980, and, more particularly, on August 25, 1980. There was evidence placing Anderson in Kansas on August 19, August 21, and August 22. And there was evidence Anderson tried to return a battery at a bike shop "World of Wheels" on August 26 which he had bought on August 25. Indeed, there was considerable testimony placing Anderson in Kansas in the August 24 to August 28 period. And, of course, Chantina Ginn's testimony accounted for Anderson's whereabouts from August 29 or August 31 until September 23, 1980.

Mr. Anderson's attorney in closing argument stated it would take 34 hours to drive from Topeka, Kansas, to Atlanta Georgia,

and back. He argued it would have been "virtually impossible" for Anderson to have been in Kansas at the times established by the evidence and also in Campers' Paradise on August 25, 1980. The prosecutor's response [33] is as follows:

I submit to you, with eleven hundred dollars in his pocket or some money, goes by the Salvation Army, gets him a free meal and gets him some gas for his vehicle, and drives to Georgia, and in the minute that after this armed robbery and murder is pulled with his companion and friend, Damon Malantino, also known as Wallace Eugene Perry, he flies back to Arkansas, puts his gun back in hock, this 38, and, boy, then we get busy with people that seen us. We get extremely busy.

\* \* \* \* \* \*

The truck driver told you, I've driven up there from fifteen to seventeen hours, including the stops, driving an eighteen-wheel truck, pulling a full loan [load], and I think that I can leave here at one o'clock in the morning, you are going to gain an hour, of course, when you cross the line, but that truck can make it in sixteen or seventeen, pulling a full load and four and eighteen wheels, and having to stop when they do, that I can drive a motorcycle over that same road, that same distance, and leave here at one o'clock, surely 1:15, 1:30 even, possibly even two o'clock, and I sure as the dickens can be in Topeka, Kansas by six that afternoon. I think I can. It shore runs faster. It shore isn't hauling the same load. Doesn't have to make as many stops. Shore hasn't got as many wheels, and going through the towns, they shore do get through the traffic quicker, so let's. let's don't talk about that. Let's talk something about thirty-four, and thirty-five hours, and see if we can get you off on something else.

\* \* \* \* \* \*

The 26th is out of the picture anyway. He's got on that motorcycle at 12:30 or one o'clock, in the morning, and you can be back out yonder. Ain't no problem to be out there on the 26th and you leave at one o'clock on the a.m. on the 25th. Ain't no if's, and's and but's about it. Even if that's true.

Tr. 1237, 1238, 1264.

Eye-witness testimony has been criticized as being very unreliable. However, from the Court's experience the reliability of such testimony depends on a combination of factors: the age, intelligence, and maturity of the eye-witness; the opportunity and the motive of the witness to observe, including the length, the number and the "focus" of the observations; the eyesight and the perception skills of the witness; the lighting and the distance involved; the time between the observations and the testimony; and the witness's memory and ability to recall. In this proceeding the Court contrasts the identification testimony or statements of Ms. Etier, Ms. Ginn, Ms. Staton–Morrison, Ms. Cindy Sue Brown, and Mr. Anderson with that of some of the witnesses who had brief glimpses of, or encounters with, persons they believed might have been involved in the Staton/Ware murders. It also contrasts the strong and reliable eye-witness testimony of Ms. Etier and Ms. Ginn with the "eye-witness" testimony used against Mr. Anderson in the Georgia trial.

What is the effect on this habeas proceeding if the Court is wrong in its conclusion that Anderson is probably innocent of any involvement in the August 25, 1980, Georgia murders? The overall effect would, strangely, in the light of the other evidence, reinforce the conviction that it was Perry who accompanied Anderson into the Staton Jewelry Store in Van Buren, Arkansas, on that fateful day of September 10, 1980.

Perry was clearly the chief suspect in the Georgia murders. And the involvement of his long time girl friend and associate in crime, Ms. Cindy Sue Brown, is confirmed by her guilty plea in Georgia. By the time of Anderson's Georgia trial in 1982, both Perry and Anderson had been convicted in separate Arkansas trials of the murders of Mr. Staton

---

**33.** In this case the prosecutor waived opening argument. Therefore, the defense argued first and then the prosecutor put on its *entire* argument, not just rebuttal. The Court was unaware of the existence of such a practice in criminal cases.

and Ms. Ware. But, whereas Perry received the death penalty, Anderson was only sentenced to life imprisonment. The Court surmises that Georgia proceeded against Anderson in an attempt to obtain the death penalty and that it chose not to proceed against Perry because he did get the death penalty. There is absolutely nothing to suggest that the Georgia authorities were not convinced of Perry's guilt.[34]

If Perry were retried for the Arkansas murders the state could urge the introduction of evidence of the very similar Georgia murders two weeks earlier involving both Perry and Anderson as additional proof that "Damon Peterson" was, indeed, Perry and that Perry and Anderson continued their crime spree by carrying out the "copy-cat" murders in Arkansas.

The problem is: The credible evidence in this case overwhelmingly supports Ms. Ginn's and Mr. Anderson's testimony that they met Perry and Cindy Sue Brown for the first time on September 6, 1980.

If Anderson and Perry and Cindy Sue Brown had been involved in the Georgia murders, a strange scenario must follow. Clearly Anderson was in Kansas the last few days of August, 1980. If he had been involved with Perry in the Georgia murders he would have had to leave immediately thereafter for Kansas. And at some point before September 6, 1980, the two of them would have had to agree to rendezvous at the Horseshoe Bend Campground on Beaver Lake. And somehow it would have had to be communicated that Anderson would be bringing Ms. Ginn and that Perry and Ms. Brown did not want Ms. Ginn to learn their true names and that the three of them would agree to do or say nothing that would suggest to Ms. Ginn that Anderson had ever seen or known Perry or Brown before. And this charade would have had to be carried on successfully from September 6, 1980, until September 19, 1980.

Such a weird scenario raises another question: why would Anderson use his own name throughout and why would he bring an assumed "weak-link," Ms. Ginn, into such a serious criminal enterprise in the first place.

Conclusion: Anderson almost certainly was not involved in the August 25, 1980, Georgia murders, but, even if he were, that circumstance is of no benefit to Mr. Perry in this proceeding.

## CONCLUSION

An immense amount of judicial and litigant resources have gone into the resolution of the issues in this, Mr. Perry's "second go-around" habeas. When one considers that the entire proceeding has been occasioned by unsworn statements made by a man who is condemned to death himself, a man who has confessed to, and been convicted of, murders and other crimes in Mississippi, Arkansas and Colorado, it is legitimate to ask, why? Why was it necessary to spend all of that time and effort to finally arrive at the same conclusion that most people would reach without any study or analysis? After all, Mr. Pruett, already condemned to death, has nothing to lose by "confessing" to the crimes for which Mr. Perry was convicted. And Pruett refuses to even take the stand and submit his statements to cross-examination. What is going on here?

The answer is clear: The law puts up barriers to the execution of an innocent person, even after that person has been convicted in a fair trial in which his/her constitutional rights have been fully protected. The law recognizes that the system can fail and, on rare occasions, does fail.[35] In the context of the issues here, where Perry claims that Pruett's "confessions" show that he (Perry) is actually innocent of the crime for which he has been convicted and sentenced to death, the law requires a judicial process which is adequate to assess the validity of the new

---

**34.** Although the state did not charge a conspiracy in any of its indictments, that was, indeed, its theory. The Georgia trial court instructed the jury, *inter alia*, as follows:

> In this case, or in these cases, the State contends that Richard Anderson, the Defendant on trial, together with one Wallace Eugene Perry,

entered into a conspiracy to rob and murder Barbara Price, and did enter into a conspiracy to Murder Allen Price.

**35.** If this Court is correct in its judgment, the conviction of Mr. Anderson of the two murders in Georgia may be an example of such a failure.

"confession." The Court has taken this obligation seriously.

Now, after a full and careful review of the evidence and the other submission of the parties, the Court finds and concludes that there is no likelihood of Mr. Perry's being innocent of the capital murders of Mr. Staton and Ms. Ware of which he stands convicted. Mr. Perry's petition for habeas corpus relief will be denied.

## ORDER

EISELE, District Judge.

On February 10, 1995, the petitioner filed a "Motion to Amend Successor Petition for Writ of Habeas Corpus," pursuant to F.R.C.P. 15(b) and attaching thereto a copy of his proposed amendment. The amendment would add "the additional basis of failure to disclose exculpatory evidence to trial counsel ... and ineffective assistance of trial counsel." The respondent vigorously opposes the motion pointing out, *inter alia*, that Mr. Perry's original habeas petition was filed in 1983 and disposed of in 1986 and his successor petition was filed in 1990 and heard in 1992.

The Court has conducted this second habeas proceeding solely because of Mr. Perry's claim of actual innocence based upon the unsworn statements of Mr. Pruett. The Court has concluded that there is no merit to Mr. Perry's claim of actual innocence and is, therefore, dismissing his successor petition. Given the Court's ruling the Court knows of no legitimate basis for permitting the amendment of Mr. Perry's 1990 successor petition at this late date, as the procedural "gateway" which would allow the Court to address the merits of these constitutional claims is now closed. See *Schlup v. Delo,* —— U.S. ——, ——–——, 115 S.Ct. 851, 860–67, 130 L.Ed.2d 808 (1995); *Herrera v. Collins,* 506 U.S. ——, ——, 113 S.Ct. 853, 867, 122 L.Ed.2d 203 (1993).

IT IS THEREFORE ORDERED that the petitioner's Motion to Amend be, and it is hereby denied.

## JUDGMENT

On the basis of the findings of fact and conclusions of law stated in the Memorandum Opinion of even date herewith,

IT IS THEREFORE CONSIDERED, ORDERED AND ADJUDGED that the Supplemental Petition for Writ of Habeas Corpus filed by the petitioner on January 17, 1990, be, and the same is hereby dismissed.